1   MUNGER, TOLLES & OLSON LLP
    HENRY WEISSMANN (SBN 132418)
2   Henry.Weissmann@mto.com
    BRAD SCHNEIDER (SBN 235296)
3   Bradley.Schneider@mto.com
    355 S. Grand Avenue, Suite 3500
4   Los Angeles, California 90071-1560
    Telephone: 213 683-9100
5   Facsimile: 213 687-3702
6
7   MACKENZIE & ALBRITTON LLP
    JAMES A. HEARD (SBN 114940)
8   jheard@mallp.com
    One Post Street, Suite 500
9   San Francisco, California  94104
    Telephone:  (415) 288-4000
10  Facsimile:  (415) 288 4010
11
12  Attorneys for Plaintiff GTE Mobilnet of California
    Limited Partnership, a California limited partnership
13  d/b/a Verizon Wireless

**SBA**

**C  07  4034 1**

14              UNITED STATES DISTRICT COURT
15            NORTHERN DISTRICT OF CALIFORNIA
                    OAKLAND DIVISION
16

| | |
|---|---|
| 17  GTE MOBILNET OF CALIFORNIA LIMITED PARTNERSHIP, a California limited partnership d/b/a VERIZON WIRELESS, | CASE NO. |
| 18 | **COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTION; REQUEST FOR EXPEDITED REVIEW UNDER 47 U.S.C. § 332(c)(7)(B)(v)** |
| 19              Plaintiff, | |
| 20        vs. | |
| 21  CITY OF BERKELEY, | |
| 22              Defendant. | |

23
24
25
26
27
28

Plaintiff GTE Mobilnet of California Limited Partnership, a California limited partnership, doing business as Verizon Wireless, complains against defendant the City of Berkeley (the "City"), and alleges as follows:

## INTRODUCTION

1.      Plaintiff is the local affiliate of a national wireless telephone carrier that provides wireless telecommunications services to customers throughout the nation. Plaintiff provides telecommunication services within the City of Berkeley. The City has violated Plaintiff's rights under the United States Constitution and the federal Communications Act (the "Act"), by enacting and enforcing its Wireless Telecommunication Facilities Ordinance, codified in Chapter 23C.17 of the Berkeley Zoning Code (the "Ordinance"). *See* attached Ex. A. The Ordinance unlawfully restricts Plaintiff's ability to install or modify its wireless facilities.

2.      To promote the rapid deployment of advanced wireless communications technology and to stimulate competition, the Act expressly preempts local regulations that may prohibit or have the effect of prohibiting the ability of any entity from providing telecommunications service. *See* 47 U.S.C. § 253. Under controlling Ninth Circuit authority, local laws that require telecommunications carriers to obtain a permit or similar authorization as a condition of installing facilities required to provide service are preempted by the Act if they vest broad discretion in local government officials to deny, revoke, or impose conditions on a permit; subject applicants to a burdensome application process; or impose substantial costs on carriers seeking to provide service.

3.      The Ordinance contains all of these unlawful features. It establishes a costly and burdensome permitting scheme that is specifically and exclusively directed at the placement, construction, and modification of wireless facilities. The Ordinance gives the City broad discretion to deny, revoke or impose conditions on a permit, including unfettered discretion to determine that a proposed wireless communications facility is not "necessary" to provide service in the City. These and

1    other provisions of the Ordinance are preempted by the Act because they "may prohibit or have the

2    effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications

3    service." 47 U.S.C. § 253(a).

4         4.    The City's Ordinance has effectively prohibited Plaintiff from improving its network in

5    the City.  As a result, Plaintiff has suffered irreparable injury due to the impairment of its ability to use

6    its federally licensed radio spectrum and the consequent loss of goodwill and adverse impact on its

7    competitive position.  This injury will continue unless and until the City's unlawful Ordinance has been

8    enjoined.  Accordingly, this Court should declare that the Ordinance is preempted by the Act and invalid

9

10   under the Supremacy Clause and should enjoin the City from enforcing its provisions.

11        5.    The burdens imposed under the Ordinance are illustrated by the City's prolonged and

12

13   unlawful delay in processing three of Plaintiff's conditional use permit ("CUP") applications to install

14   wireless communications facilities.  Plaintiff filed these applications between 2003 and 2005, and the

15   City has taken no formal action at all on two of them and no final action on any of them.  By its

16

17   prolonged and unjustified delay, the City has violated 47 U.S.C. § 332(c)(7)(B)(ii), which requires the

18   City to act upon Plaintiff's applications within a reasonable period of time.  As redress for this

19   unreasonable delay, Plaintiff seeks declaratory and injunctive relief, as well as expedited judicial review

20   of these claims as provided in Section 332(c)(7)(B)(v) of the Act.

21                              **JURISDICTION AND VENUE**

22        6.    This case arises under the Constitution and laws of the United States, including the

23

24   Supremacy Clause, U.S. Const. Article VI, Clause 2; and the federal Communications Act, 47 U.S.C. §§

25   151, *et seq.*

26        7.    The Court has subject-matter jurisdiction over this action under 28 U.S.C. §§ 1331 and

27   1337.  The Court's authority to grant declaratory relief is founded upon 28 U.S.C. §§ 2201 and 2202.

28

8.      Venue is proper in this Court under 28 U.S.C. § 1391(b), because Defendant resides in this District and the acts or omissions giving rise to this action occurred in this District.

### THE PARTIES

9.      Plaintiff GTE Mobilnet of California Limited Partnership, doing business as Verizon Wireless, is the local affiliate of a nation-wide provider of wireless telecommunications services.

10.     Plaintiff maintains an office in Walnut Creek, California.  Plaintiff is, and at all times mentioned herein was, qualified to do business in California.

11.     Plaintiff is a "communications common carrier" and a "telecommunications carrier" that provides "personal wireless services," as those terms are defined and used in the Act, the Telecommunications Act of 1996 ("TCA"), and rules, regulations and orders promulgated by the Federal Communications Commission (the "FCC") pursuant to this statutory scheme.

12.     Plaintiff is licensed by the FCC to provide personal wireless service within the City of Berkeley.  Plaintiff's affiliated entities hold licenses from the FCC to provide personal wireless services throughout the United States

13.     Defendant City of Berkeley is a municipal corporation duly constituted under the Constitution and laws of the State of California.

## II.     BACKGROUND

### A.     The Development of Wireless Services

14.     Congress promoted unprecedented growth in wireless service over the last decade by preempting burdensome state and local regulation of this highly dynamic and competitive industry.  As a consequence, new wireless services have been deployed widely to the great benefit of consumers throughout the nation.  Between June 1985 and June 2006, the number of U.S. cellular subscribers increased from 203,600 to 219.4 million, more than a thousand-fold increase.

15.    This growth has been fueled by an extremely competitive wireless industry, which has resulted in better service and lower prices.  For example, the index of cellular prices as tracked by the Bureau of Labor Statistics has fallen by almost thirty-four percent from 1997 to 2006, even as the consumer price index for the economy as a whole rose almost eighteen percent over the same period.

16.    The successful development of wireless service, which has produced enormous benefits for consumers, is the direct result of federal policies designed to ensure that carriers can freely enter markets.  In particular, Congress has expressly restricted the authority of local governments to impede the ability of telecommunications carriers in general, and wireless carriers in particular, to build and deploy networks to serve their customers.

**B.    Cellular Technology**

17.    Mobile telephones work by transmitting a radio signal to antennas mounted on a pole, building, or other structure.  The antenna feeds the signal to electronic equipment housed in a small equipment shelter or cabinet, also referred to as a base station.  The base station is connected by fiber optic cable, ordinary telephone wire, or microwave to a local telephone network and then to a switch, through which calls can be routed to other communications networks.  The combination of a base station and its associated antennas is commonly referred to as a "cell site."

18.    To provide continuous service to a wireless telephone user, coverage from the carrier's cell sites must overlap in a grid pattern resembling a honeycomb.  Each section of the grid or honeycomb corresponds to the coverage area of a single cell site.  In the event that a carrier is unable to construct a sufficient number of cell sites within a specific geographic area, it will not be able to provide uninterrupted service to the consumers within that area.  If a given area has an insufficient number of cell sites, customers in that area will suffer an unacceptable level of dropped calls, poor signal quality, and network access problems.

19.    Even where there are no existing gaps in coverage, wireless carriers must build, modify, and upgrade their networks to meet demand and to keep pace with changing technology. In particular, wireless carriers must install new cell sites to provide service to a growing number of customers and to enable the provision of the next generation of wireless services. Each cell site uses a limited number of radio frequencies that are licensed to the carrier by the FCC. As usage increases, particularly for new data and multi-media services, the licensed radio frequencies available for use by carriers at existing cell sites are exhausted. To meet increasing customer demand while maintaining service quality, carriers must in effect split existing cells by building new ones, which allows them to reuse their licensed radio frequencies in a particular geographic area.

## III.    REGULATORY FRAMEWORK

### A.    Federal Preemption of Local Roadblocks to Competition

20.    With the passage of the TCA, Congress "created a new telecommunications regime designed to foster competition in local telephone markets." *Verizon Maryland, Inc. v. Pub. Service Comm'n of Md.*, 535 U.S. 635, 638 (2002). The express purpose of the TCA is "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." 110 Stat. 56 (1996).

21.    To ensure that its pro-competitive national policy would not be frustrated, Congress enacted several provisions of the Act that protect carriers from unjustified barriers to entry.

### 1.    Section 253: Prohibition On Barriers To Entry

22.    Section 253 of the Act preempts any State or local law that "may prohibit or have the effect of prohibiting the ability of any entity to provide any interstate or intrastate telecommunications

1    service." 47 U.S.C. § 253(a).  Commercial mobile wireless services, like those provided by Plaintiff, are

2    telecommunications services under § 253.

3        23.    Section 253(a) preempts state and local regulations that not only prohibit outright the

4    ability of any entity to provide telecommunications services, but also those that may have the effect of

5    prohibiting the provision of such services.  The preemption analysis under § 253(a) focuses on the

6    challenged regulation itself rather than its actual impact on a telecommunications service.  Accordingly,

7    a telecommunications provider seeking the protection of § 253(a) does not need to make an evidentiary

8    showing that any particular telecommunications service has actually been prohibited.  *See, e.g., Qwest*

9    *Comm. Inc.. v. City of Berkeley*, 433 F.3d 1253, 1256-67 (9th Cir. 2006).

10

11

12        24.    Under controlling Ninth Circuit authority, local ordinances that require

13    telecommunications providers to obtain a permit or similar authorization as a condition of installing

14    facilities required to provide service violate § 253(a) where they vest broad discretion in government

15    officials to deny, revoke, or impose conditions on a permit; subject applicants to burdensome submission

16    requirements; or impose substantial costs on carriers seeking to provide service.  *See Sprint Telephony,*

17    *PCS v. County of San Diego*, __ F.3d __ 2007 WL 1695330 (9th Cir. 2007); *City of Auburn v. Qwest*

18    *Corp.*, 260 F.3d 1160, 1175-76 (9th Cir. 2001).  The prohibitory effect of a challenged ordinance's

19

20    provisions must be considered both individually and in combination.

21            **2.    Section 332(c)(7): Restrictions On Individual Siting Decisions**

22        25.    The TCA also added § 332(c)(7) to the Act, which confers additional protections on

23    wireless carriers beyond those accorded to all telecommunications carriers in § 253(a).  Whereas

24    § 253(a) applies to general municipal policies (including zoning ordinances) that may have the effect of

25    prohibiting any carrier from providing telecommunications services, § 332(c)(7) addresses local

26    decisions on particular applications for permits to install wireless communications facilities.

27

28

26.    Congress enacted § 332(c)(7) because it recognized that state and local governments could frustrate the rapid deployment of a wireless network not only by promulgating burdensome statutes and ordinances that would be subject to preemption under § 253, but also by applying zoning requirements to deny wireless providers the ability to construct essential wireless communications infrastructure. Section 332(c)(7) addresses this problem. While it does not completely preempt local zoning authority, § 332(c)(7) imposes several substantive and procedural limitations on local zoning decisions to ensure that those decisions do not frustrate the Act's pro-competitive goals. Two of these limitations are of particular relevance here.

27.    Section 332(c)(7)(B)(ii) requires that local governments act on permit applications for wireless facilities "within a reasonable period of time." A local government's failure to act on an application within the time required by state or local law is *per se* unreasonable.

28.    Section 332(c)(7)(B)(iv) expressly preempts state and local governments from making individual siting decisions directly or indirectly on the basis of the environmental effects of radio-frequency ("RF") emissions, to the extent that such facilities comply with FCC regulations. The "environmental effects" of RF emissions include perceived health effects.

## IV.    THE CITY'S UNLAWFUL WIRELESS FACILITIES ORDINANCE

### A.    Overview

29.    The City's Ordinance applies "to all wireless telecommunications facilities for personal wireless services on property other than the public right of way in the City of Berkeley." Berkeley Zoning Code ("BZC") § 23C.17.010.

30.    Under the Ordinance, "all new wireless telecommunications facilities shall require the approval of a Use Permit by the Zoning Adjustments Board, with the exception of additions to existing sites in non-residential zoning districts, which shall require the approval of an Administrative Use

Permit." BZC § 23C.17.100(C).  The requirements for obtaining a CUP or Administrative Use Permit

("AUP") are set forth in the City's general zoning ordinance.  *See* BZC § 23B.32 (setting forth criteria

for granting CUP); § 23B.28 (setting forth criteria for granting AUP).

31.     The Ordinance supplements these generally applicable zoning criteria with additional

requirements that apply only to the siting of wireless telecommunications facilities.  As discussed below,

the Ordinance subjects wireless carriers seeking to install or modify wireless communications facilities

in the City to a burdensome, costly, and unduly discretionary permitting process in violation of § 253(a).

**B.     Application Requirements**

32.     To obtain a permit for a wireless telecommunications facility, the Ordinance requires

applicants to submit detailed information regarding the proposed facility.  BZC § 23C.17.040.  These

disclosures are in addition to the submittal requirements for permits under the City's generally

applicable zoning ordinance.  *Id.*

33.     An application must contain "[a] narrative description and map showing the coverage

area of the provider's existing facilities and the specific site that is the subject of the application."  BZC

§ 23C.17.040(A).  The narrative description must include an explanation for why the proposed site "is

considered necessary to accomplish the provider's coverage objectives, and why the proposed site is the

most appropriate location under existing circumstances."  *Id.*  An application must state that the

applicant will provide, "if requested by the City, sufficient information for an approved radio frequency

engineer or licensed electrical engineer specializing in EMF or RFR studies . . . retained by the City to

verify that the site is necessary for the purpose stated in the provider's narrative."  *Id.*

34.     An applicant also must state that, upon request by the City, it "will provide a summary of

the alternatives considered and the reasons why the provider did not consider such alternatives feasible."

*Id.*

35.    Wireless carriers must include with an application "[a] statement agreeing to allow future co-location on the subject property subject to a determination of feasibility and approval of all necessary permits under this chapter." BZC § 23C.17.040(B).  The Ordinance does not specify the terms and conditions of any such future co-location, including whether the applicant is entitled to receive reasonable compensation for allowing shared use of its facility.

36.    An application must contain a statement that, "at the discretion of the Zoning Officer, the applicant will pay the reasonable actual costs and a reasonable administrative fee for hiring" an independent engineer "to evaluate any technical aspect of the proposed telecommunication facility, including, but not limited to, compliance with applicable Federal emission standards, feasibility of co-location, need for proposed location and suitability of alternative sites, potential for interference with existing or planned public safety emergency response telecommunications facilities, or an analysis of feasibility of alternate screening methods or devices." BZC § 23C.17.040(M).  The Ordinance does not set any caps on the amount that an applicant can be charged under this provision.

37.    The Ordinance imposes several other burdensome and unduly discretionary submission requirements, including: (1) an explanation for why co-location is not "feasible," if the facility is not to be co-located (BZC § 23C.17.040(C)); (2) a description of the services that the applicant proposes to offer (BZC § 23C.17.040(D)); (3) "engineering calculations demonstrating that the proposed facility will comply with all applicable FCC requirements and standards" (BZC § 23C.17.040(F)); (4) "[c]opies of all applicable licenses or other approvals required" by the FCC, the California Public Utilities Commission and "any other agency of the Federal or State government with authority to regulate telecommunications facilities including documentation of compliance with all conditions imposed in conjunction with such licenses or approvals" (BZC § 23C.17.040(E)); (5) a "visual impact analysis" and before-and-after photo-simulations of the site (BZC § 23C.17.040(K)); (6) a "[s]ite plan and elevations

drawn to scale" (BZC § 23C.17040(J)); (7) a description of the proposed approach to screening the facility (BZC § 23C.17.040(H)); (8) a description of "the number, type, power rating, frequency ranges, and dimensions of" all the equipment to be installed (BZC § 23C.17.040(L)); and (9) a statement that, prior to installing the facility, the "applicant shall either secure a bond or provide financial assurances, in a form acceptable to the City Manager, for the removal of the facility in the event that its use is abandoned or the approval is otherwise terminated" (BZC § 23C.17.040(N)).

38.    These application requirements are not exhaustive.  The Ordinance provides that the Zoning Officer "may require any other information deemed necessary in order to process the application in compliance with the requirements of this section."  BZC § 23C.17.040(O).  No limit is placed on what and how much additional information the Zoning Officer may require.

## C.    The City's Written But Uncodified Policies

39.    Exploiting its broad discretion under the Ordinance to demand additional, unspecified categories of information from permit applicants, the City has since October 2006 been enforcing a written but uncodified policy – so-called "draft revisions" – that adds to the burdensome submittal requirements set forth in the Ordinance.  This policy mandates that statements of need be "quantified and verifiable"; that applicants submit detailed maps and data regarding both their existing and proposed minutes of use and coverage areas for the proposed facility; and that, at the City's request, applicants provide a "network drive . . . to verify that the submitted data is accurate."  *See* attached Ex. B.

40.    In addition to increasing the Ordinance's already burdensome application requirements, the draft revisions require applicants to make substantial deposits with the City to pay for various third-party engineering review.  First, in order to pay for third party review of the technical aspects of a proposed facility, applicants must make a $5,500 deposit with the City.  *Id.*  Second, the draft revisions provide that applicants must also make a "deposit of $4,500 for preparation of an acoustic report (by

1  City appointed consultant, no third party review required), or deposit $1,000 for third party review of an

2  acoustic report prepared by the applicant," a requirement that is not contemplated by the enacted

3  Ordinance. *Id.*

4
5      **D.    Design Requirements**

6      41.    The Ordinance imposes a host of malleable and subjective design requirements on

7  wireless telecommunications facilities. BZC § 23C.17.070. The Ordinance, for example, provides that

8  "[f]acilities shall be compatible in scale and integrated architecturally with the design of surrounding

9  buildings or the natural setting." BZC § 23C.17.070(B). A wireless facility may not be sited "at a

10 location where it will be in a direct line of sight of a significant or sensitive view corridor, where it

11
12 would adversely affect a scenic vista, or where it would materially impair the significance of an historic

13 resource or unique archeological resource." BZC § 23C.17.70(C). Similarly, the Ordinance provides

14 that "[r]oof-mounted and ground-mounted antennas shall not be placed in direct line of sight of

15 significant or sensitive view corridors or where they adversely affect scenic vistas unless the Zoning

16 Officer or the Zoning Adjustments Board finds that the facility incorporates appropriate, creative stealth

17
18 techniques to camouflage, disguise, and/or blend into the surrounding environment to the extent

19 possible." BZC § 23C.17.70(J).

20     42.    While local governments have a legitimate interest in mitigating the potential aesthetic

21
22 impacts of wireless communications facilities, the Ordinance's open-ended design requirements are not

23 reasonably tailored to accomplish this objective. By vesting the City with the discretion to deny

24 applications based on vague criteria such as whether a facility is "compatible" with its surrounding

25 environment or whether proposed "stealth" technology is sufficiently "creative," the Ordinance fails to

26 limit the City's discretion as required by federal law.

27     **E.    "Feasibility" Determinations**

28

43.    Several substantive requirements under the Ordinance are based on a vague standard of "feasible" or "feasibility." For example: When a proposed facility is not to be co-located, the applicant must show that co-location is "not feasible" (BZC § 23.17.040(C)); when "feasible," providers must co-locate facilities in order to reduce adverse visual impacts (BZC§ 23C.17.050(C)); no freestanding facility may be located within 1000 feet of another freestanding facility unless its visual impact is minimized "to the extent feasible" and co-locating on an existing pole or tower is "not feasible" (BZC § 23C.17.050(D)); when "feasible," an applicant must make unused space on a facility available for future co-location (BZC § 23C.17.050(E)); if a ground-mounted or freestanding tower is proposed, an applicant must explain why other facility types are "not feasible" (BZC § 23C.17.070(A)); at the time of modification or upgrade of a facility, existing equipment must, "to the extent feasible, be replaced with equipment of equal or greater technical capacity and reduced size so as to reduce visual and noise impacts" (BZC § 23.17.070(Q)).

44.    The Ordinance defines "feasible" and "feasibility" expansively as "tak[ing] into account technical feasibility, radio signal transmitting and receiving requirements, aesthetics, electromagnetic fields, costs, landowner permission, facility owner permission, and all necessary approvals under this Chapter and the Uniform Building Code, as well as the common meaning of the term." BZC § 23C.17.040(B). This broad definition fails to impose any meaningful constraints on the City's discretion in making feasibility determinations.

F.    **Action On An Application**

45.    The approval requirements for a permit for a wireless facility are set forth in § 23C.17.100 of the Ordinance. This section provides that, in order to approve an application, the Zoning Adjustment Board ("ZAB") or Zoning Officer "must make the findings required by [Berkeley Zoning Code] Section 23B.32.040 and must also find that the proposed project is consistent with the

general requirements of this chapter and any specific requirements applicable to the proposed facility."

BZC § 23C.17.100(A)(1).

46.    Section 23B.32.040, in turn, requires a finding that a proposed facility "will not be detrimental to the health, safety, peace, morals, comfort or general welfare of persons residing or working in the area or neighborhood of such proposed use or be detrimental or injurious to property and improvements of the adjacent properties, the surrounding area or neighborhood or to the general welfare of the City." BZC § 23B.32.040(A). This amorphous standard imposes no meaningful constraints on the City's discretion.

47.    In addition to these findings, the ZAB may approve a CUP application only if it determines that "the placement, construction, or modification of a wireless telecommunications facility in such location is necessary for the provision of personal wireless services to Berkeley residents and businesses, or their owners, customers, guests, or invitees, or other persons traveling in or about the City." BZC § 23C.17.100(D). The Ordinance provides that the ZAB is to "base such finding of necessity on substantial evidence that":

    1.    Without such antenna or facility, the operator will be unable to provide personal wireless services to its customers in the proposed coverage area; or

    2.    Upon advice of the City Attorney that denial of the application would have the effect of prohibiting the provision of telecommunications services, unreasonably discriminating among service providers, or constituting any other violation of State or Federal law. The applicant shall have the burden of proving that the denial would result in such a violation.

BZC § 23C.17.100(D).

48.    The Ordinance contains no standards for making these determinations, and its only procedure for doing so is the optional requirement for third-party engineering review. This results in unbridled discretion because the Ordinance does not require the City to accept the conclusions of the City Attorney or third-party engineer or even provide any standards against which they will be evaluated.

49.    The Ordinance requires the ZAB to hold a public hearing before issuing a permit for a wireless facility. BZC §§ 23C.17.100(D); 23B.32.010. No provision in the Ordinance defines what issues are relevant at a public hearing. The absence of any criteria in the Ordinance for what issues are relevant at a public hearing, coupled with the Ordinance's subjective and malleable decision-making standards, encourages the City officials to act arbitrarily and to consider impermissible factors, such as the perceived health effects of RF emissions, when reviewing applications.

50.    Even if an applicant manages to navigate the Ordinance's application process, convinces the City that its proposed facility will comply with the Ordinance's design and other substantive standards, and demonstrates to the City's satisfaction that its proposed facility is "necessary" and not detrimental to "the health, safety, peace, morals, comfort or general welfare," the City reserves the discretion under the Ordinance to deny a permit.

51.    Finally, even where the City approves a permit, it enjoys the unfettered discretion to impose on the permit "such conditions . . . as it deems reasonable or necessary to achieve the purposes of this Ordinance, and which otherwise promote the municipal health, safety and welfare." BZC § 23B.32.040(D).

**G.    RF Certification Requirements**

52.    The Ordinance purports to confer upon the City broad authority to monitor and enforce compliance with the FCC's RF exposure limits for wireless facilities. Section 23C.17.090(A) provides that "[n]o wireless telecommunications facility or combination of facilities shall at any time produce power densities that exceed the FCC's limits for electric and magnetic field strength and power density for transmitters." Moreover, "[i]n order to ensure continuing compliance with all applicable emissions standards," the Ordinance subjects wireless facilities to periodic review (at the wireless carrier's expense) by an "approved engineer" for compliance with the FCC's RF exposure limits. *Id.*

53.    Specifically, "[w]ithin forty five (45) days of initial operation or modification of a telecommunications facility," the owner or operator of a facility must submit to the Zoning Officer "written certification by an approved engineer that the facility's radio frequency emissions are in compliance with the approved application and any required conditions." BZC § 23C.17.090(A)(1).  A report of the engineer's measurements of a facility's RF radiation and findings with respect to compliance with the FCC's exposure limits must be submitted to the Zoning Officer.  If a facility is not in compliance, the owner or operator of a facility must "cease operation of the facility until the facility complies with, or has been modified to comply with" the FCC's standards.  *Id.*  Even where the approved engineer finds that a facility complies with the FCC's RF exposure limits, the Ordinance provides that "[i]n order to assure the objectivity of the analysis, the City may require, at the applicant's expense, independent verification of the results of the analysis."  *Id.*  The Ordinance contains no standards governing the City's discretion to demand independent verification.

54.    Following this initial certification of compliance, wireless facilities must undergo "an unannounced spot check" of their compliance with the FCC's standards.  BZC § 23.17.090(A)(2).  The City conducts these spot checks once every two years at the operator's expense.  *Id.*

55.    The Ordinance further provides that, "[i]f the Zoning Officer at any time finds that there is good cause to believe that a telecommunications antenna is not in compliance with applicable FCC radio frequency standards, he/she may require the operator to submit written certification that the facility is in compliance with such FCC standards."  BZC § 23.17.090(A)(4).

56.    The City may order a facility to terminate its operations if the City finds that a wireless carrier has failed to submit the information required by the Ordinance with respect to demonstrating compliance with the FCC's RF exposure limits.  BZC § 23.17.090(D).

**H.    Enforcement Provisions**

57.    A violation of the Ordinance is a misdemeanor, punishable by a fine of up to $1,000 or six months imprisonment. Berkeley Mun. Code § 1.20.010(A). In addition, the violation of any condition of a permit is grounds for revoking or modifying the permit. BZC § 23B.60.020(A).

## V.    THE ORDINANCE'S EFFECT ON PLAINTIFF'S SERVICES

58.    Plaintiff's customers with Berkeley billing addresses subscribe to more than 21,000 separate phone lines through more than 12,000 customer accounts. Plaintiff also provides service to many additional customers who visit or travel through Berkeley every day.

59.    Plaintiff currently needs to upgrade its network within the City in order to provide adequate service to existing and prospective customers.

60.    By subjecting Plaintiff's proposed network improvements to a burdensome, costly, and unduly discretionary permitting process, the Ordinance impairs Plaintiff's ability to provide service to its customers as well as its ability to deploy and provide new technologies and services to its customers in a timely and efficient fashion.

61.    While evidence of the Ordinance's actual impact is not necessary to establish that the Ordinance violates § 253(a), the City's application of the Ordinance illustrates the law's prohibitory effect on Plaintiff's services. As discussed below, the City has exploited the unfettered discretion it enjoys under the Ordinance to delay processing three applications by Plaintiff for a permit to construct wireless facilities in Berkeley. Plaintiff urgently needs these facilities in order to address capacity needs and areas of weak signal strength within existing coverage areas.

## VI.    THE CITY'S VIOLATIONS OF § 332(c)(7)(B)(ii)

62.    Apart from demonstrating the prohibitory effect of the Ordinance on Plaintiff's services, the City's unreasonable delay in processing Plaintiff's applications violates § 332(c)(7)(B)(ii) of the Act, causing Plaintiff irreparable injury.

### A.    The Bekins Application

63.    On or about March 8, 2005, Plaintiff applied for a CUP to install a wireless communication facility at 2721 Shattuck Avenue, in Berkeley (the "Bekins Application"). The property is in a commercial zone, with other commercial uses on three sides. It is currently occupied by a four-story building used as a moving and mini-storage warehouse. The proposed facility would consist of five antennas mounted flush against the existing building, two GPS antennas attached to the building parapet, electronic equipment installed within an enclosed lease area at ground level, and air-conditioning equipment installed on the roof behind the existing parapet, as described more particularly in the application (the "Bekins Facility").

64.    The City has determined the Bekins Application was complete as of April 7, 2005, and has also determined that the proposed wireless facility was categorically exempt from environmental review under the California Environmental Quality Act ("CEQA"), Cal. Pub. Res. Code §§ 21000 *et seq*. Based on these determinations, as the City has itself acknowledged in a 2007 staff report, the deadline for granting or denying the Bekins Application under the California Permit Streamlining Act ("PSA") was June 5, 2005. *See* Cal. Govt. Code §§ 65920 *et seq*.

65.    On April 13, 2005, Plaintiff sent an email to the City Planning Department, inquiring as to the status of the Bekins Application. The City did not respond to this email. Plaintiff sent a follow-up email to the City Planning Department on May 23, 2005, requesting an update on the Bekins Application and noting that it had yet to receive any correspondence from the Planning Department on the project. Once again, the City ignored Plaintiff's request.

66.    On June 8, 2005, one of Plaintiff's representatives sent the City Planning Department an email stating the following:

> This application was submitted 3/8/05 (90 days ago today), yet I still have not received any correspondence from the Berkeley Planning Department since the application was submitted nor from emails requesting status.

While I am sympathetic to staffing issues and heavy workloads, I believe that no response in over 90 days is excessive and in violation of the Permit Streamlining Act.

Please contact me at your earliest convenience regarding this application.

67.    Later that month, Plaintiff was finally able to begin discussions with a City planner regarding scheduling hearings on the Bekins Application before the Design Review Committee ("DRC") and the ZAB. In early July, a City planner informed Plaintiff that the Department was "trying to get this project to the DRC in July and to the ZAB in August on 8/25."

68.    While the DRC conditionally approved Plaintiff's application on July 21, 2005, the ZAB delayed even holding a hearing on the Bekins Application until May 26, 2006, nearly a year after the deadline under state law for rendering a final decision on the application.

69.    At the May 26 hearing, the ZAB approved the application by a vote of 8-0, with one abstention.

70.    A neighbor appealed, and the matter was heard by the City Council on September 26, 2006. At that hearing, several neighbors opposed the project based largely on their claim that radio waves from the antennas posed a threat to health. There is no dispute that the Bekins Facility would operate well below the FCC's RF exposure limits, however, and the City therefore is expressly preempted by the Act from considering the alleged health effects of RF emissions in evaluating Plaintiff's application. *See* 47 U.S.C. § 332(c)(7)(B)(iv). The neighbors also claimed that the Bekins Facility was not necessary for Plaintiff to provide service and requested third-party engineering review of that issue. Finally, the neighbors alleged that the existing use of the property violated parking, loading, and other legal restrictions.

71.    A staff report prepared for the Council's September 26, 2006, hearing discussed the issue of third-party review in detail, concluding that it was not warranted. The report also addressed each of

the other grounds for the appeal, concluded that each of them was unfounded, and recommended affirming the ZAB and dismissing the appeal.

72.     At the conclusion of the September 26, 2006, hearing, despite its staff's well-reasoned recommendation, the Council remanded to the ZAB to: "[R]econsider the project (including a third-party engineering review), determine parking and loading requirements for the existing legal uses of the site, and consider allegations of illegal uses and work without permits . . . ."

73.     Despite protests from Plaintiff that third-party review was untimely and unwarranted, the City hired an independent engineering firm, RCC Consultants, Inc. (paid for by Plaintiff), which confirmed in a report dated January 18, 2007, that the Bekins site was necessary:

> In my professional opinion, after reviewing the coverage plots, dropped call data and capacity analysis, it is evident from this data supplied by Verizon Wireless . . . that there is a need for the new Berkeley Bekins site proposed at 2721 Shattuck Avenue. It is needed primarily to provide capacity relief, eliminate dropped calls, improve in-building coverage, and to enhance outside coverage for the customer.

74.     The staff report for the second ZAB hearing, held on January 25, 2007, summarized the City staff's exhaustive analysis of the zoning history and status of the property. The report determined that the neighbors' allegations of various code violations "do not appear founded," with the minor exception that one additional on-site parking space was required.

75.     The staff report concluded that the Bekins Application satisfied all requirements for approval under the City's ordinances, including the requirement that it will "not be readily visible," and recommended that the ZAB approve it, based on "the project's consistency with the Zoning Ordinance and General Plan, and minimal impact on surrounding properties."

76.     The second ZAB hearing, on January 25, 2007, was dominated by raucous neighborhood opposition to the proposed facility. Once again the opposition primarily focused on alleged health effects of radio waves. Opponents also raised a number of other objections to the Bekins Application,

ranging from parking and loading requirements to claims that building work had been conducted without the necessary permits.

77.     After the public comment period, the City's independent engineer answered the ZAB's questions about the proposed facility. The independent engineer explained that the facility was necessary because Plaintiff's existing facilities were projected to run out of capacity to handle demand by early 2008, and it was not technically possible to further upgrade them. The engineer also testified that, to verify need, he had reviewed actual minutes-of-use data, data regarding dropped or blocked calls and details concerning Plaintiff's existing facilities that served the relevant coverage area. In addition, the engineer explained that he had not conducted field testing of signal strength because the Bekins Facility was primarily needed for increased capacity, not for increased coverage. The engineer pointed out that field tests of signal strength are only used to verify the need for additional coverage, for example, where there are "holes" in signal coverage in a particular area.

78.     Following its deliberations -- during which one ZAB member raised concerns about the potential health effects of RF emissions -- the ZAB reversed itself and denied the application. The stated grounds for the ZAB's decision were as follows:

    1. There is not substantial evidence that the facility proposed is necessary to provide personal wireless services to Verizon Wireless customers since third party engineering review of the project was based on information that was supplied by Verizon Wireless and the review did not include a test of signal reception in the area around the project site; and

    2. There is not substantial evidence that the facility proposed is necessary in this particular location and that it could not be located in an alternative location further away from residential districts.

79.     Plaintiff filed a timely appeal to the City Council. Under the City's zoning ordinance, the Council could not simply reverse the ZAB without another public hearing, but was required to choose among the following three options: (i) affirm the decision of the ZAB and dismiss the appeal; (ii) set the

1   matter for a public hearing before the Council; or (iii) remand the matter to the ZAB to reconsider the

2   application. *See* BZC § 23B.32.060.

3       80.    The Council first considered the appeal on May 8, 2007. City staff prepared a report for

4   the May 8 meeting. Reiterating that the Bekins Application met all requirements for approval, the staff

5

6   report carefully considered the ZAB's stated reasons for denial. The report noted that the basis for the

7   ZAB's decision to reject blocked and dropped call data supplied by Plaintiff was "unclear" given that

8   "no evidence was provided that the data the City's independent engineer relied on was in any respect

9

10  inaccurate or incomplete." City staff also observed that the ZAB had failed to "make a finding relating

11  to the primary need for the facility, which is capacity." Finally, City staff determined that the ZAB's

12  second stated basis for denial -- that there was no evidence the Bekins Facility could not be located

13  further away from residential districts – was inconsistent with the City's Ordinance. The report

14  summarized the staff's conclusions as follows:

15      The basis for the Zoning Adjustments Board's decision to set aside the report from the
        City's independent engineer is unclear and does not appear to be supported by substantial
16      evidence. Field testing of signal strength is not relevant to the primary need for
        Verizon's facility, which is capacity. Despite this, City Staff asked the City's independent
17      engineer to carry out field testing subsequent to the receipt of this appeal. However, even
        if field testing indicates that coverage is adequate, it would not address the analysis of
18      capacity and would not be a basis for denial. In addition, the Board's finding relating to
        the consideration of alternative sites does not appear to be relevant since the City's
19      Ordinance (Berkeley Municipal Code Chapter 23C.17) does not provide for the City to
        deny an application on the basis that an alternative site might exist.
20

21  The staff report recommended that the Council schedule a public hearing to occur no later than July 10,

22  2007.

23      81.    Opposition to the Bekins Facility at the May 8, 2007, hearing once again focused on the

24  alleged health effects of radio waves. One speaker, for example, challenged the Council to explain

25  whether it "expect[ed] us to live next to that with God knows how many watts pointed at whose living

26  room, maybe even your living room, even if you live across town, because we have never seen a pattern

27  map about where these antennas go, what comes out of it, where it goes." He added that there were "20-

28

---

COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTION; REQUEST FOR EXPEDITED REVIEW
- 22 -

plus antennas right now pointing at children at the LeConte elementary school and you want to ring the neighborhood with more? We say no. Zero tolerance." City Council member Gordon Wozniak, who stated that he was "somewhat troubled" by the ZAB decision, noted that, based on his "conversations with a number of people who oppose this site . . . . it's clear health effects are a very big factor in that and it's a strong emotional issue." Mr. Wozniak stated that "it's a very difficult one [*sic*] for an elected body to then make an objective decision in the face of these strong emotional arguments."

82.    Had the Council voted at the May 8, 2007, meeting to set a public hearing, the Council would have been required to schedule it within 60 days. BZC § 23B.32.080(B). Neighborhood opponents, however, requested that any public hearing be held after the summer recess in order to accommodate their vacation schedules. As a result, the Council continued the May 8 hearing to May 22, 2007, solely to delay the start of the statutory sixty day deadline in a manner that would allow holding the public hearing after the summer recess.

83.    At the continued hearing on May 22, 2007, Plaintiff asked that the Council resolve the appeal as expeditiously as possible. Specifically, Plaintiff requested a public hearing on its appeal at one of the Council's four scheduled meetings in June or July. Plaintiff also stated that, if the City Council agreed with the ZAB, it should simply affirm the ZAB's denial rather than subject Plaintiff to yet another round of hearings. The City Attorney concurred with this request, urging the Council not to remand the matter to the ZAB and to set the appeal for a public hearing no later than July. The City Attorney advised the Council that remanding the matter or setting a public hearing past July would constitute unreasonable delay. Nevertheless, the Council decided to remand to the ZAB, with directions that staff refer the ZAB's decision back to the Council for another hearing, without the need for an appeal.

84.    Following the Council's remand, City staff once again recommended approval, in a staff report prepared for the ZAB. In that report, City staff summarized a supplemental report submitted by the City's third-party consultant, which reiterated that the site was needed primarily to provide additional capacity, that field testing was not relevant to address capacity constraints (as opposed to lack of signal coverage), and that in any event, field testing undertaken at the City's request confirmed that the Bekins Facility is needed for coverage reasons as well.

85.    The ZAB considered the Bekins Application for the third time at a hearing on June 28, 2007. As with every previous hearing on the Bekins Application, the purported health effects of radio frequency emissions animated the opposition. Indeed, one ZAB member candidly explained his vote to deny Plaintiff's application as follows: "DDT has been around for a long time, but it took us a long time to figure out what it had done to us . . . . I can't sit here and vote for something for which a community who lives there are having trouble with it and the people who are living somewhere else are writing the letters saying it's fine."

86.    Before voting, several members of the ZAB spoke in favor of the application, including one member who stated that a confidential memorandum from the City Attorney advised the ZAB that there were no legally sustainable grounds for denial. Contrary to the recommendations of the City's planning staff, City Attorney, and consulting engineer, the ZAB once again denied the application.

87.    The ZAB's stated reasons for denying the application were that: (a) it was unable to make the required finding that the Bekins Facility is necessary to provide service, "since service is currently being provided and since no evidence has been presented that the existing service is not at an adequate level"; (b) "the asserted gaps (dropped calls) of 1-3% for a few hours a day do not constitute 'significant gaps' but are, rather, de minimus" [sic]; (c) that the Bekins Site is "effectively in a residential area," and that such location is not necessary, contrary to the "objective of the ordinance";

and (d) the denial does not have the effect of prohibiting service in violation of federal law, explaining that "[w]ireless service exists with no significant gap; the asserted gaps are *de minimus* [sic]."

88.    Pursuant to the City Council's May 22, 2007, remand decision, the ZAB's denial was automatically referred to the City Council for a hearing, making the filing of a formal appeal unnecessary. At the advice of the City Attorney, however, Plaintiff filed a timely appeal with the City Council of the ZAB's denial in order to protect its rights. Plaintiff submitted its appeal by a July 13, 2007, letter from its counsel addressed to the City Council.

89.    In its letter appeal, Plaintiff explained that none of the ZAB's stated grounds for denying the Bekins Application was supported by substantial evidence. With respect to the ZAB's finding that "no evidence" had been presented that the existing service was not adequate, the letter noted that the City's planning staff and third-party engineer had repeatedly found that the Bekins Facility was needed in order to address limited capacity at existing sites and that the presence of existing service was irrelevant to the issue of capacity. Plaintiff further noted that there was no evidence in the record concerning specific levels of dropped calls, as this information was proprietary. Accordingly, Plaintiff noted that the ZAB's finding that 1-3% dropped calls was not a "significant gap" but rather "de minimis" was factually unsupported. Plaintiff also noted that even if existing service were fully adequate, which it was not, the ZAB's finding ignored the reality that even after zoning approval, it would take several more months to complete construction and begin providing service from the facility. Plaintiff thus implored the City to act expeditiously to reverse the ZAB's denial at the earliest possible date. At the same time, Plaintiff expressly reserved its rights with respect to the prolonged and unreasonable delay that it had already experienced in the processing of the Bekins Application.

90.    On July 16, 2007, the City Council held a hearing on Plaintiff's appeal. At this hearing – the fourth the Council has held on the Bekins Application – Plaintiff asked the Council to set a public

hearing on its appeal as early as possible.  Plaintiff maintained that delaying a public hearing for more than three months until October 23, 2007, as suggested in the staff report, was unreasonable.  Plaintiff noted that it had previously objected to scheduling any date later than July 10, 2007.  One council member agreed, arguing that the Council should postpone setting a hearing date until City staff could identify a date earlier than October 23 to hold the public hearing.  The City Council, however, voted to schedule the public hearing for October 23, 2007, in violation of the requirement that the public hearing commence within 60 days of the Council's vote.  BZC § 23B32.080(B)

**B.    The North Shattuck Application**

91.    On or about May 27, 2003, Plaintiff applied for a CUP to install a wireless communication facility at 1540 Shattuck Avenue, in Berkeley (the "North Shattuck Application").  The proposed facility would consist of antennas mounted on the roof of a commercial building.  Located in the North Shattuck Commercial District, the building is bounded on all four sides by commercial uses and parking lots.  The antennas at the North Shattuck site would be screened from view, with electronic equipment for the facility located inside the building.

92.    In a letter dated June 26, 2003, the City requested extensive additional information, including justification for exceeding the zoning height limit of 35 feet, and factual support for the findings required for approval under the City's zoning ordinance.

93.    In a letter dated June 23, 2004, Plaintiff explained that it had substantially modified the design to eliminate the need for a height variance, and provided the other information the City had requested in its previous letter.

94.    Under the California PSA, the City was obligated to make a written determination as to whether Plaintiff's June 23, 2004, submission was complete and to notify Plaintiff of its determination within 30 days. *See* Cal. Govt Code § 65943(b).  Because the City failed to make such a written

1    determination within 30 days, Plaintiff's application was deemed complete as a matter of law no later

2    than July 23, 2004. *Id.*

3        95.    On November 30, 2004, a City planner's email to Plaintiff asked for still more

4    justification for the findings required under the City's code, and also raised the issue of "peer review" of

5    the application: "Given the project site's sensitivity, it is necessary to have your application peer

6    reviewed by an outside RF firm. This firm finds that the application is incomplete." The email

7    requested a host of engineering data for the City's third-party engineer to use in evaluating the need for

8    the site, and did not explain the "sensitivity" of placing antennas on the roof of an existing commercial

9    building.

10       96.    On November 29, 2005, Plaintiff provided much of the information the City had

11   requested and proposed a conference call between Plaintiff's engineers and the City's consulting

12   engineer to discuss arrangements for providing any additional information needed for "peer review."

13       97.    After Plaintiff submitted the additional information in 2005, the City failed to respond in

14   any fashion to the application for over 18 months, until June 6, 2007. On that date, a City planner sent

15   Plaintiff an email expressing the City's interest "in finalizing the review of your application."

16       98.    In a subsequent letter dated June 21, 2007, the City planner advised Plaintiff that it would

17   need to submit extensive additional information, including, among other requests, information to

18   facilitate third-party review of the need for the facility and its noise level, several thousand dollars in

19   fees for such review, and additional copies of all state and federal licenses issued to Plaintiff (the letter

20   explained that the FCC license previously submitted had expired in 2005, approximately two years after

21   Plaintiff submitted the application).

22       99.    On July 13, 2007, the City planner sent an email to Plaintiff, demanding that Plaintiff pay

23   $10,500 for third party engineering review of the facility. Despite the City's documented history of

ignoring the recommendations of its third party engineers, the City planner expressed "surprise at Verizon's lack of enthusiasm to get the required payments submitted quickly."

100.    City planning staff have determined the North Shattuck Application to be categorically exempt under CEQA.  While it is not clear when City staff first made this determination, the legal deadline for such determination was no later than 30 days following the date the application was deemed complete, or August 22, 2004, when any initial study should have been complete. *See* Cal. Pub. Res. Code § 21080.2 ; *see also* 14 Cal. Code of Regs., §§ 15063, 15102.

101.    Under the California PSA, the City was required to grant or deny the CUP within 60 days after determining that it was exempt under CEQA. *See* Cal. Govt. Code § 65950(a)(4).  Thus, if the City had observed the time limits under both CEQA and the PSA, it should have acted on the North Shattuck Application no later than October 21, 2004.  The City has never scheduled the North Shattuck Application for hearing, or taken any formal action on it.

**C.    The Lower University Application**

102.    On or about August 10, 2005, Plaintiff applied for a CUP to install a wireless communication facility at 2002 Acton Street, in Berkeley (the "Lower University Application").  The proposed facility would consist of antennas mounted flush against the elevator penthouse of an apartment building, and electronic equipment installed on the ground floor of the building.  The Lower University site is in Berkeley's General Commercial District.

103.    Despite repeated inquiries from Plaintiff, the City has never provided comments or any other substantive response to the Lower University Application.  In fact, its first written communication of any kind came almost two years after the application was filed, in an email dated June 6, 2007, stating the City's interest in "finalizing the review of your application."

104.    In a subsequent letter dated June 21, 2007, the City planner advised Plaintiff that it would need to submit extensive additional information, including, among other requests, information to facilitate third-party review of the need for the facility and its noise level, and several thousand dollars in fees for such review.

105.    Under state law, the deadline for the City to approve or deny the Lower University Application has long since passed.  Because the City failed to request additional information within 30 days of the application's filing on August 19, 2005, it was deemed complete by operation of law as of September 9, 2005. *See* Cal. Govt. Code § 65943(a).

106.    City planning staff have determined the Lower University Application to be categorically exempt under CEQA.  While it is not clear when City staff first made this determination, the legal deadline for such determination was no later than 30 days following the date the application was deemed complete, or October 9, 2005, when any initial study should have been complete. *See* 14 Cal. Code of Regs., §§ 15063, 15102.

107.    Under the California PSA, the outside date for the City to grant or deny the CUP was 60 days after determining that it was exempt under CEQA. *See* Cal. Govt. Code § 65950(a)(4).  Thus, if the City had observed the time limits under both CEQA and the PSA, it should have acted on the Lower University Application no later than December 8, 2005.  The City has never scheduled the Lower University Application for hearing or taken any formal action on it.

## VII.    IRREPARABLE INJURY, PUBLIC INTEREST, AND BALANCE OF HARDSHIPS

108.    As a result of the City's actions, Plaintiff has been, and will continue to be damaged and irreparably harmed absent the relief requested herein.  The harm caused by the City's unlawful actions includes, but is not limited to, impairment of Plaintiff's: (a) ability to provide its customers in the City with the high-quality, reliable service they need and rightfully expect; (b) ability to compete with other

providers of telecommunications services; (c) full use of its existing licenses and business investments; and (d) good will and business reputation.

109.    The harm that Plaintiff has suffered from the City's actions is not reasonably susceptible to accurate calculation, and cannot be fully and adequately addressed through an award of damages.

110.    Moreover, the public interest in promoting competition in the telecommunications arena – the express goal of the Telecommunications Act – has been irreparably harmed and will continue to be irreparably harmed by the City's unlawful actions.  Plaintiff's present and future customers, as well as the public at large, are significantly prejudiced by the City's unlawful conduct.

111.    In addition, wireless telecommunications are an important component of emergency response systems and provide a vital alternative to traditional land lines during fires, earthquakes, and other natural disasters.  By preventing Plaintiff from installing equipment needed to provide improved service, the City's unlawful actions are causing irreparable harm to the public interest in reliable emergency communications.

112.    In contrast to the immediate and irreparable injury being suffered by Plaintiff, its customers, and the public interest, the City will suffer no significant injury if the Court issues the requested injunction.  All three proposed facilities have been determined categorically exempt from environmental review, none pose any significant visual or other impacts, and after exhaustive analysis, City staff have concluded repeatedly that the Bekins Application meets all City requirements and should be approved.

## VIII.    ALLEGATIONS SUPPORTING DECLARATORY RELIEF

113.    A present, actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties.  Plaintiff contends that the City's actions were preempted by and

in violation of the Telecommunications Act.  On information and belief, the City denies such allegations.

114.    Plaintiff has been and will continue to be adversely affected by the City's unlawful acts.

115.    Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of Plaintiff's rights and the City's duties and authority.

**COUNT I**

**Preemption Under The Supremacy Clause**

**(Violation of 47 U.S.C. § 253)**

116.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

117.    Federal law preempts any local legal requirement that may prohibit or have the effect of prohibiting the ability of any entity to provide any telecommunications service.  47 U.S.C. § 253(a).

118.    The City's Ordinance violates and is preempted by 47 U.S.C. § 253 because it may prohibit or have the effect of prohibiting Plaintiff's ability to provide telecommunications services in the City and surrounding areas.  The Ordinance requires Plaintiff to obtain a CUP or AUP in order to install, modify, or operate its telecommunications facilities within the City.  Under the Ordinance, Plaintiff and other wireless carriers must undergo a costly, burdensome, and unduly discretionary process in order to obtain a CUP or AUP.  These requirements are preempted under 47 U.S.C. § 253(a).

119.    Plaintiff is entitled to an order declaring that the Ordinance violates 47 U.S.C. § 253 and an injunction against the application of the Ordinance.

**COUNT II**

**Unreasonable Delay of the Bekins Application**
**(Violation of 47 U.S.C. § 332(c)(7)(B)(ii))**

120.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

121.    47 U.S.C. § 332(c)(7)(B)(ii) provides that "A state or local government or instrumentality thereof shall act on any request for authorization to place, construct, or modify personal wireless service facilities within a reasonable period of time after the request is duly filed with such government or instrumentality, taking into account the nature and scope of such request."

122.    The Bekins Application constitutes a request for the placement of personal wireless services facilities and, as such, Plaintiff is entitled to the benefits and protections of the Act with respect to such application.

123.    The Bekins Application was deemed complete on April 7, 2005, and the City has failed to take final action on it.

124.    The City has exceeded deadlines imposed by California law for reviewing and acting on the Bekins Application.

125.    The City has violated 47 U.S.C. § 332(c)(7)(B)(ii) by its failure to act upon the Bekins Application "within a reasonable period of time" after it was duly filed.

## COUNT III

### Unreasonable Delay of the North Shattuck Application
### (Violation of 47 U.S.C. § 332(c)(7)(B)(ii))

126.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

127.    The North Shattuck Application constitutes a request for the placement of personal wireless services facilities and, as such, Plaintiff is entitled to the benefits and protections of the Act with respect to such application.

128.    The North Shattuck Application was deemed complete on July 23, 2004, and the City has failed to take final action on it.

129.    The City has exceeded deadlines imposed by California law for reviewing and acting on the North Shattuck Application.

130.    The City has violated 47 U.S.C. § 332(c)(7)(B)(ii) by its failure to act upon the North Shattuck Application "within a reasonable period of time" after it was duly filed.

## COUNT IV

### Unreasonable Delay of the Lower University Application
### (Violation of 47 U.S.C. § 332(c)(7)(B)(ii))

131.    Plaintiff re-alleges and incorporates by reference all preceding paragraphs.

132.    The Lower University Application constitutes a request for the placement of personal wireless services facilities and, as such, Plaintiff is entitled to the benefits and protections of the Act with respect to such application.

133.    The Lower University Application was deemed complete on July 23, 2004, and the City has failed to take final action on it.

134.    The City has exceeded deadlines imposed by California law for reviewing and acting on the Lower University Application.

135.    The City has violated 47 U.S.C. § 332(c)(7)(B)(ii) by its failure to act upon the Lower University Application "within a reasonable period of time" after it was duly filed.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court issue an Order and Judgment:

(i)    Declaring that the City failed to act on the Bekins Application within a reasonable period of time, in violation of 47 U.S.C. § 332(c)(7)(B)(ii), and for an order compelling the City to issue forthwith all permits required in order to allow Plaintiff to install and operate the facility proposed in the Bekins Application;

(ii)    Declaring that the City failed to act on the North Shattuck Application within a reasonable period of time, in violation of 47 U.S.C. § 332(c)(7)(B)(ii), and for an order compelling the

City to issue forthwith all permits required in order to allow Plaintiff to install and operate the facility proposed in the North Shattuck Application;

(iii)     Declaring that the City failed to act on the Lower University Application within a reasonable period of time, in violation of 47 U.S.C. § 332(c)(7)(B)(ii), and for an order compelling the City to issue forthwith all permits required in order to allow Plaintiff to install and operate the facility proposed in the Lower University Application;

(iv)     Declaring that the City's Ordinance violates 47 U.S.C. § 253(a) and is preempted under the Supremacy Clause of the United States Constitution, and is therefore null and void;

(v)     Enjoining the City from enforcing the Ordinance;

(vi)     For expedited review of the matters set forth in this complaint;

(vii)     Awarding Plaintiff the costs and disbursements incurred in connection with this action pursuant to 28 U.S.C. § 1920; and

(viii)     Granting such other relief as this Court considers just and proper.

Dated:  August 3, 2007                    MUNGER, TOLLES & OLSON LLP

                                          By: _____
                                              Henry Weissmann
                                              Attorneys for Plaintiff

**EXHIBIT A**

**23C.17     WIRELESS TELECOMMUNICATION FACILITIES**....................23-102a
23C.17.010     Applicability of Regulations ....................................23-102a
23C.17.020     Purpose.................................................................23-102a
23C.17.030     General Requirements...........................................23-102b
23C.17.040     Minimum Application Requirements .........................23-102b
23C.17.050     Locational Requirements........................................23-102d
23C.17.060     Height Requirements..............................................23-102e
23C.17.070     Design Requirements.............................................23-102e
23C.17.080     Operation and Maintenance Standards ....................23-102h
23C.17.085     Public Information Requirements..............................23-102i
23C.17.090     Requirement for Certification of Facilities.................23-102j
23C.17.100     Findings Required for Approval................................23-102l
23C.17.110     Cessation of Operations.........................................23-102m

**23C.20     EXEMPTIONS**.................................................................23-103
23C.20.010     Exempted Accessory Uses .....................................23-103
23C.20.020     Exempted Temporary Uses ....................................23-103
23C.20.030     Exempted Temporary Structures .............................23-104

**SUB-TITLE 23D     PROVISIONS APPLICABLE IN ALL RESIDENTIAL
                    DISTRICTS** .....................................................23-105

**23D.04     LOT AND DEVELOPMENT STANDARDS** ...........................23-105
23D.04.010     Lot Requirements .................................................23-105
23D.04.020     Height Limits for Main Buildings.............................23-105
23D.04.030     Yards and Building Separations for Main Buildings.....23-106
23D.04.040     Lot Coverage .......................................................23-108
23D.04.050     Usable Open Space ...............................................23-108
23D.04.060     Screening Required for Garbage Cans and Utility Meters........23-109
23D.04.070     Pedestrian Walkway for Multiple Dwellings .............23-109

**23D.08     ACCESSORY BUILDINGS AND STRUCTURES** ...........................23-111
23D.08.010     Accessory Buildings & Structures May Exceed Limit with
                    Use Permit .........................................................23-111
23D.08.020     Height Limits for Accessory Buildings or Structures .................23-111
23D.08.030     Setback Requirements for Accessory Building or Structures.....23-112
23D.08.040     Special Rebuilding/Replacement Provisions .............23-112
23D.08.050     Maximum Building Length ......................................23-113
23D.08.060     Fences and Other Accessory Structures ...................23-113

23C.17            WIRELESS TELECOMMUNICATION FACILITIES

## 23C.17.010   Applicability of Regulations

The regulations contained in this chapter shall apply to all wireless telecommunications facilities for personal wireless services on property other than the public right of way in the City of Berkeley. (Ord. 6671-NS § 2, 2001)

## 23C.17.020   Purpose

A. The purpose of this chapter is to provide a uniform and comprehensive set of standards for the development, siting, installation, and operation of wireless telecommunications antennas and related facilities ("wireless telecommunications facilities") for personal wireless services. These regulations are designed to protect and promote public safety, community welfare and the aesthetic quality of the city consistent with the goals, objectives and policies of the Berkeley Master Plan, while at the same time providing for managed development of wireless telecommunications infrastructure in accordance with the Telecommunications Act of 1996.

B. The objectives of this chapter include but are not limited to the following:

1. Foster an aesthetically pleasing urban environment, prevent visual blight, protect and preserve public safety and general welfare, and maintain the character of residential and adjacent neighborhood commercial areas consistent with the adopted General Plan and Area Plans and in compliance with applicable state and federal legislation;

2. Because wireless telecommunications antennas and related facilities for cellular and mobile phones and personal communications systems are a commercial use that is usually separate from and is rarely accessory to the primary use of a parcel, to prevent the location of such facilities in residentially zoned districts unless (a) such location is necessary to provide personal wireless services to residents and businesses in the City of Berkeley, or their owners, customers, guests, or invitees, or other persons traveling in or about the City of Berkeley and (b) the wireless telecommunications facilities are designed to interfere as little as possible with the character of the neighborhood;

3. Establish and maintain telecommunications facilities that are components of a wireless telecommunications infrastructure designed to enhance the city's emergency response network and do not interfere with such emergency systems in violation of applicable Federal or state regulations;

4. Establish a process for obtaining necessary permits for wireless telecommunication facilities that provides greater certainty to both applicants and interested members of the public while ensuring compliance with all applicable zoning requirements;

5. Provide opportunities for further reduction in potential aesthetic or land use impacts of wireless telecommunications facilities as changes in technology occur; and

6. Support the use of personal wireless services to enhance personal and public health and safety as well as the public welfare of the City of Berkeley. (Ord. 6671-NS § 2, 2001)

## 23C.17.030   General Requirements

In addition to any other requirements imposed by this chapter, all wireless telecommunications facilities on property other than the public right of way in the City of Berkeley shall be consistent with:

A. The Berkeley Master Plan, adopted Area Plans, and other adopted policies and guidelines including, but not limited to, the Telecommunications Ordinance (Berkeley Municipal Code Chapter 16.10), and all other applicable provisions of the Zoning Ordinance.

B. Applicable regulations and standards of any other governmental agency with jurisdiction over the installation or operation of wireless telecommunications facilities including, but not limited to, the Federal Communications Commission, the Federal Aviation Administration, and the California Public Utilities Commission.

C. Any applicable discretionary permits affecting the subject property except to the extent the Zoning Officer or the Zoning Adjustments Board may modify such requirements. (Ord. 6671-NS § 2, 2001)

## 23C.17.040   Minimum Application Requirements

In addition to meeting the standard application submittal requirements for permits specified in Chapter 23B.24, applications for wireless telecommunication facilities pursuant to this chapter, shall include:

A. A narrative description and map showing the coverage area of the provider's existing facilities and the specific site that is the subject of the application. The narrative shall include information regarding the reasons why a permit is being sought (for example, whether a new antenna is necessary to accommodate increased demand or to fill a "dead zone" in the provider's coverage area), why the subject site is considered necessary to accomplish the provider's coverage objectives, and why the proposed site is the most appropriate location under existing circumstances. The application shall include a statement offering to provide, if requested by the City, sufficient information for an approved radio frequency engineer or licensed electrical engineer specializing in EMF or RFR studies (hereinafter, "an approved engineer") retained by the City to verify that the site is necessary for the purpose stated in the provider's narrative. The application shall also include a statement that the provider, upon request by the City, will provide a summary of the alternatives considered and the reasons why the provider did not consider such alternatives feasible.

B. A statement agreeing to allow future co-location on the subject property subject to a determination of feasibility and approval of all necessary permits under this chapter. As

used in this chapter, the term "feasibility" or "feasible" shall take into account technical feasibility, radio signal transmitting and receiving requirements, aesthetics, electromagnetic fields, costs, landowner permission, facility owner permission, and all necessary approvals under this Chapter and the Uniform Building Code, as well as the common meaning of the term. If the owner of a building or structure will not consent to placement of wireless telecommunications facilities on the building or structure, then placement or co-location of wireless telecommunications facilities on the building or structure shall be deemed to be not feasible. If it is not reasonably practical to place or co-locate wireless telecommunications facilities on a building or structure, then placement or co-location of wireless telecommunications facilities on the building or structure shall be deemed to be not feasible.

C. If the proposed facility will not be co-located, an explanation of the reasons why co-location is not feasible.

D. A description of the services that the applicant proposes to offer or provide in conjunction with the proposed sites.

E. Copies of all applicable licenses or other approvals required by the Federal Communications Commission (FCC), the California Public Utilities Commission (PUC), and any other agency of the Federal or State government with authority to regulate telecommunications facilities including documentation of compliance with all conditions imposed in conjunction with such licenses or approvals.

F. Engineering calculations demonstrating that the proposed facility will comply with all applicable FCC requirements and standards.

G. Site plan and elevations drawn to scale. Elevations shall include all structures on which facilities are proposed to be located.

H. Description of proposed approach for screening all facilities from public view including plans for installation and maintenance of landscaping, sample exterior materials and colors.

I. Where applicable, a plan showing existing surrounding landscaping, proposed landscaping, a landscape protection plan for construction, and a maintenance plan including an irrigation plan.

J. Plans and elevations, drawn to scale, for façade- or roof-mounted antennas.

K. A visual impact analysis including scaled elevation diagrams within the context of the building, before and after-photo simulations, and a map depicting where the photos were taken. Where the installation would be readily visible from the public right-of-way or from surrounding properties, the application shall include an explanation as to why, if screening or other techniques to minimize visibility are not proposed, such approaches to reduce the visibility of the installation would not be effective. The Zoning Officer may

require the submission of photo overlays, scaled models, renderings, or mockups to document the effectiveness of techniques proposed to minimize visibility.

L. Description of the number, type, power rating, frequency range, and dimensions of antennas, equipment cabinets, and related wireless telecommunications facilities proposed to be installed.

M. A statement that, at the discretion of the Zoning Officer, the applicant will pay the reasonable actual cost and a reasonable administrative fee for hiring an independent qualified radio frequency or electrical engineer to evaluate any technical aspect of the proposed telecommunication facility, including, but not limited to, compliance with applicable Federal emission standards, feasibility of co-location, need for proposed location and suitability of alternate sites, potential for interference with existing or planned public safety emergency response telecommunication facilities, or analysis of feasibility of alternate screening methods or devices. Any proprietary information disclosed to the city or the consultant in confidence shall not be a public record and shall remain confidential and not be disclosed to any third party without the express consent of the applicant. The City shall return all proprietary information to the applicant and not retain any copies of such information once its decision is final.

N. A statement that prior to obtaining a building permit to erect or install the proposed facility, the applicant shall either secure a bond or provide financial assurances, in a form acceptable to the City Manager, for the removal of the facility in the event that its use is abandoned or the approval is otherwise terminated.

O. The Zoning Officer may require any other information deemed necessary in order to process the application in compliance with the requirements of this section. (Ord. 6671-NS § 2, 2001)

## 23C.17.050   Locational Requirements

A. No wireless telecommunications facilities shall be located in any zoning district unless the Zoning Adjustments Board or the Zoning Officer, as provided for in Section 23C.17.100.C, makes the finding of necessity required in Section 23C.17.100.D and any other applicable findings.

B. No wireless communications facilities shall be sited on or above a ridgeline or at any other location readily visible from a public park, unless the Zoning Adjustments Board, makes the applicable findings required in Section 23C.17.100.

C. When feasible and consistent with other requirements of this chapter, providers of personal wireless services shall co-locate facilities in order to reduce adverse visual impacts. The Zoning Officer or the Zoning Adjustments Board may require co-location or multiple-user wireless telecommunication facilities based on a determination that it is feasible and consistent with the purposes and requirements of this Chapter.

Chapter 23C.17                                   Wireless Telecommunications Facilities

D.  No new freestanding facility, including towers, lattice towers and monopoles, shall be located within 1,000 feet of another freestanding facility, unless appropriate stealth techniques have been used to minimize the visual impact of the facility to the extent feasible, and mounting on a building or co-location on an existing pole or tower is not feasible.

E.  When determined to be feasible and consistent with the purposes and requirements of this Chapter, the Zoning Officer or Zoning Adjustments Board shall require the applicant to make unused space available for future co-location of other wireless telecommunication facilities, including space for different operators providing similar, competing services.

F.  The Zoning Officer may approve minor modifications and aesthetic upgrades that will reduce the size or visibility of any legally established wireless telecommunication facilities without notice or hearing subject to compliance with all existing conditions of approval. (Ord. 6671-NS § 2, 2001)

## 23C.17.060   Height Requirements

A.  The height of a telecommunications tower shall be measured from existing grade below the center of the base of the tower to the top of the tower itself or, if higher, to the tip of the highest antenna or piece of equipment attached thereto. The height of building-mounted antennas shall include the height of that portion of the building on which the antenna is mounted. In the case of "crank-up" or similar towers whose height is adjustable, the height of the tower shall be the maximum height to which it is capable of being raised.

B.  No antenna telecommunications tower or façade-mounted antenna shall exceed or project above the height limits specified for the district in which the antenna is located.

C.  Roof-mounted antennas affixed to an existing or proposed tower or pole shall not extend or project more than 15- feet above the height limit of the district.

D.  Roof-mounted or façade-mounted antennas proposed on an existing building, tower, or pole that is legal non-conforming in terms of height shall not extend or project more than 15 feet above the existing height of the building or structure. (Ord. 6671-NS § 2, 2001)

## 23C.17.070   Design Requirements

In addition to all other requirements set forth in this chapter, all wireless telecommunication facilities shall meet the following design requirements:

A.  Based on potential aesthetic impact, the order of preference for facility type is: façade mounted, roof mounted, ground mounted, and freestanding tower. If a ground-mounted or freestanding tower is proposed, the application must include an explanation as to why other facility types are not feasible.

B. All facilities shall be designed and located to minimize their visibility to the greatest extent  feasible, considering technological requirements, by means of placement, screening, and camouflage. The applicant shall use the smallest and least visible antennas feasible to accomplish the owner/operator's coverage objectives. All wireless telecommunications facilities proposed for locations where they would be readily visible from the public right-of-way or from the habitable living areas of residential units within 100 feet shall incorporate appropriate techniques to camouflage or disguise the facility, and/or blend it into the surrounding environment, to the extent feasible. Facilities shall be compatible in scale and integrated architecturally with the design of surrounding buildings or the natural setting.

C. No readily visible antenna shall be placed at a location where it will be in a direct line of sight of a significant or sensitive view corridor, where it would adversely affect a scenic vista, or where it would materially impair the significance of an historical resource or unique archeological resource.

D. Colors and materials for facilities shall be chosen to minimize visibility. All visible exterior surfaces shall be constructed of non-reflective materials. Facilities shall be painted or textured using colors to match or blend with the primary background.

E. Facility lighting shall be designed to meet but not exceed minimum requirements for security, safety or FAA regulations, and in all instances shall be designed to avoid glare and minimize illumination on adjacent properties. Lightning arresters and beacon lights shall not be included in the design of facilities unless required by the FAA. Lightning arresters and beacons shall be included when calculating the height of facilities such as towers, lattice towers and monopoles.

F. No advertising shall be placed on telecommunications antennas or other equipment.

G. All facilities shall be designed to be resistant to and minimize opportunities for unauthorized access, climbing, vandalism, graffiti, and other conditions that would result in hazardous conditions, visual blight, or attractive nuisances. The Zoning Officer or Zoning Adjustments Board may require the provision of warning signs, fencing, anti-climbing devices, or other techniques to prevent unauthorized access and vandalism when, because of their location and/or accessibility, antenna facilities have the potential to become an attractive nuisance. The design of the fencing and other access control devices shall be subject to design review.

H. Where appropriate and directly related to the applicant's placement, construction, or modification of wireless telecommunications facilities the applicant shall maintain and enhance existing landscaping on the site, including trees, foliage and shrubs, when used for screening unless the Design Review Planner or Design Review Committee approves appropriate replacement landscaping. Additional landscaping shall be planted as needed to minimize the visual impact of the facility and, when feasible, to block the line of sight between facilities and adjacent residential uses and residentially zoned properties. The Design Review Planner or Design Review Committee shall determine the appropriate minimum size of new trees and shrubs.

I. Facade-mounted equipment shall not project more than 18 inches from the face of the building or other support structure unless specifically authorized by the Zoning Officer or the Zoning Adjustments Board.

J. Roof-mounted antennas shall be located in an area of the roof where the visual impact is minimized. Roof-mounted and ground-mounted antennas shall not be placed in direct line of sight of significant or sensitive view corridors or where they adversely affect scenic vistas unless the Zoning Officer or the Zoning Adjustments Board finds that the facility incorporates appropriate, creative stealth techniques to camouflage, disguise, and/or blend into the surrounding environment to the extent possible. Roof mounted antennas shall be designed and sited to minimize their visibility and shall be no taller than necessary to meet the operator's service requirements, based on independent analysis by an approved engineer retained by the City.

K. Satellite dish or parabolic antennas shall be situated as close to the ground as possible to reduce visual impact without compromising their function. When screened from pedestrian-level view from the public right-of-way and not readily visible from any property that contains a legally-established residential use, such antennas may be located in any required yard subject to the approval of a Use Permit under Section 23D.08.060.B. No such antenna may exceed 39 inches in diameter unless the Zoning Officer or the Zoning Adjustments Board finds that a smaller antenna can not feasibly accomplish the provider's technical objectives. The Zoning Officer may require that this determination be based on independent technical analysis by an approved engineer.

L. All monopoles and lattice towers shall be designed to be the minimum functional height and width required to support the proposed antenna installation unless a higher monopole or lattice tower will facilitate co-location or other objectives of this Chapter.

M. In order of preference, ancillary support equipment for facilities shall be located either within a building or structure, on a screened roof top area or structure, or in a rear yard if not readily visible from surrounding properties and the public right of way, unless the Zoning Officer or Zoning Adjustments Board finds that another location is preferable under the circumstances of the application.

N. Aboveground and partially buried ancillary equipment including support pads, cabinets, shelters, and buildings shall be located where they will be the least visible from surrounding properties and the public right of way and shall be designed to be architecturally compatible with surrounding structures and/or screened using appropriate techniques to camouflage, disguise, and/or blend into the environment including landscaping, color, and other techniques to minimize their visual impact. If the Zoning Officer determines than an equipment cabinet is not or can not be adequately screened from surrounding properties or from public view or architecturally treated to blend in with the environment, the equipment cabinet shall be placed underground or inside the existing building where the antenna is located unless the Zoning Officer or Zoning Adjustments Board finds that such placement is not feasible or consistent with the objectives of this Chapter and other applicable requirements.

O. No telecommuications antenna or ancillary support equipment shall be located within any setback or between the face of a building and a public right of way without approval of a Use Permit except for facilities that are completely subterranean.

P. When antennas are co-located, the City may limit the number of antennas with related equipment and providers to be located at any site and adjacent sites in order to prevent negative visual impacts associated with multiple facilities. Architectural and other camouflaging treatment shall be coordinated between all users on each site.

Q. At the time of modification or upgrade of facilities, existing equipment shall, to the extent feasible, be replaced with equipment of equal or greater technical capacity and reduced size so as to reduce visual and noise impacts.

R. Proposed facilities shall not reduce the number of available parking spaces below the amount required pursuant to the Zoning Ordinance. (Ord. 6671-NS § 2, 2001)

### 23C.17.080    Operation and Maintenance Standards

All wireless telecommunication facilities shall at all times comply with the following operation and maintenance standards. Failure to comply shall be considered a violation of conditions of approval subject to enforcement pursuant to provisions of this Chapter.

A. Each owner or operator of a wireless telecommuications facility shall provide signage identifying the name and phone number of a party to contact in event of an emergency. The design, materials, colors, and location of signs shall be subject to design review. The signage shall be attached to the base of any utility pole or light standard to which microcells are affixed.

B. Wireless telecommuications facilities and related equipment, including lighting, fences, shields, cabinets, and poles, shall be maintained in good repair, free from trash, debris, litter and graffiti and other forms of vandalism, and any damage from any cause shall be repaired as soon as reasonably possible so as to minimize occurrences of dangerous conditions or visual blight. Graffiti shall be removed from any facility or equipment as soon as practicable, and in no instance more than forty-eight (48) hours from the time of notification by the city.

C. The owner or operator of a wireless telecommunications facility shall be responsible for maintaining landscaping in accordance with the approved landscape plan and for replacing any damaged or dead trees, foliage, or other landscaping elements shown on the approved plan. Amendments or modifications to the landscape plan shall be submitted to the Zoning Officer for approval.

D. Each wireless telecommunications facility shall be operated in a manner that will minimize noise impacts to surrounding residents and persons using nearby parks, trails, and similar recreation areas. Except for emergency repairs, testing and maintenance activities that will be audible beyond the property line shall only occur between the hours of 8:00 a.m. and 7:00 p.m. on Monday through Friday, excluding holidays. All air

conditioning units and any other equipment that may emit noise that would be audible from beyond the property line shall be enclosed or equipped with noise attenuation devices. Backup generators shall only be operated during periods of power outages or for testing. At no time shall equipment noise from any source exceed the standards specified in the Berkeley Community Noise Ordinance (BMC Chapter 13.40).

E. All wireless telecommunications facilities providing service to the government or the general public shall be designed to meet the following requirements:

   1. The exterior walls and roof covering of all aboveground equipment shelters and cabinets shall be constructed of materials rated as nonflammable in the Uniform Building Code.

   2. Openings in all aboveground equipment shelters and cabinets shall be protected against penetration by fire and windblown embers to the extent feasible.

   3. Material used as supports for antennas shall be fire resistant, termite proof, and subject to all applicable requirements of the Uniform Building Code.

   4. Telecommunications antenna towers shall be designed to withstand forces expected during earthquakes to the extent feasible building-mounted facilities shall be anchored so that a quake does not dislodge them or tip them over. All equipment mounting racks and attached equipment shall be anchored so that a quake would not tip them over, throw equipment off its shelves, or otherwise damage equipment.

   5. All connections between various components of the wireless telecommunications facility and necessary power and telephone lines shall, to the extent feasible, be protected against damage by fire, flooding, and earthquake. Reasonable measures shall be taken to keep wireless telecommunication facilities in operation in the event of a natural disaster.

F. Routine maintenance and repairs shall be limited to 8:00 a.m. to 7:00 p.m. Monday through Friday, excluding holidays.

G. Vehicle and personnel access to sites for maintenance and repairs shall not be from residential streets or adjacent residential properties to the maximum extent possible. (Ord. 6671-NS § 2, 2001)

## 23C.17.085    Public Information Requirements

A. The Planning and Development Department shall maintain a map and inventory of all existing and proposed wireless telecommunication sites, which shall be available to members of the public and other interested parties for inspection.

B. The inventory shall, at a minimum, include the following information:

   1. Address of site;

   2. Number, type, power rating, and frequency range of all antennas at the site;

   3. Name of telecommunications carrier owning, operating, or leasing each antenna at the site;

   4. Date of most recent certification.

C. Upon approving an Administrative Use Permit to establish a wireless telecommunications facility pursuant to Section 23C.17.050, the Planning and Development Department shall provide notice of the Zoning Officer's decision as required by Section 23B.28.040.C and, in addition, shall mail the Notice of Administrative Decision to owners and occupants of properties within a three hundred (300) foot radius of the project site. (Ord. 6671-NS § 2, 2001)

## 23C.17.090    Requirement for Certification of Facilities

A. No wireless telecommunications facility or combination of facilities shall at any time produce power densities that exceed the FCC's limits for electric and magnetic field strength and power density for transmitters. In order to ensure continuing compliance with all applicable emission standards, all wireless telecommunications facilities shall be reviewed by an approved engineer in accord with the schedule and procedures set forth below. All reasonable costs of such inspections shall be born by the owner or operator of the facility. The City may require, at the operator's expense, independent verification of the results of any analysis. If an operator of a telecommunications facility fails to supply the required reports or fails to correct a violation of the Federal Communications Commission standard following notification, the Use Permit is subject to modification or revocation by the Zoning Adjustments Board following a public hearing.

   1. Within forty five (45) days of initial operation or modification of a telecommunications facility, the operator of each telecommunications antenna shall submit to the Zoning Officer written certification by an approved engineer that the facility's radio frequency emissions are in compliance with the approved engineer that the facility's radio frequency emissions are in compliance with the approved application and any required conditions. The engineer shall measure the radio frequency radiation of the approved facility and determine if it meets the FCC requirements. A report of these measurements and the engineer's findings with respect to compliance with the FCC's MPE limits shall be submitted to the Zoning Officer. If the report shows that the facility does not comply with applicable FCC requirements, the owner or operator shall cease operation of the facility until the facility complies with, or has been modified to comply with this standard. Proof of compliance shall be a certification provided by the engineer who prepared the original report. In order to assure the objectivity of the analysis, the City may require, at the applicant's expense, independent verification of the results of the analysis.

2.  Once every two years, the City shall retain, at the operator's expense, an approved engineer to conduct an unannounced spot check of the facility's compliance with applicable FCC radio frequency standards.

3.  In the event of a change in the FCC's Maximum Permissible Exposure (MPE) limits for electric and magnetic field strength and power density for transmitters, the operator of each wireless telecommunications facility shall be required to submit to the Zoning Officer written certification by an approved engineer of compliance with applicable FCC radio frequency standards within 90 days of any change in applicable FCC radio frequency standards or of any modification of the facility requiring a new submission to the FCC to determine compliance with emission standards. If calculated levels exceed 50% of the FCC's MPE limits, the operator of the facility shall hire an approved engineer to measure the actual exposure levels. If calculated levels are not in compliance with the FCC's MPE limit, the operator shall cease operation of the facility until the facility is brought into compliance with the FCC's standards and all other applicable requirements. A report of these calculations, required measurements, if any, and the engineer's findings with respect to compliance with the current MPE limits shall be submitted to the Zoning Officer.

4.  If the Zoning Officer at any time finds that there is good cause to believe that a telecommunications antenna is not in compliance with applicable FCC radio frequency standards, he/she may require the operator to submit written certification that the facility is in compliance with such FCC standards.

B.  The owner or operator of any wireless telecommunications facility that was approved by the City before the effective date of this chapter, shall submit the following to the Zoning Officer within six (6) months from the date of notification:

1.  A written summary certifying the commencement date and expiration date of any lease, license, property right, or other use agreement for the facility, including any options or renewal terms specified therein. The information disclosed in this summary is, and shall remain, confidential, shall not be made a matter of public record, and shall not be disclosed to any third party without the express written consent of the applicant;

2.  Written certification by an approved engineer that the facility's radio frequency emissions are in compliance with the approved application and any required conditions. The engineer shall measure the radio frequency radiation of the approved facility and determine if it meets the FCC requirements. If the report shows that the facility does not comply with applicable FCC requirements, the owner or operator shall cease operation of the facility until the facility is brought into compliance. In order to assure the objectivity of the analysis, the City may require, at the applicant's expense, independent verification of the results of the analysis.

C.  Any facility that was approved by the City prior to the effective date of this chapter and which does not comply with this chapter on the date of its adoption shall be considered a lawful non-conforming use provided that the owner or operator submits the information

required in subsection B of this section. A lawful non-conforming personal wireless service facility shall be subject to the requirements of Chapter 23C.04 except to the extent that they are modified herein.

D. Failure to submit the information required in this section will be considered a violation of the Zoning Ordinance. Any facility found in violation may be ordered to terminate operations by the Zoning Adjustments Board following a duly noticed public hearing. (Ord. 6671-NS § 2, 2001)

## 23C.17.100    Findings Required for Approval

A. 1. In order to approve any Use Permit or Administrative Use Permit under this chapter, the Zoning Adjustments Board or the Zoning Officer must make the finding required by Section 23B.32.040 and must also find that the proposed project is consistent with the general requirements of this chapter and any specific requirements applicable to the proposed facility. Additionally, the Zoning Officer or Board must make the finding required in subsection B and any other applicable finding required by this section.

2. All findings must be based on substantial information in the record such as, where required, technical analysis by an approved radio frequency engineer, letters from telecommunications operators with existing facilities stating reasons for not permitting co-location, calculations by a State-licensed structural engineer, or other evidence. The Zoning Officer or the Board may require that any determination required by this Chapter be supported by independent analysis by an approved engineer retained by the City.

B. In order to approve a Use Permit or Administrative Use Permit for any wireless telecommunications antenna, the Zoning Adjustments Board or the Zoning Officer must find that the proposed antenna or related facility, operating alone or in conjunction with other telecommunications facilities:

1. Will comply with all applicable state and Federal standards and requirements; and that EITHER

2. The facility will not be readily visible; OR

3. It is not feasible to incorporate additional measures that would make the facility not readily visible.

C. Subject to compliance with the applicable requirements of this chapter, all new wireless telecommunications facilities shall require the approval of a Use Permit by the Zoning Adjustments Board, with the exception of additions to existing sites in non-residential zoning districts, which shall require the approval of an Administrative Use Permit.

D. To approve a Use Permit to allow establishment of any wireless telecommunication antenna, the Zoning Adjustments Board, following a public hearing, must find that the placement, construction, or modification of a wireless telecommunications facility in such

location is necessary for the provision of personal wireless services to Berkeley residents and businesses, or their owners, customers, guests, or invitees, or other persons traveling in or about the City. The Board shall base such finding of necessity on substantial evidence that

1.  Without such antenna or facility, the operator will be unable to provide personal wireless services to its customers in the proposed coverage area; or

2.  Upon advice of the City Attorney that denial of the application would have the effect of prohibiting the provision of telecommunications services, unreasonably discriminating among service providers, or constituting any other violation of State or Federal law. The applicant shall have the burden of proving that the denial would result in such a violation.

E.  The Zoning Adjustments Board or the Zoning Officer may approve establishment of a satellite dish or parabolic antenna exceeding 39 inches in diameter, only after finding that a smaller or different antenna can not feasibly accomplish the provider's technical objectives and that the facility will not be readily visible.

F.  The Zoning Adjustments Board may approve establishment of a wireless telecommunications antenna that is not co-located with other existing or proposed facilities or a new freestanding pole or tower only after finding that co-location is not feasible, would have more significant adverse effects on views or other environmental considerations, is not permitted by the property owner, would impair the quality of service to the existing facility, or would require existing facilities at the same location to go off-line for a significant period of time. (Ord. 6671-NS § 2, 2001)

### 23C.17.110    Cessation of Operations

A.  Within thirty (30) days of cessation of operations of any wireless telecommunications facilities approved pursuant to this chapter, the operator shall notify the Zoning Officer in writing. The permit for said wireless telecommunications facility shall be deemed lapsed and of no further effect six (6) months thereafter unless:

1.  The Zoning Officer has determined that the same operator resumed operation within six (6) months of the notice; or

2.  The City has received an application to transfer the permit to another operator.

B.  No later than thirty (30) days after a permit has lapsed under the preceding subsection, the operator shall remove all wireless telecommunication facilities from the site. If the operator fails to do so, the property owner shall be responsible for removal, and may use any bond or other assurances provided by the operator pursuant to the requirements of Section 23C.17.050 to do so. If such facilities are not removed, the site shall be deemed to be a nuisance pursuant to Section 23B.64 and the City may call the bond to pay for removal.

C. Failure to inform the Zoning Officer of cessation of operations of any existing facility shall constitute a violation of the Zoning Ordinance and be grounds for:

1. Prosecution;

2. Revocation or modification of the permits;

3. Calling of any bond or other assurance secured by the operator pursuant to the requirements of Section 23C.17.050; and/or

4. Removal of the facilities.

D. Any FCC-licensed telecommunications carrier that is buying, leasing, or considering a transfer of ownership of an already approved facility, shall provide written notification to the Zoning Officer and request transfer of the existing Use Permit. The Zoning Officer may require submission of any supporting materials or documentation necessary to determine that the proposed use is in compliance with the existing Use Permit and all of its conditions including, but not limited to, statements, photographs, plans, drawings, models, and analysis by a State-licensed radio frequency engineer demonstrating compliance with all applicable regulations and standards of the Federal Communications Commission and the California Public Utilities Commission. If the Zoning Officer determines that the proposed operation is not consistent with the existing Use Permit, he/she shall notify the applicant who may revise the application or apply for modification to the Use Permit pursuant to the requirements of Section 23B.56.(Ord. 6671-NS § 2, 2001)

**EXHIBIT B**

## IV.  Required For All Wireless Telecommunications Facility Projects

**A. Applicant Statement** – Refer to Item I.C, above. Particularly explain how the project would satisfy the requirements and findings required by Section 23C.17 of the Zoning Ordinance, including:

_____    1.  **Description of Coverage Area** – Provide a narrative identifying the coverage area needing improvement. Specify area boundaries using street names or intersections. Provide maps of coverage from applicant's existing and proposed (existing plus proposed) facilities (refer to Item IV.F-G, below for detailed map requirements).

_____    2.  **Statements Related to Need** – Describe, in the least ambiguous terms possible, why the proposed site is necessary, and why it is the most appropriate location under the circumstances. The statements shall be quantified and verifiable. Statements such as: "the area to be served by the proposed site now suffers 20% more dropped calls than the average for the entire Bay Area"; are preferred rather than statements such as "coverage is weak in the proposed coverage area".

If the facility would not be co-located with an existing wireless facility, state the reasons why co-location is not feasible. The applicant shall state that they agree to allow future co-location on the subject property subject to a determination of feasibility and approval of all necessary permits.

Provide the locations of all alternative sites considered and the reasons why the applicant did not consider the alternatives feasible.

_____    3.  **Description of Services** – Provide a description of the services the applicant proposes to offer or provide in conjunction with the proposed site.

_____    4.  **Visibility** – Provide a description of the methods that would be used to ensure that the wireless facility would not be readily visible.  If it is not feasible to incorporate measures that would make the facility not readily visible, provide an explanation of why (also refer to Item IV.E, below for photo simulation requirements).

_____    5.  **Third Party Evaluation Statement** – Provide a statement that the applicant would pay the reasonable actual cost and administrative fees for the hiring of an independent qualified engineering consultant to evaluate any technical aspect of the proposed site, and that the applicant would provide to the engineer any information necessary to perform the evaluation. Proprietary information may need to be provided to the independent qualified engineer following the initial application submittal to verify need for the facility.  Such information shall be excluded from the public record as provided for in Section 23C.17 of the Zoning Ordinance.  A deposit of $5,500 for third party review should be submitted with application.  The check should be payable to the "City of Berkeley" and separate from any other checks submitted for payment/deposit.  Refer to general cost proposal for engineering review for more information.

_____    **6. Noise Data** – Identify any equipment that may generate noise effects, such as air conditioning equipment, and provide manufacturer noise specifications for proposed equipment and/or noise measurements conducted for similar equipment.  Provide a statement that the applicant would pay the reasonable actual cost and administrative fees for the hiring of an independent qualified acoustic consultant to prepare or independently review an acoustic report on the equipment.  A deposit of $4,500 for preparation of acoustic report (by City appointed consultant, no third party review required), or deposit of $1,000 for third party review of an acoustic report prepared by applicant, should be submitted with the application.  The check should be payable to the "City of Berkeley" and separate from any other checks submitted for payment/deposit.  Refer to general cost proposal for noise study for more information.

_____    **7. Assurance of Removal** – Provide a statement that, prior to obtaining a building permit to erect or install the proposed facility, the applicant shall either secure a bond or provide financial assurances, in a form acceptable to the City Manager, for the removal of the facility in the event it is abandoned or the approval is otherwise terminated.

**B. Site Plans** – Refer to Item II.A-D, above. Plans for Wireless Telecommunications Facilities should also include:

_____    1.  Site plans and elevations drawn to scale.

_____    2.  The number, type, power rating, frequency range and dimensions of antennas, equipment cabinets or shelters, and related ancillary equipment proposed to be installed.

_____    3.  The means used to secure all equipment and antennas to prevent movement or damage as a result of windstorms or earthquakes.

_____    4.  Detailed plans and elevations for antennas and antenna mounts.

_____    5.  Detailed plans for screening the site from public view, including sample exterior materials and colors.

_____    6.  Where applicable, a plan showing existing and proposed landscaping, a landscape protection plan for construction, and landscape maintenance plan (including irrigation).

**C. Current Licenses and Approvals** – Provide copies of all licenses and approvals required by the Federal Communications Commission (FCC), the California Public Utilities Commission (PUC) and any other agency of the Federal or State government that are applicable to the proposed site.

**D. Radio Frequency Exposure Determination** – Provide a report, including engineering calculations, demonstrating that the proposed facility will comply with Federal Communications Commission (FCC) and Occupational Safety and

Zoning Projects – Application Submittal Requirements
City of Berkeley Planning & Development Dept.

Page 3 of 4
Updated 10/24/2006

Health Administration (OSHA) requirements for occupational and non-occupational exposure to radio frequency electromagnetic fields.

**E. Photo Simulations** – Provide before and after photo simulations, and a map depicting where the photos were taken.

**F. Maps and Data of Existing Coverage Area**

1.  Provide Coverage Plots of area without proposed site:
    a.  In vehicle coverage.
    b.  In building coverage.

2.  Provide Drive Testing Plots of existing coverage area:
    a.  Location of existing sites.
    b.  In vehicle down link Received Signal Strength Indication levels. (RSSI).
    c.  In vehicle up link levels.
    d.  Frame Erasure Rate (FER) data or Pilot Strength (Ec/Io).
    e.  Drop calls data.
    f.  Block calls data.

3.  If required, a network drive may be requested (witnessed by independent engineer) to verify that the submitted data is accurate.

Note:  Plots should be submitted on 8 1/2 x 11" paper and include legend correlating grayscale shades used to specific signal levels or percentage as used by the applying applicant's engineering department.

**G. Maps and Data of Proposed Coverage Area**

1.  Provide Coverage Plots of with proposed site.
    a.  In vehicle coverage.
    b.  In building coverage.

2.  Provide Drive Test data of proposed site.
    a.  Using Continuous Wave (CW) transmitter.

3.  Provide the following data:
    a.  Projected Minutes of Use (MOUs) at the new site.
    b.  Projected Minutes of Use (MOUs) for the affected cluster of sites (indicate increase or decrease).
    c.  Projected drops for the affected cluster of sites (indicate increase or decrease).
    d.  Projected blocks for the affected cluster of sites (indicate increase or decrease).

Note:  Plots should be submitted on 8 1/2 x 11" paper and include legend correlating grayscale shades used to specific signal levels or percentage as used by the applying applicant's engineering department.

Zoning Projects – Application Submittal Requirements
City of Berkeley Planning & Development Dept.

Page 4 of 4
Updated 10/24/2006

**H. Electronic Copies –** Provide electronic copies of all submitted documents in pdf file format.

**I. Other Required Information –** The Zoning Officer may require any other information deemed necessary in order to process the application under Section 23C.17 of the Zoning Ordinance.

---

**Authority:**

Ord. 6671-NS § 2, 2001, City of Berkeley, California
Sections 23C.17.010 through 23C.17.110 of the Zoning Code of the City of Berkeley, California.