# EXHIBIT U



Berkeley ZAB mts
06-28-07

# Zoning Adjustments Board Meeting June 28, 2007

# Extract of real-time closed captioner's transcript

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

THANK YOU FOR WAITING.

NOW WE'LL MOVE TO ITEMS 8 AND 9,

THE CELL PHONE ANTENNAS.

DEBBIE, DO YOU WANT TO GIVE A BRIEF RECAP OF WHAT THE CITY

COUNCIL REMANDED IT TO US FOR?

>> D. Sanderson: YES.

OKAY, WHEN THE COUNCIL TOOK THIS UP, EACH OF THE STAFF

REPORTS INCLUDES AN EXCERPT FROM EACH OF THE COUNCIL

MEETINGS, THAT I WANTED TO MAKE IT CLEAR TO THIS BOARD THE

PRESENTATION I MADE TO THE COUNCIL, THAT WE TALKED ABOUT

WHAT THIS COVERAGE MEANS, WHAT DOES CAPACITY MEAN, I USED

THE UMBRELLA METAPHOR THAT I RECEIVED FROM OUR CONSULTANT,

AND THE PARTICULAR PROBLEM THAT WE FOUND WITH THE

RECOMMENDATION.

THIS BOARD VOTED TO DENY THE PERMIT.

THE EVIDENCE THAT WAS PROVIDED IN STAFF'S OPINION WAS NOT

SUBSTANTIAL ENOUGH.

SO WE ASKED THE COUNCIL TO SET IT FOR HEARING TO PROVIDE

SUBSTANTIVE EVIDENCE THAT WOULD BE DEFENSIBLE IN COURT.

RATHER THAN DO THAT THEMSELVES, THE BOARD -- THE COUNCIL HAS

DECIDED TO REMAND IT, YET AGAIN, TO THE ZAB.

SO THE -- IT IS NOW BACK BEFORE YOU.

YOU HAVE INFORMATION THAT WE PROVIDED THE COUNCIL WHICH WAS

THE ADDITIONAL DRIVE TEST, EVEN THOUGH IN OUR OPINION IT

WASN'T NECESSARY, IT IS IN YOUR REPORT FOR EACH OF THE

PROJECTS.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

AND THE OTHER INFORMATION THAT WAS AVAILABLE TO THE COUNCIL

HAS BEEN INCLUDED IN YOUR STAFF REPORT.

SO THE ACTION IS BACK BEFORE YOU.

AND MY ADVICE WOULD BE THAT WHATEVER DECISION YOU WISH TO

MAKE, PLEASE BE CAREFUL TO PROVIDE SUBSTANTIAL EVIDENCE TO

BACK THAT DECISION.

THAT'S THE STANDARD THAT'S IN OUR ORDINANCE AND, IT'S

STANDARD THAT IS IN THE FEDERAL ORDINANCE.

SO I WOULD ENCOURAGE YOU TO THINK ABOUT SUBSTANTIAL

EVIDENCE.

BECAUSE THAT'S REALLY THE KEY THAT WAS THE DILEMMA WE MAD

HAD WITH THE PREVIOUS DECISION.


NOT THE -- THAT WE HAD WITH THE PREVIOUS DECISION, NOT THE

DECISION BUT THE LACK OF SUBSTANTIAL EVIDENCE.

>> C. Tiedemann: ALL RIGHT.

IS THERE A REPRESENTATIVE FROM VERIZON HERE AND IS THERE A

REPRESENTATIVE FROM NEXT TELL?

-- NEXTEL?

I HAVE A CARD FROM PAUL ALBATRON, WHO LOOKS LIKE VERIZON

REPRESENTATIVE.

NEXTEL, I CAN'T TELL.

>> DO YOU WANT TO TAKE THEM IN ORDER, 8?

>> C. Tiedemann: OKAY, HOW ABOUT THE NEXTEL REPRESENTATIVE.

I'M GOING TO GIVE YOU INSTEAD OF FIVE MINUTES, FOUR MINUTES.

AND I'M GOING TO GIVE MEMBERS OF THE PUBLIC TWO MINUTES.

PART OF THE REASON FOR THAT IS WE'VE HEARD FROM EVERYONE

MULTIPLE TIMES ON THIS.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

>> SURE, GOOD EVENING MADAM CHAIR, MEMBERS OF THE BOARD.

I'M COREY ALVIN, REGARDING NEXTEL'S REQUEST TO BUILD A

TELECOMMUNICATIONS TOWER.

THIS WAS DEEMED COMPLETE IN 1992005.

THIS AT THE TIME OF SUBMITTAL IT WAS SUFFICIENT FOR THE

BOARD TO MAKE A DECISION.

MAY 2006.

TO APPROVE THAT APPLICATION, THE BOARD APPROVED THE

APPLICATION BASED ON NONDETRIMENT FINDINGS PRESENTED BY

STAFF.

SINCE THE APPROVAL, AND SUBSEQUENT APPEALS OF THAT APPROVAL,


NEXTEL HAS BEEN ASKED TO PROVIDE FURTHER INFORMATION TO

FURTHER DEMONSTRATE NONDETRIMENT.

TO THE SATISFACTION OF STAFF BY CONDUCTING A STUDY AND

TESTING TO PROVE NECESSITY.

THE INDEPENDENT ENGINEER CHOSEN WERE BY STAFF CONCLUDED THAT

THE SITE WAS NECESSARY TO PROVIDE RELIABLE COVERAGE TO OUR

CUSTOMERS, NEXTEL CUSTOMERS --

>> C. Tiedemann: HANG ON.

PEOPLE IN THE AUDIENCE, DON'T DO IT.

IT'S NOT -- I'M NOT GOING TO TOLERATE IT.

BE POLITE.

WE EXPECT OTHER PEOPLE TO BE POLITE TO YOU.

>> THANK YOU.

NONDETRIMENT FINDINGS HAVE BEEN MADE TO A REASONABLE DEGREE.

AND ALL THE LAND USE CONCERNS HAVE BEEN ADDRESSED AND

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

MITIGATED.

UNTIL RECENTLY I YOU WAS A LONG-TIME MEMBER OF THIS

COMMUNITY.

I WAS PART OF THE PLANNING DEPARTMENT BACK IN '93 TO '97, I

WAS EVEN ON THE BOARD FOR A TIME.

AND I UNDERSTAND THE POLITICS AND LAND USE AND HOW THEY MIX

AND MERGE IN THE CITY.

IT'S VERY DELICATE, I UNDERSTAND THAT.

HOWEVER, IN THE INTEREST OF FAIRNESS, I ASK YOU TO CONSIDER

THIS PROPOSAL ON ITS LAND USE MERIT, ONLY.

AND TO ONCE AGAIN APPROVE THIS PROPOSAL FOR


TELECOMMUNICATIONS FACILITY.

>> C. Tiedemann: OTHER QUESTIONS FOR HIM?

BOB?

>> R. Allen: QUESTION WAS RAISED TO COUNCIL, ALSO, CAN YOU

DESCRIBE AS BEST YOU CAN THE TYPE OF MAINTENANCE THAT'S

REQUIRED FOR THIS FACILITY?

HOW OFTEN, IF THERE IS A PATTERN, WHAT KIND OF VEHICLES,

VEHICLE OR VEHICLES YOU WOULD BRING TO THE SITE?

CAN YOU GIVE US ANY INFORMATION ON THAT?

>> YES, I CAN.

THERE IS A VAN THAT COMES TO THE SITE ONCE OR TWICE A MONTH,

DEPENDING ON WHAT THE COVERAGE ISSUES ARE.

JUST TO MAKE SURE THAT EVERYTHING IS WORKING PROPERLY, THAT

IF THERE ARE ANY PROBLEMS WITH THE EQUIPMENT, AND THE

MODULATION, ALL OF THE TECHNICAL STUFF THAT THEY DO IS

WORKING OPTIMALLY.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

AND WE CAN PARK ON THE STREET, IN THE PARKING LOT, THESE

GUYS DON'T HAVE A LOT OF EQUIPMENT, IT'S A VERY EASY THING

TO DO.

>> R. Allen: FURTHER, TYPICALLY IS IT AN ALL-DAY EFFORT,

ONE-HOUR EFFORT?

>> ABOUT TWO HOURS.

>> C. Tiedemann: SARA?

>> S. Schumer: YES.

IF I UNDERSTAND OUR MANDATE IN PART YOU WERE TO RESPOND --

WE WERE TO RESPOND TO WHAT THE COUNCIL THOUGHT WAS NEW


INFORMATION THAT WE DIDN'T HAVE BEFORE.

AND COMING OUT OF THAT, I HAVE SOME QUESTIONS.

ONE WAS THAT WE HEARD THAT WE HAD -- YOU OR VERIZON, I'M NOT

SURE WHETHER IT WAS ONE OR BOARDS OF YOU, HAD A SYSTEM OF

RATING THE CAPACITY OF THE SYSTEM.

IF YOU DO HAVE SUCH A SYSTEM OF RATING RECEPTION, I'M

INTERESTED IN WHAT THE RATING WAS FOR THE BERKELEY AREA THAT

YOU HAVE UNDER CONSIDERATION, AND FOR OTHER AREAS IN

BERKELEY OR IN THE BAY AREA.

ALSO, RELATED TO THAT, IT SEEMS THAT FROM -- YOU'LL ASKING

YOU THE SAME QUESTION, FROM THE VERIZON CAR, IT SEEMS THAT

MOST PEOPLE -- IT SEEMS LIKE A LOT OF THE PEOPLE RESPONDING

TO HAVING PROBLEMS WERE IN NORTH BERKELEY AND IN THE

BERKELEY HILLS.

THEY WERE SAYING THEY WERE HAVING PROBLEMS ON GRIZZLY, ON

EUCLID, ON HENRY NORTH OF CEDAR, ON EUCLID, SEVERAL AREAS OF

**This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.**

PARK HILLS.

I'M WONDERING IF YOU CAN TELL US IF THE AREA THAT YOU

CONSIDER NEEDING, REQUIRING ADDITIONAL CAPACITY, HOW THAT

COMPARES TO THE AREAS THAT APPEAR TO HAVE REAL PROBLEMS WITH

CAPACITY?

THAT PEOPLE ARE TALKING ABOUT.

HOW DO YOU FIND -- OKAY, ONE QUESTION TO BEGIN WITH, IS WHAT

IS THE RELATIONSHIP, THE COMPARISON IN TERMS OF DROPPED

CALLS, ET CETERA?

>> WELL, TO START WITH, I'M NOT SURE IF THE PEOPLE YOU SPOKE

TO ABOUT NOT HAVING ADEQUATE COVERAGE OF NEXTEL PHONES.

I DON'T KNOW WHAT CARRIER THAT WAS.

THE WAY IN WHICH WE DECIDE, SPRINT-NEXTEL DECIDES TO GO IN

AND BUILD A SITE, IS THROUGH CUSTOMER COMPLAINTS.

IN THIS CASE THEY HAPPEN TO BE LARGE INSTITUTIONAL CLIENTS

WHO, IN THAT SORT OF THE NATURE OF THE NEXTEL PHONE, WE HAVE

A LOT OF BUSINESS CUSTOMERS.

'S AND THERE ARE A LOT OF BUSINESSES IN THE AREA.

ALTA BATES, THE BERKELEY UNIFIED SCHOOL DISTRICT, THEY USE

OUR PHONES AND THEY CALL AND THEY SAY, HEY, WE KEEP DROPPING

IN THE BUILDINGS, WE DON'T HAVE RELIABLE SERVICE, THE VOICE

IS NOT VERY CLEAR.

SO THAT'S WHAT TRIGGERS THE R.F. ENGINEERS DECIDE WE NEED A

SITE SOMEWHERE.

AND THAT'S HOW WE ENDED UP ON IN THIS LOCATION.

WE DETERMINED THAT THIS LOCATION ACTUALLY WOULD SATISFY THE

CELL COVERAGE WOULD SATISFY OUR CUSTOMERS IN THE AREA.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

>> S. Shumer: CAN WE GET SOME HARD EVIDENCE OF NUMBERS OF

CALLS OF COMPLAINTS AND WHERE THEY'RE COMING FROM?

BECAUSE WHAT BOTHERS ME IS THAT THE PLACEMENT OF THE TOWER

IS BASED ON WITHOUT THE TOWER YOU CANNOT PROVIDE SERVICE.

SO IT'S REQUIRED.

TO PROVIDE SERVICE.

AND IT LOOKS AS IF THERE ARE OTHER AREAS IN BERKELEY THAT

HAVE MUCH LESS SERVICE AND I DON'T UNDERSTAND HOW YOU CAN --

HOW THAT SERVICE CAN BE REQUIRED.


I UNDERSTAND WHY IT'S COMMERCIALLY DESIRABLE.

BUT HOW YOU CAN MEET THE TEST OF REQUIREMENT AND NECESSITY

FOR ONE AREA WHEN ANOTHER AREA SEEMS TO HAVE MUCH LESS.

SO WHAT I'D LIKE TO HAVE BEFORE FINDING NECESSITY, I'D LIKE

TO HAVE SOME INFORMATION THAT EITHER GOES AGAINST THE

APPARENT ANECDOTAL INFORMATION OR THAT -- SOMETHING THAT

SAYS WHY.

THERE SEEMS TO BE A DOUBLE STANDARD.

>> IF I COULD QUICKLY ANSWER YOUR ONE POINT ABOUT HAVING NO

COVERAGE IN SOME AREAS AND REQUIRING THAT WE BE IN OTHER

AREAS.

AS I MENTIONED, THE NEXTEL PHONE IS MORE OF A BUSINESS

PHONE.

AND WE DO HAVE ADEQUATE SERVICE IN MOST OF THE CITY OF

BERKELEY WHERE WE NEED IT.

WHERE WE NEED IT IS DOWN ALONG THE COMMERCIAL CORRIDORS

WHERE PEOPLE TEND TO DO BUSINESS.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

SO, IF WE DON'T HAVE VERY GOOD COVERAGE UP IN THE HILLS,

IT'S BECAUSE WE DON'T HAVE CUSTOMERS THERE WHO ARE

REQUESTING SERVICE.

THE REASON WHY WE NEED THAT COVERAGE, ALONG UNIVERSITY WHICH

WE HAVE A SITE, ALONG SHATTUCK, SAN PABLO, UNIVERSITY, THOSE

AREAS ARE THE AREAS THAT ARE IMPORTANT TO NEXTEL.

>> S. Shumer: ONE OTHER QUESTION,

AND THAT IS, WHAT IS THE LEVEL AT WHICH YOU DECIDE THAT YOU

ARE UNABLE TO PROVIDE SERVICE OR THAT YOU'RE PROHIBITED FROM

PROVIDING SERVICE IF YOU DON'T HAVE A NEW TOWER?

>> THAT MIGHT BE A QUESTION --.

>> S. Shumer: THERE IS A LEVEL OF COMPLAINT?

IS THERE A LEVEL OF DROPPED CALLS?

IS ANYBODY -- HAS NUMBER SET CRITERIA FOR A THRESHOLD OF

WHEN -- I'M TRYING TO DISTINGUISH AND GET INFORMATION TO

DISTINGUISH BETWEEN JUST WHAT IS COMMERCIALLY -- WHERE IT IS

COMMERCIALLY DESIRABLE AND WHAT IS ACTUALLY NECESSARY WITH

THE REQUIREMENT THAT YOU ARE PROVIDING SERVICE?

>> THERE ARE TWO CRITERIA, THE ONE I MENTIONED, COMPLAINTS,

FROM TEAM.

>> S. Shumer: NO, NO, THE CRITERIA MIGHT BE ONE COMPLAINT

PER YEAR.

OR IT MIGHT BE 5% OF THE CUSTOMERS COMPLAINING.

OR IT MIGHT BE DROPPED CALLS OR DROPPED AS WAS SUGGESTED 1%

TO 3% DURING PEAK HOURS.

OR IT MIGHT BE IT HAS TO BE UP TO 5% TO 10% OVER AT LEAST 12

HOURS THE.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

>> I SEE.

THE R.F. ENGINEER FOR THIS SITE IS HERE WHO CAN --- HE IS

HERE TO DISCUSS THOSE ISSUES.

I THINK HE CAN PROBABLY BETTER GIVE YOU THE NUMBERS AND THE

SORT OF THRESHOLDS.

>> S. Shumer: OKAY.

>> D. Sanderson: I'LL BE HAPPY TO HAVE THE R.F. ENGINEER FOR

THE COMPANY SPEAK.


TONY IS THE CITY'S INDEPENDENT CONSULTANT, HE DOES ALL OF

THE ANALYSIS FOR US.

HIS REPORTS, THAT ARE ATTACHED TO EACH STAFF REPORT, ARE OUR

EFFORT TO ADDRESS BOTH OF THOSE QUESTIONS AND TO DESCRIBE

WHAT HE DID, AND WHAT HE FOUND SITE BY SITE.

I THINK WE'LL LET THE R.F. ENGINEER SPEAK.

BUT IF YOU WOULD LIKE TO HAVE TONY TALK ABOUT WHAT HE FOUND

AND HOW HE MADE THE DECISION TO RECOMMEND TO US THAT THERE

WAS A NEED, WE WOULD BE WILLING TO DO THAT.

>> C. Tiedemann: WHY DOESN'T HE SPEAK TO IT.

>> IN ANSWER TO YOUR QUESTION ABOUT COVERAGE, BASICALLY WHEN

THESE SYSTEMS ARE FIRST DEPLOYED, THEY HAVE TO COMPLY WITH

AN FCC MANDATE.

THE FCC MANDATE US THEY HAVE TO COVER 95% OF THE POPULATION.

IN THREE YEARS.

SO BASICALLY WHAT THEY DO IS GO OUT AND START PUTTING CELL

SITES ON TO START PROVIDING COVERAGE.

AS THE SYSTEM MATURES, THINGS HAPPEN WHEN YOU START ADDING

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

PEOPLE TO A SYSTEM.

JUST LIKE WHEN THE HIGHWAY DEPARTMENT DECIDES TO GO OUT AND

BUILD AN EXPRESSWAY, THEY SAY WE NEED THESE MANY LANES, THIS

IS WHAT WE'RE PROJECTING THE NUMBER OF CARS PER HOUR GOING

DOWN THESE LANES.

AS PEOPLE MOVE INTO AN AREA, PEOPLE START REALIZING THIS IS

A GOOD WAY TO UTILIZE YOUR HIGHWAY SYSTEM, YOU GET

CONGESTION.


IN THIS CASE, THEY HAVE A COVERAGE ISSUE, BECAUSE OF THE

USAGE THAT IS BEING INCREASED.

AND ALSO NEXTEL IS MORE GEARED FOR BUSINESS CUSTOMERS,

BECAUSE THEY HAVE TO PUSH TO TALK.

A LOT OF PEOPLE LIKE THE HANDY TALKIE TYPE OF FUNCTION OF

NEXTEL VERSUS SOMEBODY WHO HAS A VERIZON OR SPRINT OR AT&T,

IT'S A MOBILE TELEPHONE.

IN THAT CASE IT'S -- IT HAS BOTH THE MOBILE TELEPHONE AND

THE HANDY TALKIE.

WHEN THEY START SELLING THESE TO THE AREA THAT THEY'RE

HAVING A PROBLEM, THIS IS BASED ON THE BUSINESS CUSTOMERS

COMPLAINING, WE JUST PURCHASED THESE UNITS AND WE'RE HAVING

A PROBLEM IN THE AREA OR IN THE BUILDINGS.

IF YOU LOOK AT ONE OF THE DRAWINGS THERE, WE DROVE THE AREA,

AS I MONITORED, AND THE SYSTEM DOES HAVE A DEFICIENCY IN

COVERAGE.

I DID LOOK AT THE OTHER CELL SITES, WHAT WE CONSIDER A

CLUSTER.

AND TALKED TO THE ENGINEERS AND ALSO LOOKED UP THEIR

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

ANTENNAER ONENTATIONS.

I QUESTIONED THEM ON THE OPTIMIZATION EFFORTS THEY'VE TRIED

TO DO PRIOR TO -- OPTIMIZATION EFFORTS THEY'VE DONE PRIOR TO

SUBMITTING TO THE CITY.

THIS WAS THEIR LAST RESORT IN ORDER TO FILL THE COVERAGE

HOLE THAT'S SHOWN ON THE DRIVE TEST.

>> C. Tiedemann: JESSE?


>> J. Arreguin: THANK YOU.

MR. ALVIN, YOU STATED THAT THE, I GUESS THE MAIN THRESHOLD

FOR DECIDING WHETHER THERE IS A NEED TO PROVIDE ADDITIONAL

COVERAGES THROUGH CUSTOMER COMPLAINTS, SPECIFICALLY THROUGH

INSTITUTIONAL CUSTOMERS AND THEIR LACK OF ABILITY TO RECEIVE

ADEQUATE SERVICE.

AND I GUESS THIS QUESTION ALSO COULD BE DIRECTED TOWARDS THE

GENTLEMAN WHO JUST SPOKE WHO PROVIDED THE ANALYSIS.

SEVERAL SITES WERE LOOKED AT IN THE GENTLEMAN'S STUDY, I

BELIEVE IT WAS ALTA BATES, IT WAS THIS BUILDING AND THE FINE

ARTS BUILDING.

I GUESS MY QUESTION IS, WHETHER THE LACK OF ADEQUATE

COVERAGE WAS AN ISSUE REGARDING THE WAY THE BUILDINGS ARE

STRUCTURED OR WHETHER IT'S AN ISSUE REGARDING WHETHER THERE

ACTUALLY IS NOT ADEQUATE COVERAGE BASED ON WHERE THE TOWERS

ARE LOCATED AND WHETHER THERE IS A NECESSARY NETWORK TO

PROVIDE SERVICE.

IT IS CONCEIVABLE TO ME THAT BECAUSE A BUILDING HAS CONCRETE

WALLS OR ANY OTHER STRUCTURAL ISSUES, THAT THAT MAY LIMIT

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

THE ABILITY OF SERVICE.

I'M JUST TRYING TO GET AN UNDERSTANDING ABOUT HOW DO WE

MEASURE WHETHER THERE IS ADEQUATE SERVICE AT THESE LOCATIONS.

AND DO THOSE ENVIRONMENTAL STRUCTURES WEIGH INTO THAT?

>> THERE'S A COUPLE OF WAYS OF DETERMINING THAT.

FIRST ALL IT'S CUSTOMER COMPLAINTS.

YOU GET A NEW CUSTOMER AND HE WORKS IN A BUILDING AT SUCH

AND SUCH LOCATION AND THEY FIND OUT THAT THERE'S -- THEY

CAN'T COMMUNICATE.

THEY CAN'T CALL EACH OTHER OR TALK TO -- A LOT OF THESE

CUSTOMERS ARE LIKE DISPATCHING AND TRYING TO GET HOLD OF

THEIR FIELD UNITS.

THE OTHER THING THAT HAPPENS IS BASICALLY THESE NETWORKS ARE

CONTROLLED BY A SWITCH.

A BIG SWITCH.

IT'S BASICALLY MIRRORS WHAT THE TELEPHONE COMPANY USES AT

THE CENTRAL OFFICES.

YOU'VE HEARD OF CENTRAL OFFICES.

THEY HAVE A BIG -- AN OLD LUCENT SWITCH.

BASICALLY THESE SWITCHES, OR SWITCH, COMMUNICATES WITH EACH

CELL SITE.

THERE'S CONSTANT COMMUNICATIONS WITH A CELL SITE.

ONE OF THE THINGS THEY MONITOR IS THEY MONITOR DROPPED CALLS

AND THEY ALSO MONITOR BLOCKING.

JUST LIKE THE PHONE COMPANY MONITORS THEIR TRUNK LINES FOR

THOSE KINDS OF -- NOT SO MUCH DROPPING BUT THEY LOOK FOR

BLOCKING.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

BLOCKING IS THAT YOU CAN'T GET ACCESS.

I DON'T KNOW IF YOU'VE BEEN IN A SITUATION LIKE MOTHER'S DAY

AT HOME AND YOU TRY TO CALL YOUR MOTHER IN WEST VIRGINIA,

YOU GET A FAST BUSY.

THAT MEANS THE TRUNKS ARE BLOCKED.

THAT USUALLY HAPPENS AT WHAT THEY CONSIDER PEAK TIMES OF THE


PHONE COMPANY DOES NOT BUILD A SYSTEM TO MITIGATE THAT

SITUATION.

BECAUSE THAT'S A ONCE A YEAR SITUATION AND CHRISTMAS TIME.

THE OTHER TIME YOU RUN INTO THESE ISSUES IS WHEN YOU HAVE A

MAJOR DISASTER OR STORM.

THE PHONE LINES GET COMPROMISED.

THE SWITCH, WHEN YOU LOOKED AT THEIR DATA, I ASKED FOR THE

SWITCH DATE A THE SWITCH DATA IS WHAT THE ENGINEERS USE,

ALSO, TO DETERMINE IF THERE IS AN ISSUE IN THE AREA.

THE SWITCH IS ACTUAL PRINTOUT OF WHAT THE SWITCH IS SEEING.

YOU CANNOT CHANGE THAT.

BECAUSE IT'S A PRINTOUT, IT COMES IN A FORMAT, AND BASICALLY

THAT'S IT.

NOW, THIS TYPE OF ANALYSIS IS ALWAYS USED IN PUBLIC SAFETY

SYSTEMS.

POLICE DEPARTMENTS ARE GOING TO TRUNKING SYSTEMS.

AND BASICALLY IT'S THE SAME THING.

WHEN A POLICE SYSTEM IS PUT IN, THEY DO GET INTO A SITUATION

CALLED QUEUING WHEN THEY GET A LOT OF HIGH QUEUING, THE

POLICE OFFICER CAN'T GET ACCESS TO THE SYSTEM.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

WHAT THE POLICE DEPARTMENT DOES, GOES BACK AND TRIES TO GET

ANOTHER FREQUENCY..

THIS IS A CAPACITY RELATED ISSUE.

NOW, DROPPING IS A BYPRODUCT OF BLOCKING.

IF THE NETWORK, THE SITE THAT YOU ARE MOVING ALONG THE ROAD

IS GOING TO BE HANDED OFF TO ANOTHER SITE, THERE'S NO ROOM,


YOU'RE DROPPED.

SO THEY WORK HAND IN HAND.

AND COVERAGE IS BASICALLY WHAT THEY DO ALSO, BASED ON THE

TRENDING REPORTS.

NOW THEY DO TRENDING REPORTS, I WORKED FOR AN AGENCY FOR 7,

8 YEARS, I'VE DONE THESE THINGS IN THE PAST, THERE'S A

TRENDING.

WHEN YOU INITIALLY PUT IN A SYSTEM YOU WATCH THE NETWORK, AS

TIMES GO ON YOU WATCH FOR CHANGES.

SO THESE TRENDING REPORTS ALSO HELP TO SAY, YEAH, THE

CUSTOMER IS RIGHT, WE HAVE A PROBLEM HERE.

SO THE NEXT THING THEY DO IS YOU GO OUT AND YOU DO A

COVERAGE TEST.

YOU GO OUT THERE AND YOU DRIVE.

BASED ON THE DATA HERE, IT SHOWS THAT THERE IS AN ISSUE.

BECAUSE WHEN YOU DO GO INTO BUILDINGS, I KNOW IT'S A VERY

DIFFICULT SUBJECT TO DEFINE TO ANYBODY.

EACH BUILDING HAS ITS OWN CHARACTERISTICS.

ONE OF THE THINGS YOU'LL NOTE IN NEW BUILDINGS WITH THE

GLASS WINDOWS THAT THEY PUT A LEAD OR METAL METALLIC PRODUCT

IN THE WINDOWS TO GIVE IT MORE SHADING, CUTS DOWN ON THE

**This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.**

LIGHT.

IT AFFECTS BUILDING COVERAGE.

THERE'S SO MANY VARIABLES THAT IT TAKES TO KEEP THESE

SYSTEMS GOING.

THIS IS SOMETHING THAT I DON'T WANT TO GET TOO COMPLICATED


BUT THERE IS A LOT OF THINGS THAT HAVE TO GO INTO DETAIL

HERE.

I HOPE THAT ANSWERS YOUR QUESTION.

>> J. Arreguin: IT ACTUAL WILL YOU DOESN'T ANSWER MY

QUESTION.

   -- IT ACTUALLY DOESN'T ANSWER MY QUESTION.

YOU SAID CUSTOMER COMPLAINTS IS THE MAIN COMPONENT TO

ANALYZING THAT.

BUT IF A CUSTOMER IS COMPLAINING ABOUT THE LACK OF ADEQUATE

COVERAGE BECAUSE THEY CAN'T GET A GOOD SIGNAL BECAUSE THE

WAY THAT THE BUILDING IS STRUCTURED PREVENTS THEM FROM DOING

THAT, THEN HOW DO YOU DIFFERENTIATE THOSE THINGS?

I DON'T UNDERSTAND.

>> WELL, THE SYSTEM, IT DEPENDS ON THE INITIAL COVERAGE OF

ON THE STREET COVERAGE.

AT LEAST BE A ON THE STREET COVERAGE.

   -- THERE'S AN ON THE STREET COVERAGE.

>> C. Tiedemann: EXCUSE ME, DON'T INTEREST RUT, YOU WILL

HAVE YOUR TIME.

>> ONE OF THE MAPS I SHOWED YOU, THAT'S ON THE STREET

COVERAGE.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

IT PICKS WHAT THE SYSTEM IS RADIATING ON THE STREET.

NOW, A HAND SET, WHICH IS YOUR TELEPHONE, HAS A THRESHOLD OF WHERE IT DOESN'T RECEIVE THE SIGNAL ANY MORE.

SO, BASICALLY, DEPENDING -- IF THE OUTSIDE OF THE BUILDING IS MARGINAL, THEN THE PERSON WALKS INTO THE BUILDING,

THERE'S A GOOD POSSIBILITY THE HAND SET WILL TRACK AND YOU CAN'T INITIATE A CALL N THEIR CASE THEY HAVE ONSTREET COVERAGE ISSUES WHICH HAS TO BE MITIGATED BY ACTUALLY ADDING THE CELL SITE TO THEIR NETWORK.

I LOOKED AT SURROUNDING SITES AND THE ANTENNAS CANNOT BE MOVED.

WE LOOKED AT THOSE OPTIMIZATION ISSUES.

>> J. Arreguin: I GUESS THE REASON I ASKED THIS QUESTION, MR. ROBINETTE SAID THE REASON THEY LOOK AT SERVICE SHOULD BE IMPROVED IS THROUGH THE CUSTOMER COMPLAINTS FROM INSTITUTIONS, WE HAVE SEVERAL INSTITUTIONS THAT WERE SCUDDYED, IT'S NOT CLEAR WHETHER THE REASON WHY THERE WAS INADEQUATE COVERAGE IS BECAUSE THERE ISN'T A SUFFICIENT NETWORK OR BECAUSE THEY CAN'T GET GOOD COVERAGE, BECAUSE OF THE WAY THE BUILDING IS CONFIGURED.

THAT'S WHY I WANTED TO ASK THIS QUESTION, TO GET CLARIFICATION ON THAT.

I HAVEN'T.

>> C. Tiedemann: JESSE ANTHONY?

>> J. Anthony: I WAS JUST WONDERING, LIKE YOU MENTIONED, SCHOOLS -- THE SCHOOL DISTRICT AND THE BUSINESSES AND THE HOSPITALS.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

WELL, I'M JUST TRYING TO FIGURE OUT WHY YOU COULDN'T HAVE

THESE ANTENNAS SCATTERED AROUND TOWN TO THE BUSINESSES.

THEY HAVE ROOFS.

AND THE SCHOOLS HAVE ROOFS.


YOU'LL JUST TRYING TO FIGURE WHY YOU PICKED THIS LOCATION,

DECIDED -- IS IT BECAUSE IT'LL COST MORE MONEY TO PUT IT

THERE?

OR BECAUSE THE SCHOOLS DON'T WANT IT ON THEIR BUILDING AND

THE HOSPITALS DON'T WANT IT ON THEIR BUILDING?

>> THAT'S ACTUALLY NOT THE CASE AT ALL.

THERE ARE LOTS OF CRITERIA WE USE.

ONE IS HEIGHT.

WE NEED TO BE UP IN THE AIR.

>> C. Tiedemann: YOU KNOW WHAT?

I SAID I'M NOT GOING TO TOLERATE IT, AND I REALLY AM NOT.

AND I'VE SEEN A LOT OF DISGUSTED PEOPLE.

I WAS SOMEONE WHO VOTED IN YOUR FAVOR LAST TIME.

AND I'M NOT DOING THIS TO TRY TO BE UNFAIR, I'M TRYING TO DO

IT TO BE POLITE AND RESPECTFUL OF PEOPLE.

PLEASE DON'T.

>> WHAT YOU ARE ASKING ABOUT IS SITE SELECTION.

AND THERE IS LOTS OF CRITERIA FOR THAT.

WE HAVE TO HAVE A WILLING LANDLORD WHO IS WILLING TO RENT

SPACE FOR OUR FACILITY.

SECOND, WE NEED TO HAVE A BUILDING THAT IS WITHIN THE

COVERAGE OBJECTIVES.

**This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.**

WE DON'T WANT TO BUILD A SITE THAT WILL TAKE CARE OF THE

OBJECTIVE IF THE OBJECTIVE IS ON SHATTUCK AVENUE BETWEEN

WOOLSY AND DWIGHT, WE NEED A SITE WITHIN THAT BOUNDARY.

BEING DOWN SAN PABLO OR UP ON THE CAMPUS IS JUST A WASTE.


IT WON'T TAKE CARE OF THE COVERAGE OBJECTIVE.

SECOND, WE NEEDED A HEIGHT SO THAT WE DON'T GET A LOT OF

BLOCKING FROM BUILDINGS OR TREES.

BECAUSE IF THAT IS THE CASE, THEN THE SITE IS COMPLETELY

INEFFICIENT AND THERE'S NO REASON TO BUILD IT.

THIS SITE HAS THE LINE OF SIGHT, IT HAS THE LOCATION, AND

THERE'S A WILLING LANDLORD.

AND ALSO, IT WAS SOMETHING THAT WAS -- IT WAS A BUILDING

THAT WAS CONSISTENT WITH THE ZONING ORDINANCE.

FOR A COMMERCIAL DISTRICT, IT'S HIGHER THAN MOST RESIDENTIAL

BUILDINGS, IT JUST SEEMS VERY, VERY IDEAL.

>> C. Tiedemann: OTHER QUESTIONS?

>> S. Shumer: I HAVE ONE OTHER QUESTION.

I WANT TO -- I HAVE ONE OTHER QUESTION.

I WANT TO DISTINGUISH BETWEEN THE NOTION OF CAPACITY AND THE

NOTION OF COVERAGE.

I WANT TO DISTINGUISH BETWEEN YOUR DROPPED CALLS AND BLOCKED

CALLS, AND THE INABILITY TO GET ANY SERVICE INSIDE THE THREE

BUILDINGS THAT ARE DONE.

THAT DIDN'T COME TO US BEFORE.

I'M A LITTLE WARY OF THAT BEING PRESENTED AT THIS POINT.

ALL THREE -- CERTAINLY THE ARTS BUILDING AND ALTA BATES,

WE'RE NOT TALKING ABOUT CAPACITY BUT THE COVERAGE OF

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

PENETRATING THE BUILDING.

THEY BOTH HAVE TOWERS THAT ARE MUCH, MUCH CLOSER.

AND I WOULD THINK THAT IN TERMS OF GAINING ENTRANCE INTO A

BUILDING THAT HAS SOMETHING ON ITS WINDOWS AND THICK WALLS,

ET CETERA, CLOSENESS WOULD BE RELEVANT.

YOU JUST SAID THAT IT WOULD BE IRRELEVANT TO PUT SOMETHING

ON THE UNIVERSITY.

AND YET ONE OF THE EXAMPLES IS THE ARTS BUILDING IS ON THE

UNIVERSITY.

I'M NOT SURE HOW THIS TOWER THAT WE'RE TALKING ABOUT REALLY

DIRECTLY RELATES TO COVERAGE.

FOR ALTA BATES, THE ARTS BUILDING --

>> ALTA BATES IS ON DWIGHT.

THAT'S THE ALTA BATES WE'RE TALKING ABOUT.

>> THE HERRITT CAMPUS ON SHATTUCK.

>> WE HAVE ADEQUATE COVERAGE ON ASHBY.

OFTEN, JUST AS AN ASIDE, IF THERE IS A BUILDING THAT IS

WITHIN ADEQUATE COVERAGE, IN OTHER WORDS THERE'S A BUILDING

ISSUE WHERE FOR SOME REASON THE ARCHITECTURE OF THE BUILDING

IS HARD TO GET A SIGNAL INSIDE THE BUILDING, SAY THERE IS A

HEAVY BASEMENT, OR OTHER IMPEDIMENTS TO THE SIGNAL,

SOMETIMES WE CAN USE A REPEATER.

THAT'S TAKING THE EXISTING SIGNAL IN THE AREA AND REPEATING

IT IN THE BUILDING.

THAT'S A VERY LOW COST WAY TO PROVIDE SERVICE TO OUR

CUSTOMERS.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.



WE TRY TO DO THAT IN ANY INSTANCE WE'RE ABLE TO.

IN THIS CASE WE WERE NOT ABLE TO.

THERE'S NOT ENOUGH COVERAGE ON THE STREET OR A DONOR SITE

THAT WE CAN TAKE THE SIGNAL AND DISTRIBUTE IT INSIDE OF THE

PARTICULAR AREA.

>> C. Tiedemann: OTHER QUESTIONS?

JESSE?

>> J. Anthony: IF FO INSTANCE THE U.C. BUILDING, IS THAT --

IF THAT BUILDING DID NOT EXIST, WHAT WOULD YOU DO?

PUT A TALLER POLE UP AND PUT SOMETHING ON IT?

HOW WOULD YOU -- WHAT WOULD YOU DO IF THAT BUILDING WASN'T

AROUND?

THEN WOULD YOU USE THAT SAME BLOCK, THE SAME THREE OR FOUR

BLOCKS -- I'M JUST WONDERING WHAT DO YOU DO?

COMMUNICATION IS SOMETHING WE ALREADY KNOW SOMETHING ABOUT

BY NOW.

I'M JUST TRYING TO FIGURE OUT -- MONEY ISN'T INVOLVED IN

THIS?

>> I'M NOT QUITE SURE I UNDERSTAND THAT QUESTION.

>> J. Anthony: MOST OF THE TIME WHEN PEOPLE MAKE DECISIONS,

EVEN A GOVERNMENT, IT'S MONEY.

I MEAN, WE'RE IN SERIOUS TROUBLE BECAUSE OF MONEY.

NOT BECAUSE OF THE FACT THAT PEOPLE WERE TRYING TO PROTECT

US.

AND I'M TRYING TO FIGURE OUT WHY WOULD -- WHY IS IT THAT

THAT NEIGHBORHOOD HAS TO BE THE ONE, FOR INSTANCE, THAT YOU

WOULD PUT IT?

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

IF THE BUILDING WASN'T THERE, WAS THERE SOMETHING -- I

UNDERSTAND THERE ARE SOME PLACES YOU CAN RENT AND SOME PLACE


US CAN'T RENT.

BUT IF I HAD A BUSINESS LIKE A HOSPITAL, I WOULDN'T MIND

THEM PUTTING WHATEVER I NEEDED ON IT.

>> WELL, THERE ARE A COUPLE OF ANSWERS TO YOUR QUESTION.

THE R.F. ENGINEER MAY BE ABLE TO ADD SOMETHING TO IT.

BUT FIRST OF ALL WE LOOK AT THE ZONING.

AND THE AREA.

THE BUILDING WAS IDEAL IN TERMS OF ZONING.

WE'RE TRYING TO STAY AS FAR AWAY FROM RESIDENTIAL AREAS AS

POSSIBLE.

EVERY NEIGHBORHOOD IN THE CITY, AND I WORKED AS A PLANNER, I

KNOW THIS, HAS A RESIDENTIAL -- THERE'S A COMMERCIAL AND

RESIDENTIAL ADJACENT.

SO THE MAIN ARTERIAL, SHATTUCK, SAN PABLO, UNIVERSITY ALL

HAVE RESIDENTIAL NEARBY.

HOW DO YOU CHOOSE THAT NEIGHBORHOOD THAT IS MOST OPTIMUM?

THAT WOULD HOPEFULLY HAVE THE LEAST EXPOSURE TO RESIDENTIAL

USES?

WE HAVE A TALL BUILDING THAT IS AT LEAST TWO STORIES TALLER

THAN 99% OF THE RESIDENTIAL UNITS IN THE AREA.

IT SEEMED IDEAL.

BECAUSE IT'S GOT THAT SEPARATION VERTICALLY AND

HORIZONTALLY.

AND IN FACT THIS BUILDINGSING IS BORDERED ON THREE SIDES BY

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.
COMMERCIAL DISTRICTS.

ONLY ONE SIDE ON THIS BUILDING IS RESIDENTIAL.


LIKE I SAID, AT A PREVIOUS HEARING, MOST OF THE BUILDINGS IN

THAT AREA ARE TWO STORY.

THIS BUILDING IS FOUR TO FIVE STORIES.

THERE'S THAT VERTICAL SEPARATION THAT'S IMPORTANT.

THAT VERTICAL SEPARATION NOT ONLY KEEPS US AWAY FROM THE

RESIDENTIAL USES BUT ALSO GIVES US THE LINE OF SIGHT TO BE

ABLE TO PUT ANTENNAS WHERE THEY NEED TO BE.

>> C. Tiedemann: OKAY.

LET'S HEAR FROM MICHAEL.

>> M. Alvarez-Cohen: I THINK THIS QUESTION IS GOOD TO POSE

RIGHT NOW N MY RESEARCH, I THINK I KNOW THE ANSWER BUT IT'S

IMPORTANT TO ME TO GET CONFIRMATION.

THE ANALYSIS HERE IS JUST IN ONE SECTION OF BERKELEY.

AND IN ONE DIRECTION OF THE PROPOSED SITE.

DOES THAT MEAN THAT THE ADDITIONAL TOWERS, THE ANTENNAS

PROPOSED HERE ARE GOING TO BE FACING THE DIRECTION OF THIS

ANALYSIS?

THE ANTENNAS BEING PROPOSED HAVE A DIRECTION.

THEY'LL FACE A CERTAIN AREA TO IMPROVE COVERAGE AND

CAPACITY.

>> OF COURSE, YES.

>> M. Alvarez-Cohen: THIS THE ANALYSIS THAT WE HAVE.

AND IT'S ONLY FOR ONE DIRECTION FROM THE TOP OF THIS

PROPOSED BUILDING.

DOES THAT MEAN THAT THE ANTENNAS ARE GOING TO BE FACING IN

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

ONLY THIS DIRECTION TO COVER THIS AREA?

>> C. Tiedemann: COME UP TO THE MIKE.

>> THE AREA THAT YOU HAVE HERE, TWO OF THE ANTENNA FACING

ONE TO THE NORTH AND ONE TO THE SOUTH.

YOU HAVE TWO ANTENNA.

AND THE THIRD ANTENNA WILL BE TO THE EAST SIDE.

>> M. Alvarez-Cohen: YOU WILL GO FOR THE ENTIRE PERIPHERY.

>> YES.

>> M. Alvarez-Cohen: WHY DO WE ONLY HAVE ANALYSIS FOR ONE OF

THOSE DIRECTIONS?

>> IT IS FOR TWO.

FOR THE NORTH AND THEN THE SOUTHWEST.

>> M. Alvarez-Cohen: THE RESIDENTIAL NEIGHBORHOODS, THE

LECONTE NEIGHBORHOOD THE ONE THAT THERE IS -- LECONTE, WHY

DON'T WE HAVE A COVERAGE ANALYSIS FOR THAT?

>> I'M NOT QUITE SURE.

>> M. Alvarez-Cohen: THAT'S A LACK OF EVIDENCE THAT IS A

PROBLEM.

>> WE HAD COVERAGE PROBLEMS.

YOU CAN SEE THE NEED FOR THE SITE.

>> M. Alvarez-Cohen: I'M NOT SURE THAT IS A SATISFACTORY

ANSWER.

>> FOR THE TWO SECTORS.

>> M. Alvarez-Cohen: BUT NOT THE THIRD.

>> THE THIRD WOULD BE TAKEN WEST.

>> THE RESIDENTIAL NEIGHBORHOOD THAT IS MOSTLY CONCERNED

Captioner's Report, ZAB, 06-28-07                    Page 111 of 176

**This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.**
                ABOUT SAFETY ISSUES.


        LET ME MOVE ON.

        THE EXISTING TOWERS, THE ANTENNA THERE, HOW MANY ARE THERE,

        AND IN WHICH DIRECTION?

        ARE THEY FACING EVERY ANGLE, ALL THREE SECTORS?

        >> THE ANTENNA, YES.

        >> M. Alvarez-Cohen: OKAY, THIS IS TROUBLE THE ENTIRE

        PERIPHERY.

        >> D. Sanderson: THERE ARE NO ANTENNAS ON THE SITE NOW.

        >> I THOUGHT HE WAS TALKING ABOUT THE SURROUNDING.

        >> M. Alvarez-Cohen: I THOUGHT THE BUILDING HAS ALREADY,

        THIS IS ADDITIONAL.

        >> NO, NO.

        >> S. Shumer: TWO COMPANIES ARE PUTTING THEM IN.

        >> M. Alvarez-Cohen: ALL RIGHT, GOT IT.

        >> C. Tiedemann: ARE YOU DONE, MICHAEL?

        LET'S HEAR FROM PAUL ABATRON, PLEASE.

        >> THANK YOU.

        I HAVE A QUICK PROCEDURAL QUESTION.

        I HAVE A FIVE-MINUTE PRESENTATION, I'LL CUT TO IT FOUR.

        WE UNDERSTAND WE HAVE A REBUTTAL OF THREE MINUTES?

        >> C. Tiedemann:.'

        >> THERE WERE A NUMBER OF QUESTIONS RELATED TO VERIZON

        WIRELESS, I HAVE WRITTEN THEM DOWN, I'D LIKE TO ANSWER THEM

        AFTER MY PRESENTATION.

        I'M COUNCIL TO VERIZON WIRELESS, THANK YOU FOR YOUR TIME.

        THIS IS A SERIOUS ISSUE AND WE APPRECIATE YOUR SERIOUS

**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

CONSIDERATION.

I HAVE WITH ME DUANE BONHAM OUR R.F. PERFORMANCE MANAGER AND

OUR R.F. ENGINEER AND JAMES SINGLETON WHO HAS BEEN WORKING

ON THIS PROJECT FOR OVER TWO YEARS.

WE'RE APPEARING ON THE SECOND REMAND FROM THE CITY COUNCIL

FOR TWO REASONS.

I UNDERSTAND THIS IS THE THIRD TIME WE'VE APPEARED BEFORE

YOU, THE THIRD TIME THE STAFF HAS RECOMMENDED APPROVAL OF

THIS PROJECT.

THE TWO REASONS THAT THE COUNCIL REMANDED THIS TO YOU WAS

FOR A LEGAL UPDATE FROM THE CITY ATTORNEY WHO WE THOUGHT

WOULD BE HERE TONIGHT, AND THE OTHER WAS TO REVIEW NEW

EVIDENCE SINCE YOU REVIEWED THIS IN JANUARY.

I'VE GIVEN YOU A LETTER WHERE I REVIEW THAT EVIDENCE FOR

YOU.

I'D LIKE TO RUN THROUGH IT QUICKLY.

ON THE LEGAL UPDATE, I HOPE THAT THE CITY ATTORNEY ADVISED

YOU OF THE JUNE 13 OF THIS YEAR AFFIRMATION OF MY NINTH

CIRCUIT COURT OR APPEALS, SPRINT VERSUS SAN DIEGO WHICH

STRIKES TOWN SAN DIEGO ORDINANCE AS BEING OVERLY BURDENSOME

FOR FACILITY.

MANY OF THE REQUIREMENTS IN THE BERKELEY ORDINANCE ARE IN

THE SAN DIEGO ORDINANCE INCLUDING A DEMONSTRATION OF NEED

AND THE OBLIGATION TO HIRE THIRD PARTY COUNCIL -- CONSULTANT

I MUST BE TALKING TOO LATE.

WE HAVE CONTINUED TO COMPLY WITH THE BERKELEY MUNICIPAL

Captioner's Report, ZAB, 06-28-07                    Page 113 of 176

**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

CODE.

BUT RESERVE HAVE THE LIGHT TO CHALLENGE THAT OBVIOUSLY THOSE
CODE PROVISIONS.

NEW EVIDENCE THAT IS BEFORE YOU, YOU HAVE THE THIRD PARTY
ENGINEERING REPORT, AS YOU KNOW VERIZON WIRELESS IS FOCUSING
ON A CAPACITY SITE.

WE AGREED TO COVERAGE TESTING FOR IN-BUILDING COVERAGE WHICH
IS SECONDARY CONSIDERATION FOR US.

I'd BE HAPPY TO TALK ABOUT THE CAPACITY VERSUS COVERAGE.

WE'VE ATTACHED AND YOU HAVE THE REPORT IN YOUR PACKET.

WE ALSO DID AN OUTREACH, THOSE ARE THE CARDS YOU WERE
TALKING ABOUT, WE SENT TO CUSTOMERS IN THE VICINITY OF THE
SITE.

AND WE RECEIVED 125 CARDS BACK, FROM CUSTOMERS WHO SAID
THEY'D LIKE TO SEE IMPROVED COVERAGE.

TWO OF THEM OPPOSED, 123 SUPPORTING.

WE DID GET A NUMBER SAYING THEY WANTED, I'LL TRY AND ANSWER
THAT QUESTION, ADDITIONAL SERVICE IN THE GRIZZLY PEAK.

OUR SITE IN COVERAGE IS A CAPACITY SITE.

PHONES WORK IN THIS AREA BUT OUR CONCERN, IT'S IN THE REPORT
AND THE INFORMATION WE PROVIDED, BY 2008 WE'RE NOT GOING TO
HAVE ENOUGH CAPACITY TO SERVE THE NUMBER OF CALLS GOING INTO
THAT AREA.

THEY NEED SERVICE IN GRIZZLY PEAK.

THERE IS A GOOD REASON THEY DON'T HAVE IT, YOUR ZONING
DOESN'T PROMOTE IT AND PUTTING RIGHTS IN A RESIDENTIAL ZONE

- 329 -

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

IS DIFFICULT.

WOULD WE LIKE SERVICE IN GRIZZLY PEAK, ABSOLUTELY.

ALSO IN THE ADDITIONAL EVIDENCE THAT WAS PROVIDED WAS AN

AFFIDAVIT FROM DOANE BONHAM WHICH HE IS A SWORN AFFIDAVIT,

UNDER PENALTY OF PERJURY, HE STATES THAT THE INFORMATION

PROVIDED WAS RELIABLE INFORMATION FROM OUR SWITCH.

HE ALSO COMMENTS ON HOW FIELD TESTING IS IRRELEVANT TO

CAPACITY.

WE HAVE SUPPLIED A SUPPLEMENTAL ALTERNATIVE ANALYSIS TO THE

CITY COUNCIL WHICH SHOWS 7 OR 8 SITES THAT WERE REVIEWED BY

VERIZON AND DEMONSTRATES WHY THIS IS THES LEAST INTRUSIVE

ALTERNATIVE.

YOU TALK ABOUT ANALYSIS.

WE ALSO SUBMITTED AFFIDAVITS FROM THE STORE MANAGER IN CORTE

MADERA AND AFFIDAVIT FROM A CUSTOMER SERVICE REPRESENTATIVE

IN CORTE MADERA -- IN BERKELEY INTERVIEWED BY THE OPPONENTS,

THE EVIDENCE THEY SUPPLIED WAS COMPLETE HERE SAY, AND IS

CONTRADICTED BY THIS AFFIDAVIT PLUS, AGAIN, THERE ARE SWORN

STATEMENTS UNDER PENALTY OF PERSONALRY.

AND, AGAIN, WHAT YOU DON'T HAVE -- PERJURY.

YOU DON'T HAVE SUBSTANTIAL EVIDENCE FOR DENIAL OF THIS SITE

WHICH IS REQUIRED UNDER FEDERAL LAW.

THAT CONCLUDES MY COMMENTS.

I DID IT IN UNDER FOUR MINUTES.

I'LL QUICKLY IF I MAY REFER TO THE QUESTIONS.

HOPEFULLY THIS WILL EXPEDITE YOUR REVIEW.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

>> C. Tiedemann: WE APPRECIATE THAT.

THAT YOU TOOK NOTES.

>> HERE WE GO.

FORGIVE ME IF I SPEAK TOO QUICKLY.

JUST ASK ME TO REPEAT.

IN TERMS OF MAINTENANCE, THE SITES ONLY REQUIRE TWO VISITS

PER YEAR.

THEY'RE MONITORED REMOTELY, FOR EVERYTHING FROM FIRE --

THEY'RE MONITORED REMOTELY.

A VAN COMES IN, FOR ABOUT FOUR HOURS AND IT'S TWICE A YEAR.

IF ANYTHING HAPPENS THEY HAVE MONITORS ON THE SITE AND THEY

CAN BE THERE 24 HOURS A DAY.

IN TERMS OF RATING, THIS IS ONE OF THE ISSUES THAT CAME UP

WITH THE INTERVIEWS OF THE STORE MANAGER, THEY LOOK AT A

COMPUTER LOCATEOR TOOL WHICH ALLOWS TO PINPOINT AN ADDRESS

FOR A CUSTOMER AND TELL THEM IF THERE IS COVERAGE.

THAT'S ALL THAT MAP SHOWS, IS IF THERE'S COVERAGE.

THERE'S NO RATING OF ONE, TWO OR THREE AS PURPORTED BY THE

OPPONENTS FOR SAN FRANCISCO VERSUS BERKELEY OR SOMETHING

ELSE.

ALL THEY SHOW IS COVERAGE.

HAS NOTHING TO DO WITH CAPACITY.

WHICH IS WHY THIS SITE IS NEEDED.

I ALREADY MENTIONED THE CARDS.

AND WE DID GET CARDS FROM WARD, WHITE, LECONTE WHERE PEOPLE

WANTED ON THEY ARE SERVICE, ADDITIONAL COVERAGE IN GRIZZLY

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

PEAK AND ELSEWHERE.

HARD EVIDENCE, WE PROVIDE EXTREMELY HARD EVIDENCE.

WE PROVIDED IT UNDER PROPRIETARY CONFIDENTIALITY AGREEMENT,

WE PROVIDED ACTUAL DROPPED CALL DATA FOR 30 DAYS DURING THE

MONTH OF OCTOBER IN 2006, WE PROVIDED ACTUAL DATA FOR

MINUTES OF USE FOR NOVEMBER 2005 AND NOVEMBER 2006 SHOWING A

93% INCREASE OF MINUTES OF USE OF BERKELEY CUSTOMERS DURING

THAT PERIOD OF TIME.

93%.

PEOPLE ARE USING THEIR PHONES.

THERE WAS A 300% INCREASE IN DATA, THAT'S THE TEXT

MESSAGING.

I'M NOT GOOD AT THAT BUT A LOT OF YOUNG PEOPLE ARE.

IT TRIPLED THE AMOUNT OF USAGE.

THIS IS THE CAPACITY WE'RE TRYING TO MEET IN BERKELEY.

THERE WAS AN -- A QUESTION OF WHAT IS THE LEVEL THAT WE

DETERMINE WHEN WE NEED TO PUT IN NEW FACILITIES.

THIS IS IN YOUR REPORT, EACH OF THE CELL SITES HAS A CERTAIN

NUMBER OF CARRIERS, RADIOS WE CAN PUT UP THERE.

IN JANUARY OF THIS YEAR WE'LL PUT THE MAXIMUM NUMBER OF

RADIOS IN THE AREA.

AT THAT POINT WE HAVE NO MORE CAPACITY AND WE'LL START

BECAUSE OF THIS INCREASE, AND ACTUALLY OUR PROJECTIONS ARE

BASED ON A LOWER -- THAT WAS A SURPRISE TO OUR ENGINEERS

WHEN WE PROVIDED THAT INFORMATION.

THEY ACTUALLY PREDICT LOWER INCREASES.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

BUT BASED ON THEIR PREDICTIONS THEY'LL BEGIN TO RUN OUT OF

CAPACITY IN 2008.

THAT'S HOW IT'S FIGURED OUT.

IT'S EXTREMELY COMPLICATED AND I APPLAUD YOU FOR HIRING A

THIRD PARTY ENGINEER.

THERE'S CLOSER BUILDINGS, CLOSER SITES TO THE BUILDINGS THAT

WE SITED.

THE ANSWER IS NO, THAT WAS CLARIFIED.

WHY THIS LOCATION, THERE IS alternative ANALYSIS THAT SHOWS

A NUMBER OF BUILDINGS THAT WE LOOKED AT.

COREY DID A GOOD EXPLANATION OF WHY THAT HAPPENS.

I HAVE TO SAY THIS IS VERIZON WIRELESS, FIVE FLUSH MOUNTED

ANTENNAS ON THE FACADE OF A BUILDING N SAN FRANCISCO WHICH

HATS TOUGHEST GUIDELINES IN THE COUNTRY, THIS SITE IN A

COMMERCIAL ZONE WOULD BE WITHOUT A REQUIRED AUP.

IT IS A COMMERCIAL ZONING, COMMERCIAL BUILDING FLUSH MOUNTED

ANTENNA.

THE EQUIPMENT IS ALL INSIDE.

THE BUILDING IS SO HIGH THAT THE R.F. ISSUES ARE NEGLIGIBLE.

IF YOU LOOK AT THE REPORT THAT YOU RECEIVED, 3% OF THE FCC

STANDARDS.

WE CAN TALK ABOUT THE FCC STANDARDS IF YOU NEED TO.

CONCLUDES MY REMARKS AND THE QUESTIONS.

IF YOU HAVE FURTHER QUESTIONS I'D BE HAPPY TO ANSWER THEM.

>> C. Tiedemann: MICHAEL WAS FIRST IN LINE, THEN JESSE

ANTHONY, THEN JESSE ARREGUIN.


>> M. Alvarez-Cohen: I WANT TO FOLLOW UP ON MY SUBSEQUENT

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

COMMENT, MAYBE YOU CAN RESPOND TO IT.

A LOT OF THIS WHOLE DISCUSSION IS ALL BASED ON EVIDENCE.

AND DEBBIE INFORMED ME THAT SOME OF THIS EVIDENCE, IT'S

PRETTY IMPORTANT, IS INACCURATE OR MURKY AT BEST.

THIS MAP HERE, HAS SITES MANY OF WHICH HAVE PARENTHETICAL

NUMBERS ADJACENT TO THEM.

AT HEINZ AVENUE, THERE'S A A NUMBER 161.

AT THIS PROPOSED SITE, SHATTUCK, IT SAYS THAT IT HAS A

NUMBER OF 2, IMPLYING PERHAPS THERE ARE ALREADY ANTENNAS....

THERE.

>> D. Sanderson: I WOULD LYING TO EXPLAIN.

I DIDN'T EXPLAIN WHAT IS BEHIND THIS MAP.

THIS MAP IS THE BEST EVIDENCE THAT WE HAVE, THOSE ARE

PROPOSED AND APPROVED.

AND AS I PROVE EXPLAINED IF I HAD THOUGHT OF IT EARLY

ENOUGH, I BROUGHT THIS MAP, SEVERAL PEOPLE HAVE BEEN ASKING

FOR IT.

IT HAS SOME INACCURACIES IN IT.

I STRUGGLED WITH WHETHER NOT TO GIVE YOU THE MAP UNTIL IT

WAS PERFECT AND DECIDED THAT A MAP SHOWING THE LOCATIONS OF

THE TOWERS WAS BETTER THAN PROVIDING YOU NOTHING.

THE NUMBER OF ANTENNAS IS NOT ACCURATE IN THIS LIST.

AND THERE MAY BE SOME DOWNLYCATION IN THERE OF PROJECTS.

BUT THE LIST, THE MAP GOES ALONG WITH THE INVENTORY LIST

THAT WAS ALSO GIVEN TO YOU.


AND IF THIS IS DISTRACTING, WE'LL JUST RIP IT UP AND TAKE IT

**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

OUT OF THE RECORD.

>> M. Alvarez-Cohen: WE CAN CLARIFY IT.

BUT ALSO YOU SAID THAT THERE WERE FIVE ANTENNAS FLUSH

MOUNTED.

>> VERIZON CAN PUT FIVE FLUSH MOUNTED TRANSMIT RECEIVE

ANTENNAS.

THERE IS ALSO A GPS ANTENNA, NOT A CELLULAR ANTENNA.

THAT'S VERIZON WIRELESS.

SPRINT NEXTEL HAS ANTENNAS THEY'RE PROPOSING AS WELL.

>> M. Alvarez-Cohen: THAT MAKES THIS AMONG THE MOST DENSE

ANTENNA SITES IN THE CITY?

>> ABSOLUTELY NOT N THIS CITY.

IT CERTAINLY IS NOT -- THERE ARE CO-LOCATION SITES WHICH

HAVE SIX CARRIERS ON THEM.

THIS IS TWO CARRIERS.

I DON'T KNOW IF THERE ARE ANY THREE CARRIERS --

>> D. Sanderson: WE HAVE THREE CARRIERS ON THE ONE SITE I

CAN THINK OF, ON THE TEMPLE, DOWN ON ADELINE.

>> M. Alvarez-Cohen: JUST TO FINALIZE --

>> YOUR COATED ENCOURAGES CO-LOCATION.

>> M. Alvarez-Cohen: I KNOW THAT.

WHICH MAY ALSO HAVE ITS WEAKNESSES BUT THAT'S A DIFFERENT

STORY.

YOUR FIVE ANTENNAS, ARE THEY FACING ALL DIRECTIONS AS WELL?

>> OUR ANTENNAS ARE FACING NORTH AND SOUTH.


AND EAST.

>> S. Shumer: NOT WEST.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

>> THE WESTERN FACADE IS CLEAN.

THIS WENT THROUGH DESIGN REVIEW.

AND OUR SOUTH FACING ANTENNAS WERE REQUIRED TO BE PLACED ON

THE EAST FACADE THERE, THEY'RE ACTUALLY ON THE CORNER FACING

SOUTH.

THIS PROJECT WENT THROUGH DESIGN REVIEW COMMITTEE IN MAY OF

2005.

THERE ARE AESTHETIC CONSIDERATIONS THAT WERE CONSIDERED.

THE PRIMARY CORRIDOR WE'RE TRYING TO COVER IS THE SHATTUCK

COMMERCIAL CORRIDOR.

AND THAT IS THE PRIMARY ANTENNAS NORTH AND SOUTH.

THERE WAS A QUESTION IF THIS BUILDING WERE NOT HERE WHERE

WOULD WE GO AND WE WOULD BE LOOKING FOR A COMMERCIAL

BUILDING IN THAT AREA THAT HAD THAT KIND OF HEIGHT, PERHAPS

2701 SHATTUCK.

THAT'S ONE THAT IS COMING BEFORE YOU.

>> M. Alvarez-Cohen: HOW MANY ANTENNAS ARE FACING EAST OVER

THE LECONTE?

>> TWO FOUR-FOOT PANELS.

THESE ARE, I HAVE TO REMIND YOU, IF AN ANTENNA IS 10 METERS

IN THE AIR THE FCC DOESN'T REQUIRE YOU TO DO ANY KIND OF

TESTING IN TERMS OF R.F. ANALYSIS.

AT LEAST FIVE STORIES HIGH.

THE SIGNAL IS A DIRECTIONAL ANTENNA, IT GOES OUT LIKE A

LIGHTHOUSE, IN A FAN SHAPED SHAPE.

SO THE SIGNAL THAT IS DISAPPOINTED, UP AND DOWN FROM THE

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

DIRECTION THAT IT IS FACING.

>> C. Tiedemann: JESSE ANTHONY?

>> J. Anthony: I THOUGHT I HEARD YOU SAYING IN SOMETHING
ABOUT GRIZZLY PEAK, YOU COULDN'T PUT ONE UP BECAUSE OF A
ZONE OR SOMETHING?

IT WASN'T ZONED FOR IT?

>> YOUR CODE ENCOURAGED PLACEMENT OF FACILITIES ON
COMMERCIAL BUILDINGS, THIS IS A COMMERCIAL BUILDING.

AND IT TAKES IT DIFFICULT TO PLACE FACILITIES IN RESIDENTIAL
ZONES.

>> C. Tiedemann: JESSE ARREGUIN?

>> J. Arreguin: THANK YOU.

MR. ALBERTSON WE RECEIVED IN OUR RECORD PRIOR TO THIS
MEETING AS WELL AS IN ATTACHMENT C OF THE SUPPLEMENTAL
COMMUNICATION THAT YOU PROVIDE US AS WELL, A NUMBER OF POST
CARDS FROM VERIZON WIRELESS CUSTOMERS INDICATING SUPPORT FOR
THE PROPOSED FACILITY.

DO YOU HAVE ANY UNDERSTANDING ABOUT WHAT PERCENTAGE OF THOSE
CUSTOMERS ACTUALLY WOULD LIVE IN THE AREA THAT WOULD BE
SERVED BY THESE ANTENNAS?

IT APPEARS TO ME ON THE BASIS OF THE ADDRESSES THAT I SEE ON
THE -- THE ADDRESSES THAT I SEE ON THE LIST, A LOT OF THEM
LIVE IN AREAS THAT WOULD BE JUT SIDE OF THE COVERAGE AREA AS
PROPOSED.


>> I HAVE TO SAY THAT I HAD THE SAME CONCERNS.

THIS WAS DONE BY PRECISIONS, THEY MAILED WITHIN, I THINK,
TWO -- PRECISION, THEY MAILED WITHIN TWO ZIP CODES ADJACENT

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

TO WHERE THIS SITE WILL BE LOCATED.

IT WAS DONE BY ZIP CODE.

I AM PUZZLED AT SOME OF THE GRIZZLY PEAK ADDRESSES.

I'M NOT -- I DID SEE ADDRESSES WITHIN, AS I SAID, LECONTE,

DWIGHT, WARD.

WE DID THIS TO TRY AND SHOW THAT YOU THERE ARE BERKELEY

CUSTOMERS WHO DO FAVOR CELLULAR SERVICE.

THEY'RE NOT THE KIND OF PEOPLE WHO SHOW UP AT HEARINGS.

70%, OVER 70% OF CALIFORNIANS CARRY A CELL PHONE.

IT IS A PERVASIVE TECHNOLOGY, IT IS "USA TODAY" SAID THE

APPLIANCE, SECOND APPLIANCE THAT PEOPLE HATE BUT ALL CARRY.

FIRST ONE BEING AN ALARM CLOCK IS THE FIRST APPLIANCE PEOPLE

HATE BUT HAVE TO HAVE.

I WISH I HAD A MORE SPECIFIC ANSWER FOR YOU.

I WANT TO SAY THAT THIS IS ANECDOTAL EVIDENCE OF THE NEED

FOR THE SITE.

THE REALLY HARD EVIDENCE WAS SUPPLIED UNDER PROPRIETARY

AGREEMENT TO THE ENGINEER WHO CONFIRMED OUR NEED TO EXPAND

CAPACITY IN THIS SITE, OR DOWN THE LINE, WHEN THERE'S

CONGESTION, PHONES WILL NOT WORK.

I OFFER A VERY QUICK STORY.

I RECENTLY WAS ON THE PODIUM WITH MAYOR RONDELL HAM

REGARDING COMMUNICATIONS.

HE TOLD THE STORY OF BEING IN A LIMOUSINE IN WASHINGTON,

D.C. DURING 911, HE WAS TRAPPED, TRIED TO CALL HIS WIFE ON

THE CELL PHONE, THE NETWORK WAS BLOCKED, AND HE SAID I WAS



This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

SCARED.

WHAT WE ARE TALKING ABOUT IS REALLY A VITAL INFRASTRUCTURE

WHICH IN TIMES OF CRISIS IS GOING TO PROVIDE PEOPLE TO CALL

THEIR LOVED ONES, CALL EMERGENCY SERVICES IN TERMS OF FIRE

AND EMERGENCY.

IT'S JUST AS THE ENGINEER DESCRIBED, THIS IS INFRASTRUCTURE,

THIS IS THE PHONE COMPANY.

WE'RE TRYING TO DO OUR BEST AND SPENDING A LOT OF MONEY TO

TRY, TWO YEARS IN THIS PROCESS, TO PROVIDE THE CAPACITY THAT

YOUR CLIENTS DESERVE. AND, YES, OUR CLIENTS PAY BILLS AS

WELL.

BUT WE'RE REGULATED BY THE CALIFORNIA PUBLIC UTILITIES

COMMISSION, WE HAVE A CERTIFICATE OF PUBLIC CONVENIENCE AND

NECESSITY.

THERE IS A STRONG COMMUNITY NEED FOR THIS KIND OF

INFRASTRUCTURE.

>> C. Tiedemann: SARA?

>> S. Shumer: JUST A QUICK ONE TO FOLLOW UP HERE.

I'M PUZZLED THAT YOU HAVE YOUR -- THAT THEY'RE DIRECTED EAST

RATHER THAN WEST.

THEY'RE NOT DIRECTED TOWARDS THE COMMERCIAL AREA EXCEPT

NORTH AND SOUTH.

>> WE HAVE THE R.F. ENGINEER HERE.


I DON'T KNOW IF HE WANTS TO REPLY.

HIGH UNDERSTANDING OF THE INTENT NORTH AND SOUTH ANTENNAS,

IT'S LIKE A LIGHTHOUSE, THEY HAVE A FAN EFFECT.

THEY WILL BE FACING SOUTH IN A RADIATING 180 DEGREE FAN

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

SOUTH AND RADIATING 180 DEGREE NORTH.

THEY WILL BE GOING NORTH AND SOUTH PRIMARILY, UP AND DOWN

SHATTUCK AVENUE AND TO THE WEST.

I'M SURE THAT THE COVERAGE NEEDS ARE TO THE EAST.

THE EAST IS JUST THE AREA, IT'S UP WHERE THERE'S LIMITED

COVERAGE UP IN THE HILLS.

>> S. Shumer: LET ME SAY WHAT MY CONCERN IS AND SEE IF YOU

CAN SPEAK TO IT.

>> THE INTENT IS A 360 DEGREE SERVICE PATTERN.

>> S. Shumer: GIVEN THE CHOICE OF FOUR DIRECTIONS, IT

PUZZLED ME IT WAS TOWARDS THE NEIGHBORHOOD RATHER THAN

TOWARDS THE STREET.

I'M TRYING TO GET A HANDLE ON THE REQUIREMENT OF FEDERAL AND

LOCAL THAT SAY THAT WE CANNOT PREVENT SERVICE, PROHIBIT --

CANNOT DO SOMETHING THAT PROHIBITS SERVICE.

AND THAT THERE IS INVOLVEMENT IN NECESSITY.

I'M GOING BACK TO THE FACT THAT IT APPEARS ANECDOTALLY, AND

MAYBE WE CAN GET SWITCHING INFORMATION FROM THOSE SWITCHES

THAT HANDLE THE HILLS IN THE NORTH OF BERKELEY, BUT THAT

THIS AREA IS ACTUALLY BETTER SERVED THAN SOME OTHER AREAS.

YET THE CLAIM IS THAT THIS ONE REQUIRES A TOWER IN ORDER TO

BE ABLE TO PROVIDE SERVICE.


OBVIOUSLY WE'RE PROVIDING SERVICE, WE'RE TALKING ABOUT A

LEVEL.

I'M TRYING TO GET A HANDLE ON WHY SOME AREAS DON'T HAVE TO

HAVE THIS REQUIRED SERVICE AND OTHERS DO.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

AND ON THE OTHER HAND, TRYING TO GET A HANDLE ON WHO SETS

THE LINE FOR WHEN THERE ARE ENOUGH DROPPED CALLS THAT WE NOW

REQUIRE ANOTHER TOWER IN ORDER TO QUOTE UNQUOTE PROVIDE

SERVICE.

IT HAS TO BE PROVIDING ADEQUATE SERVICE.

WHO SETS THAT LEVEL?

>> YOU ASK A VERY BROAD QUESTION.

>> S. Shumer: DO WE HAVE INFORMATION ABOUT IT, WHAT THAT

LEVEL IS?

>> I'M GOING TO TRY AND ANSWER IT QUICKLY.

FIRST, YOU ASKED ABOUT THE STANDARDS.

AND THERE ARE TWO -- I THOUGHT YOUR CITY COUNCIL ATTORNEY

WAS GOING TO GIVE YOU AN UPDATE.

THERE ARE TWO TYPES OF FEDERAL OBLIGATIONS.

UNDER SECTION 332 OF THE TELECOM ACT YOU CAN'T FAN SERVICE.

-- BAN SERVICE.

UNDER SECTION 333 YOU CAN'T MAKE IT IMPOSSIBLE FOR US TO GET

SELL SITES.

IN TERMS OF -- IN ORDER TO DENY A SITE YOU HAVE TO HAVE

SUBSTANTIAL EVIDENCE A WRITTEN RECORD OF WHY THAT YOU DENIED

THAT SITE.

IN TERMS OF YOUR QUESTION ABOUT CAPACITY AND COVERAGE, VERY


GOOD QUESTION, AND YOU CAN UNDERSTAND THAT I MIGHT WANT TO

HAVE -- LET'S JUST COMPARE THE SAN FRANCISCO AIRPORT TO THE

OAKLAND AIRPORT.

AND THE EAST BAY HILLS OR POINT REYES.

SAN FRANCISCO AIRPORT, I MAY HAVE FULL COVERAGE, OR THE

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

OAKLAND AIRPORT OR THE BAY BRIDGE TOLL PLAZA.

I MAY HAVE GOOD COVERAGE BUT I HAVE SO MANY CARS, THAT YOU

NEED TO PROVIDE SERVICE TO THOSE CARS.

THERE'S SO MANY CARS THAT YOU'VE GOT TO HAVE MORE ANTENNAS.

YOU NOTE AROUND THERE, THERE'S A LOT OF ANTENNAS.

IF I DON'T HAVE THE ANTENNAS, EVERY FIFTH CAR, EVERY TENTH

CAR, CAN'T MAKE A CALL.

THEY CAN'T GET ON THE SYSTEM.

IN POINT REYES I MAY NOT HAVE COVERAGE.

AND THERE MAY BE A LOT OF REASONS.

THERE'S A COUPLE OF HIKERS, EDON'T HAVE A LOT OF PEOPLE THAT

NEED A PHONE OUT THERE, I DON'T HAVE A LOT OF PAYING

CUSTOMERS OUT THERE.

TO GET A SITE IN POINT REYES I HAVE TO GO THROUGH NATIONAL

GOVERNMENT BUREAUCRACY I'LL NEVER GET THROUGH.

IF THAT GIVES YOU A PICTURE, THIS IS A DEMAND BUSINESS.

A COMPANY LIKE METRO PCS ONLY SERVICES THE METROPOLITAN

AREAS.

THEY DON'T SERVICE THE RURAL AREAS.

COMBINED WITH ALL OF THE OTHER LICENSING OBLIGATIONS.

WHAT WE'RE TALKING ABOUT IS WE HAVE THE DEMAND, THE PEOPLE,


WE'VE GIVEN YOU THE DEMAND INFORMATION, VERY SPECIFIC, HARD

DEMAND INFORMATION SHOWING THAT THE DEMAND IN THIS AREA AND

IN THIS PARTICULAR AREA WHERE WE HAVE A SPLIT SITE IS SO

GREAT WE NEED TO HELP EVERY FIFTH CALLER, WHATEVER IT IS, BE

ABLE TO MAKE A CALL.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

YOU'RE ASKING WHAT IS YOUR DROPPED CALL RATE, WHAT IS YOUR

ACCESSIBILITY RATE THAT MAKES YOU GO OUT AND PUT IN ANOTHER

SITE.

THE ENGINEERS HERE WILL TELL YOU WE HAVE NO DROPPED CALLS OR

SOMETHING LIKE THAT.

THEY WANT A PERFECT SYSTEM.

THAT ISN'T THE CASE.

THERE IS A LEVEL.

BUT THE MOST RECENT CASE IS SAYING IN SPRINT VERSUS SAN

DIEGO, IS THAT THERE'S BEEN A DETERMINATION OF NEED FOR THIS

SERVICE BY THE PUBLIC UTILITIES COMMISSION.

IT IS NOT UP TO EVERY JURISDICTION TO DECIDE WHAT THAT

DROPPED CALL RATE IS OR WHAT THAT ACCESSIBILITY RATE IS, SO

THAT WE HAVE A DIFFERENT RATE IN BERKELEY THAN WE DO IN SAN

JOSE, OR WE HAVE IN SAN FRANCISCO, OF WHAT IS ACCEPTABLE

DROPPED CALLS.

THE DETERMINATION OF NEED IS REALLY NOT IN YOUR EXPERTISE

AND OUTSIDE OF YOUR PURVIEW.

IT'S JUST LIKE THE ELECTRIC COMPANY.

SAYING TO THE ELECTRIC COMPANY, YOU DON'T NEED TO PUT A

TRANSFORMER ON THIS BLOCK.


IT'S A PROPRIETARY -- IT'S A QUESTION THAT THE COMPANY

CONSIDERS TO BE THEIR LEVEL OF COMPETITION BETWEEN THE TWO

-- ALL OF THE INTERESTS.

BETWEEN CINGULAR AND VERIZON, CINGULAR CLAIMS TO HAVE THE

FEWEST DROPPED CALLS AND THEY DO.

NATIONALLY LAST YEAR THEY HAD 35 FEWER DROPPED CALLS THAN

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

VERIZON WIRELESS.

AND SO IT'S HARD TO SAY, YOU CAN'T REALLY SAY WHAT IS

SERVING YOUR CUSTOMSER, WHAT IS COMPETITIVE.

THEY PROVIDE THE AMOUNT OF SERVICE THAT ALLOWS THEIR

CUSTOMERS TO HAVE RELIABLE SERVICE AND TO TURN A PROFIT,

CERTAINLY.

THEY'RE NOT OUT THERE SPENDING HALF A MILLION DOLLARS ON A

SITE TO THROW MONEY AWAY.

THEY KNOW THAT PEOPLE WANT TO USE THESE PHONES AND ARE USING

THEIR PHONES FOR A VARIETY OF REASONS.

I HOPE THAT ANSWERS YOUR QUESTION.

>> S. Shumer: ONE QUICK FOLLOWUP.

YOU SAID THE PUC ESTABLISHES THE DROPPED --

>> NO.

THE PUC --.

>> S. Shumer: THEY ESTABLISH THE LEVEL?

>> PUBLIC CONVENIENCE AND NECESSITY.

AS THEY DO FOR ANY PUBLIC UTILITY, THIS IS A NEEDED UTILITY.

AND THE PUBLIC -- THE PUBLIC RETAINS THE RIGHT TO OVERTURN

THE LOCAL JURISDICTION IF YOU TURN DOWN SITES WHERE SERVICE


IS NEEDED, IT CAN GO BACK TO THE PUBLIC UTILITIES

COMMISSION.

UNFORTUNATELY IT'S A TWO-YEAR PROCESS.

IT'S NOT ONE THAT THE CARRIERS --.

>> S. Shumer: THANK YOU.

>> R. Judd: I THINK WE HAVE SOME INFORMATION FROM NEXTEL



This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

ABOUT WHAT IT COSTS TO INSTALL ONE OF THESE FACILITIES.

WHAT ARE THE COSTS, THE PHYSICAL INSTALLATION?

I DON'T WANT TO HEAR HOW MUCH YOUR LEGAL BILLS HAVE GONE UP.

>> THIS IS DUANE BONHAM, YOU HAVE AN AFFIDAVIT FROM, HE IS

THE R.F. PERFORMANCE MANAGER.

>> IT CAN VARY BY THE TYPE OF EQUIPMENT USED BY THE

DIFFERENT CARRIERS.

AND THE LEVEL OF HOW YOU BUILD YOUR NETWORK.

AT VERIZON WE BUILD OUR NETWORKS TO SURVIVE DISASTERS BETTER

THAN OUR COMPETITORS.

OURS RUN ABOUT $800,000, CITY OF BERKELEY IT LOOK QUITE A

BIT MORE, WITH LEGAL FEES.

DOES THAT ANSWER YOUR QUESTION?

>> R. Judd: YOU'RE SAYING THAT -- I SAID I WASN'T INTERESTED

IN HEARING ABOUT THE LEGAL FEE PART.

THE PHYSICAL INSTALLATION IN BERKELEY --

>> THE EQUIPMENT, THE ELECTRONIC EQUIPMENT THAT GOES IN

THERE, THE CONSTRUCTION COSTS, THOSE TYPE OF ISSUES.

EXPENSES.

REALLY, WHEN WE BUILD CELL SITES IT'S AN EXPENSE TO US.


>> C. Tiedemann: THANK YOU.

LET'S HEAR FROM THE PUBLIC.

MOLLY McGOVERN --

>> THANK YOU FOR YOUR TIME.

>> C. Tiedemann: MOLLY McGOVERN FOLLOWED BY TIM McGOVERN.

>> THANK YOU.

>> C. Tiedemann: COULD YOU SPEAK RIGHT INTO THE MIKE.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

>> SURE.

I JUST WANT TO SAY THANK YOU.

THIS WAS THE BODY THAT STOOD UP ORIGINALLY AND USED COMMON

SENSE IN SPITE OF THE FACT THAT THESE FOLKS HAD STARTED OUT

BY FILLING OUT THE FORM THAT THIS IS AN EXISTING SITE.

AND THAT WENT THROUGH THE PROCESS.

AND IT'S NOT.

THAT IS WHERE THE VIOLATIONS OF THE ZONING LAWS HAVE BEGUN.

THE SITE HAS BEEN REDONE, THERE IS NO PARKING LOT, GUYS,

SORRY, LIVE NEXT TO IT.

THERE IS NO PARKING LOT.

THEY'VE REDONE THE WHOLE BUILDING.

THERE'S BEEN NO, WITHOUT PERMITS, THE CITY COUNCIL TOLD THEM

TO STOP BUILDING, THEY KEPT INSTALLING.

THEY'RE BLOCKING THE STREETS.

PG&E THERE EVERY DAY PUTTING TRANSFORMERS ALL NEXT TO OUR

HOUSES.

BUT WHAT I WANT TO SAY IS THIS IS THE WILD WEST FOR THEM.

THIS IS ABOUT GREED NOT NEED.


THEY'RE MAKING MONEY HAND OVER FIST.

I'M SORRY THE CITY OF BERKELEY DIDN'T BUY STOCK IN THESE

COMPANIES.

THEY WON'T -- UNTIL THEY HAVE TO DO DIFFERENTLY, UNTIL

PEOPLE STAND UP, THIS IS A NEIGHBORHOOD, I DON'T CARE WHAT

THEY SAY.

AND THERE'S BEEN NO TRUE PATTERN MAPS OF THIS, NO EARTHQUAKE

This is not a legal record of the ZAB meeting – It has not been proofed for accuracy.

STUDY ON THAT BUILDING, NO TRUE STUDY OF THE EFFECTS ON THE

FIRE STATION.

THE LACONT SCHOOL HAS 20 ANTENNAS POINTING DIRECTLY AT IT.

ALL THOSE PEOPLE WITH LITTLE KIDS HAD TO GO HOME.

WHY IN OUR NEIGHBORHOOD?

IT'S EQUITY.

THIS IS GENETIC ENGINEERING.

THEY CAN FIGURE THIS OUT.

BUT NOT IF WE ROLL OVER.

THE RIGHT WING SUPREME COURT HAS SAID CITIES DO NOT HAVE TO

PAY DAMAGES.

YOU PAY LEGAL FEES.

I PAY TAXES SO THAT YOU STAND UP AND WE USE OUR TAX DOLLARS

TO PAY LEGAL FEE WHEN IS OUR HEALTH AND SAFETY AND OUR

RIGHTS ARE AT STACK.

IF IT GOES TO THAT, SO BE IT, WE HAVE A CASE.

THANK YOU.

>> C. Tiedemann: TIM McGOVERN.

FOLLOWED BY ELLE McGOVERN.


>> THAT WAS ELLEN.

>> DOES SHE ALSO GO BY MOLLY?

>> MOLLY HAD TO LEAVE.

SHE COULDN'T HANG.

JUST SKIPPING ALL OVER THE PLACE.

BUT THERE IS AN ANTENNA SITE UP ON GRIZZLY PEAK, BY THE WAY.

MAYBE THEY CAN CO-LOCATE UP THERE.

WITH KPFA AND OTHER ANTENNAS UP ON GRIZZLY PEAK BOULEVARD.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

THIS IS A CASE WHERE WE'RE, AS ALLEN POINTED OUT, THEY CAME

IN, AND THIS WAS ROLLING ALONG.

IT'S NOT AT ALL NECESSARY.

I WOULD GUESS IT'S ABOUT BANDWIDTH.

I UNDERSTAND WHAT THE GENTLEMAN IS SAYING, THAT DURING PEAK

DEMANDS YOU NEED MORE BANDWIDTH.

MY SUSPICION IS THAT THIS IS ABOUT BEING ABLE TO USE HAND

HELD DEVICES TO VIEW DOGS ON STATE BOARDS FROM YOUTUBE.

I DON'T THINK WE NEED THAT.

THE PEOPLE IN MY LECONTE NEIGHBORHOOD WOULD NOT BE WILLING

TO RISK THE HEALTH OF THEIR FAMILIES TO ENABLE BETTER CELL

PHONE COVERAGE IN THE BERKELEY HILLS.

THESE, IF THESE ANTENNAS A POINTING EAST, THEY'RE POINTING

AT THE HOSPITAL, THEY'RE POINTING AT THE TWO SCHOOLS THAT

ARE UP THERE, LECONTE AND WILLARD.

IF THEY'RE POINTK TO THE SOUTH THEY'RE POINTING AT A

NEIGHBORHOOD.

IF THEY'RE POINTING TO THE WEST, THEY'RE GOING ACROSS THE


HOUSING PROJECT.

THEY'RE GOING ACROSS THE OLD PEOPLE'S HOUSING PROJECT THAT'S

OVER THERE ALONGED A LIGHT.

AND IF THEY'RE BEAMING INTO THE NORTH, THEN, OKAY, MAYBE

YOU'RE GETTING BETTER COVERAGE IN THE COMMERCIAL ZONE.

WHERE THEY'RE ACTUALLY PUTTING THESE, THERE'S VERY FEW

COMMERCIAL BUSINESSES.

AND I REALLY DON'T THINK THAT BERKELEY BOWL OR THE OTHERS

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

ARE THE TIME TO BE TOO CONCERNED ABOUT A NEXTEL TWO-WAY.

I MIGHT BE MISSING SOMETHING.

NO, I'M NOT.

>> C. Tiedemann: THANK YOU.

BYRON McGOVERN.

>> HE LEFT.

>> C. Tiedemann: MICHAEL BERGLOFF.

>> I DIDN'T REALIZE THAT.

I'M GOING TO BE REFERRING TO THAT, SO I'D LIKE TO TAKE A

MOMENT.

>> C. Tiedemann: YOU WANT LAURIE TO GO FIRST?

>> I FEEL LIKE I'M IN AN INSANE ASYLUM.

I HAVE A SPEECH, BUT I FEEL LIKE I'M IN AN INSANE ASYLUM

BECAUSE OF THESE BOYS AND THEIR FRIGGING TOYS AND PROFIT

MAKING THINGS, THEY'RE WILLING TO COMPROMISE OUR COMMUNITY

AND THE INTEGRITY OF OUR COMMUNITY.

I THINK IT'S RIDICULOUS.

I'M JUST LIVID AT THIS POINT.


THERE ARE LOTS OF REASONS FOR DROPPED CALLS.

LOW BATTERIES IN YOUR PHONE.

OLD PHONES.

THE LACK OF UPDATING PREFERRED ROAM LISTS.

PROBLEMS WITH THE BACKEND NETWORK, SOMEONE CALLING TIMBUKTU.

WE WANT VERIFICATION THAT EVERY ONE OF THESE DROPPED PHONE

CALLS IS FOR NOT THOSE REASONS.

AND WE WANT VERIFICATION AND DEMAND LEGAL VERIFICATION OF

THAT ISSUE.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

WHAT COMPANIES DEFINE AS NEED FOR THEIR CORPORATE GROWTH AND

WHAT WE, THE PEOPLE, DECIDE WE NEED IS DIFFERENT.

AND WE EXPECT OUR GOVERNMENT TO REPRESENT US AND PROTECT US

AT ALL COSTS.

WE CANNOT LET THE THREAT OF LAWSUITS AND LEGALISTIC JARGON

RULE US, ESPECIALLY WHEN IT CONTRADICTS OUR BASIC COMMON

DECENCY.

MOST PEOPLE I KNOW THINK THE TELECOMMUNICATIONS ACT IS

UNCONSTITUTIONAL.

IT MAKES IT POSSIBLE THAT A NEIGHBORHOOD WILL LOSE ITS LEGAL

CASE BECAUSE OF HEALTH ISSUES.

IF I HAVE TO PRETEND AND TESTIFY THAT THE EMPEROR IS CLOTHED

WHEN, IN FACT, HE NAKED THAT'S A MUZZLING OF MY FREE SPEECH.

IF IT ISN'T, I DON'T KNOW WHAT IS.

RIGHT NOW, IN OUR CITY, WE NEED SOME THURGOOD MARSHALLS, NOT

MANUELA ALBUQUERQUES TO LEAD US.

WE NEED CREATIVE LEADERSHIP FROM A SOLID LEGAL STAFF TO TAKE


THIS TO THE SUPREME COURT.

AND BELIEVE ME, THURGOOD IS ALIVE AND WELL IN MANY YOUNG

LAWYERS, IDEALISTIC ONES THAT WANT HUMANITARIAN WORK.

LET THEY COME TO BERKELEY, LET BERKELEY GOING BACK ON THE

MAP AS FIGHTING FOR PEOPLE'S RIGHTS INSTEAD OF CREATING

ELECTROGHETTOS WHERE WE HAVE TO LIVE.

>> WE DON'T KNOW WHERE THE CUSTOMERS ARE THAT VERIZON

CLAIMS.

WE JUST LOOK AT THE EVIDENCE THEY HAVE GIVEN.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

WE HAVE ALSO GIVEN YOU A MAP THAT SHOWS SOUTH BERKELEY IS

INUNDATED WITH CELL PHONE ANTENNAS.

VERIZON 96 POST CARDS, LAST TIME IT WAS 96 POST CARDS.

THEY HAVE BEEN ANALYZED CAREFULLY, YOU HAVE THEM IN FRONT OF

YOU.

HOW MANY DID THEY GET BACK?

ONE E-MAIL FROM TWO OF THEIR CUSTOMERS SUGGESTS SOME WEEKS

AGO MY HUSBAND AND I BOTH RECEIVED POST CARDS FROM VERIZON.

WE RETURNED THEM STATING WE HAD NEVER HAD A PROBLEM.

OKAY, THESE ARE NOT INCLUDED IN THEIR PACKET.

IT IS ASTOUNDING TO ME OUT OF THE THOUSANDS OF RESIDENTS

THEY HAVE IN SOUTH BERKELEY THEY ONLY GOT 36 -- THEY ONLY

GOT 96 POST CARDS.

IF YOU LOOK AT THOSE 96 POSTCARDS AND YOU LOOK AT THE TABLE

IN FRONT OF YOU, YOU WILL FIND THAT AS WE'VE ALREADY

NOTICED, A PREPONDERANCE OF THEM COME FROM THE BERKELEY

HILLS.


50% OF THEM COME FROM NORTH BERKELEY AND THE BERKELEY HILLS.

SOUTH BERKELEY HAS TEN.

WE HAVE NO -- TEN OUT OF THOSE 100 POSTCARDS COMPLAIN ABOUT

PROBLEMS IN SOUTH BERKELEY.

WE DON'T KNOW WHAT CAUSED THOSE PROBLEMS.

IT'S VERY CLEAR THAT THE CELL PHONE COVERAGE IN SOUTH

BERKELEY IS VERY GOOD, IT'S CLEAR FROM THE MAPS THAT COME

FROM THE COMPANIES THEMSELVES.

FINALLY, I'D LIKE TO SAY IN ORDER TO PROVE ITS CASE, VERIZON

NEXTEL NEEDS TO PROVIDE TOTAL NUMBER OF CALLS ATTEMPTED IN A

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

GIVEN TIME PERIOD AND NUMBER OF BLOCKED AND DROPPED CALLS.

THEY MAY CLAIM THIS IS PROPRIETARY BUT IF THEY WON'T REVEAL

IT THEY HAVE THE BURDEN OF PROOF.

AND THEY HAVE NOT SHOWN US THAT WE NEED THESE ANTENNAS IN ,

SOUTH BERKELEY.

THANK YOU.

LECONTE LECONTE HIGER OREN?

AND THIS IS A DIFFICULT ONE TO PRODUCE.

OKAY.

NEXT WILL BE KAREN.

>> MADAM CHAIR, MEMBERS OF THE BOARD, THANK YOU.

I JUST HAVE SOMETHING BRIEF TO SAY.

I LIVE IN THE AREA BUT I ALSO TEACH DAY AND NIGHT AT THE

YOGA AND MEDITATION CENTER 2 1/2 BLOCKS FROM THE TEMPLE.

AND OF COURSE BEING ON ALCATRAZ A BLOCK AND A HALF WEST OF

ADELINE, WE'RE RIGHT IN THE MIDDLE OF THE INCREDIBLE


CONCENTRATION OF TOWERS.

WE HAVE, I REPRESENT SEVERAL HUNDRED PEOPLE, DAY AND NIGHTS

SEVEN DAYS A WEEK, WE HAVE PROGRAMS THAT INVOLVE INFANTS,

CHILDREN, ADULTS, SENIORS, THE DISABLED AND PREGNANT WOMEN.

I'M DEEPLY DISTURBED ABOUT THE HEALTH IMPLICATIONS FOR THESE

PEOPLE WE'RE TRYING TO SERVE DAY.

THANK YOU.

>> C. Tiedemann: KAREN, FOLLOWED BY MARILEE MITCHELL.

PLEASE HOLD THE APPLAUSE.

>> GOOD EVENING.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

I'M KAREN, I LIVE ON CARLETON STREET IN THE LECONTE

NEIGHBORHOOD.

THREE BLOCKS NORTH OF THE PROPOSED SITE.

I WANT TO JUST THANK YOU ALL FOR BEING HERE TONIGHT.

I APPRECIATE ALL OF YOUR FOCUS ON THIS.

I'M FEELING VERY SMALL AND UNDERFUNDED.

I KNOW WE'RE UP AGAINST A BIG COMPANY, AND SO I'M GLAD

YOU'RE HERE.

WE HAVE HAD A VERIZON PHONE FOR YEARS AND NEVER HAD ANY

COVERAGE PROBLEM WITH OUR PHONE.

AND DIDN'T GET A POSTCARD.

I AGREE UP IN BERKELEY.

I'M ATTEMPTING TO RAISE MY FAMILY HERE, CHOSEN TO LIVE NEAR

SHATTUCK AVENUE, WE WANT TO WALK PLACES AND BE HEALTHY.

I FEEL UNCOMFORTABLE WITH THIS PROPOSAL.

I WAS SHOCKED AND DISMAYED TO SEE THE TRANCE CONCENTRATION


OF CELL PHONE TOWERS EXISTING IN OUR NEIGHBORHOOD.

NO ONE IS TALKING ABOUT TAKING THOSE DOWN.

AND IT SEEMS TO BE GOING TOO FAST, I DON'T LIKE THE PROCESS.

THERE'S CONCERN ABOUT 2008.

WHEN WE GET THERE, WE GET THERE.

WE'RE NOT THERE YET, THERE ISN'T A PROBLEM.

I DON'T SEE THE NEED TO RISK MY COMFORT ABOUT MY FAMILY'S

HEALTH AND SAFETY IN OUR NEIGHBORHOOD.

AND I'M VERY PROUD OF BERKELEY AND I WANT IT TO STAY A PLACE

THAT I WANT TO BE.

I WAS IN ARLINGTON, VIRGINIA ON 9-11 AND I WAS REAR-ENDED

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

BECAUSE THERE WERE TOO MANY PEOPLE WHO PANICKED AND WENT ON

TO THE STREET.

YOU CAN NEVER HAVE ENOUGH CELL PHONES OR COVERAGE THE PEOPLE

NEED TO PREPAY FOR THE DISASTER, BE PREPARED TO STAY OFF THE

STREETS, STAY OFF THE PHONE LINES SO EMERGENCY PERSONNEL CAN

DO WHAT THEY NEED TO DO.

I DON'T BUY THAT ARGUMENT AT ALL, EITHER.

I DO NOT FEEL WE NEED THIS FOR TEXT MESSAGING.

I AM IN THE PUBLIC HEALTH FIELD AND I WILL TELL YOU

EXPERIENCE I DO HAVE IS WITH FOOD ADDITIVES.

YOU DO NOT PUT A FOOD ADDITIVE IN THE COMMUNITY, IN OUR FOOD

SUPPLY, AS WITH OUR ENVIRONMENT UNTIL IT'S PROVEN SAFE.

THAT CAN TAKE FIVE TO TEN YEARS TO COMPLETE.

I WANT TO BE THAT COMFORTABLE WITH ALL OF THIS.

>> C. Tiedemann: THANK YOU.


MARILEE MITCHELL.

THANK YOU.

CHRIS RESTIVA.

FOLLOWED BY KATE.

>> GOOD EVENING.

THANK YOU VERY MUCH FOR BEING HERE THE I HAD A SPEECH BUT

EVERYBODY HAS BEEN SAYING SUCH GOOD THINGS, RAISING SUCH

GREAT QUESTIONS; I THANK YOU ALL FOR GIVING IT DUE

CONSIDERATION.

I ALSO APOLOGIZE FOR THE PASSION THAT IS COMING FROM THE

NEIGHBORS AND I REALIZE THAT CAN BE DISRUPTIVE.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

BUT I HOPE THAT DOESN'T CHANGE ANYTHING.

I ALSO WAS CURIOUS ABOUT OUR ENGINEER HERE, AND HOW MANY

PROJECTS YOU THINK HE ACTUALLY PUT HIS DISAPPROVAL ON.

BECAUSE HE PROBABLY WOULD BE OUT OF A JOB IF HE WENT AROUND

SAYING THAT THEY DIDN'T NEED ANTENNAS.

I WANT TO CONSIDER THAT.

AND I HAD TO, WHEN I SAW THE RCC REPORT, WAS FOCUSED

PRIMARILY ON ALTA BATES AND THIS BUILDING, AND WHEN IT SAYS

SPECIFICALLY IN THE REPORT CUSTOMERS EXPECT THE SAME SIGNAL

QUALITY INDOORS THAT THEY EXPERIENCE ELSEWHERE.

IF SIGNAL QUALITY CAN BE DIFFICULT TO DELIVER ON SOME

BUILDINGS AND LOCATIONS.

CONTINUATION OF THE SIGNAL INSIDE THE BUILDING US AFFECTED

BY THE COMPOSITION OF THE WALL, THICKNESS OF THE WALL, ET

CETERA.


THIS IS A BIG BUILDING, A BIG, THICK WALL.

AND ALTA BATES IS A HOSPITAL WITH BIG, THICK WALLS.

FOR EXAMPLE IF OUTSIDE READING IS NEGATIVE 90 DECIBELS, THE

SIGNAL INSIDE THE BUILDING COULD FALL TO 105.

ACTUALLY, IN THAT REPORT IT STATES THE SIGNAL OUTSIDE IS

NEGATIVE 88 DECIBELS.

IT IS SUITABLE FOR HOLDING A CALL OUTSIDE OF ALTA BATES.

IT'S THE WALLS THAT DON'T ALLOW THAT.

IF THAT IS THE ONLY PROBLEM IN SOUTH BERKELEY, ON SPECIFIC

BUILDINGS, THAT'S WHERE THE ANTENNAS SHOULD BE.

THEY SHOULD HAVE A WAY TO PUT SMALL ANTENNA NEARBY THE

BUILDINGS TO SERVICE THE PEOPLE THAT NEED THEM.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

BECAUSE WE DON'T.

THANK YOU.

>> C. Tiedemann: KATE, FOLLOWED BY KEN.

 -- PAMYLA SPIKES.

>> I'M KATE AND I LIVE IN NORTH BERKELEY.

AND I DO NOT HAVE A CELL PHONE AND I WILL NEVER GET ONE.

I HAVE A QUESTION I WANT A YES OR NO ANSWER, PLEASE.

IS IT NOT TRUE THAT THE RECEPTION IN A CAR CAN BE -- IS IT

NOT TRUE --

>> C. Tiedemann: WAIT.

BEFORE YOU ASK IT, THIS IS YOUR OPPORTUNITY TO MAKE

COMMENTS, NOT TO ASK QUESTIONS.

>> ALL RIGHT, HE MENTIONED THAT HE WENT AROUND IN A CAR AND

CHECKED RECEPTION.


I UNDERSTAND THAT THE METAL OF A CAR CAN BLOCK SOME

RECEPTION, AT LEAST INTERFERE WITH IT.

SO THERE'S ANOTHER STATEMENT BY SOMEBODY ELSE TALKING ABOUT

TREES BLOCKING R.F. ENERGY.

I WANTED TO KNOW HIS OPINION, DO TREES ONLY BLOCK IT OR DO

THEY NOT BE A SORE R.F. ENERGY AS WELL.

I KNOW THEY DO ABSORB IT.

BE AND WHEN THE ENGINEERS TAKE THE MEASUREMENTS THEY HAVE TO

DO DIFFERENTLY DEPENDING ON THE SEASON.

BECAUSE DECIDUOUS TREES, ARE DIFFERENT, DIFFERENT TIMES OF

THE YEAR.

AND THEIR ABSORPTION ABILITIES.

Captioner's Report, ZAB, 06-28-07                              Page 141 of 176

**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

THERE IS ONE ANTENNA ON THE SOUTHWEST CORNER OF THE

BUILDING, THERE WERE TWO TREES, NEAR -- THESE ARE READ WOOD

TREES, 18 TO 22 TREES IN THAT AREA.

IT'S HARD TO COUNT THEM.

ON THE TWO TREES CLOSEST TO THE ANTENNA, DYING FROM THE TOP

DOWN, WHICH IS THE PATTERN FOR R.F. ENERGY ABSORPTION, THE

CITY LOOKED AT THE TREES, HAD THEM WONDERING WHAT WAS WRONG

WITH THESE TREES.

THEY FOUND NO BUGS, THEY FOUND NO DISEASES.

WELL, I THINK AESTHETICALLY THE TREES ARE UGLY AND PROBABLY

THE CELL PHONE TOWERS ARE GOING TO AFFECT THE AESTHETICS OF

THE AREA.

BECAUSE THEY WILL PROBABLY AFFECT THESE TREES.

THANK YOU.


>> C. Tiedemann: PAMELA SIKES BOLD BY B.O.

>> GOOD EVENING, I HAVE TWO ISSUES.

ONE IS NUMBER ONE, YOU'LL A NURSE AND I HAVE WORKED AT ALTA

BATES AND WE'RE NOT ALLOWED TO USE CELL PHONES.

I DON'T KNOW WHAT TO SAY ABOUT ALL OF THE PERSONS WITH CELL

PHONES.

PERHAPS THERE WOULD BE ONE OR TWO PEOPLE AT ALTA BATES IN

ADMINISTRATION, LIKE MAYBE THE CEO, MIGHT HAVE A CELL PHONE.

BUT THE REST OF US, EMPLOYEES WHO TAKE CARE OF PATIENTS IN

THE HOSPITAL, CAN'T USE OUR CELL PHONES.

I'M REALLY SORRY, I DON'T KNOW WHAT TO SAY ABOUT THAT.

I'M NOT SURE WHY ALTA BATES IS PURCHASING ALL THOSE CELL

PHONES.

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

SECONDLY, I THINK THAT YOUR PLAN IS REALLY, AT THIS POINT,

NOT THE LEAST INTRUSIVE INSTALLATION.

THESE ANTENNAS ARE BEING PLACED ON THE WALLS OF THE BUILDING

AND NOT BEHIND ANY R.F. TRANSPARENT PANELS WHICH WOULD BE

MUCH LESS INTRUSIVE.

THOSE ARE MY TWO PAINTS.

THE MAIN ONE IS THE HOSPITAL ISSUE AND WE AREN'T ALLOWED TO

USE CELL PHONES.

WE NEED TO TAKE CARE OF PATIENTS AND IT WOULD NOT BE HELPFUL

FOR THE NURSES TO CARRY CELL PHONES AROUND AND TALK ON CELL

PHONES RATHER THAN TAKE CARE OF OUR PATIENTS.

I'M REALLY SORRY.

>> C. Tiedemann: THANK YOU.


>> R. Judd: I HAVE A QUESTION.

>> C. Tiedemann: MA'AM?

PART OF THE REASON FOR THE CLAPPING, COMMISSIONER JUDD WANTS

TO ASK A QUESTION, SHE CAN'T HEAR.

>> I'LL BE HAPPY TO ANSWER IT.

>> R. Judd: I DID WANT TO ASK YOU WHEN YOU COULD HEAR ME.

ARE PATIENTS OR VISITORS ALLOWED TO USE CELL PHONES?

>> IN GENERAL WHAT HAPPENS IS THERE IS A REGULAR TELEPHONE,

A LAND LINE, AT EACH BED SIDE.

THAT'S WHAT THE PATIENTS USE.

SOMETIMES VISITORS USE THAT.

BUT THE VISITORS COULD WHEN THEY COME, COULD USE A CELL

PHONE IN THE PATIENT'S ROOM, I SUPPOSE.

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

>> R. Judd: YOU'RE TALKING ABOUT IN-PATIENTS.

HOW ABOUT OUTPATIENTS?

>> THE THING IS, IT'S ABOUT PRIVACY, HIPPA AND PRIVACY.

>> R. Judd: I WISH PEOPLE WITH CELL PHONES HAD MORE RESPECT

FOR PRIVACY THAN THEY DO.

THERE IS NO PROMPT RULE --

>> THERE IS.

THE STAFF WHO TAKES CARE -- ALL OF THE EMPLOYEES.

>> R. Judd: I WAS TALKING ABOUT PEOPLE WHO DON'T WORK THERE.

>> HE WAS TALKING ABOUT ALTA BATES PURCHASING CELL PHONES

AND THEY WERE A BIG CUSTOMER.

AND I DON'T KNOW THAT THAT IS TRUE.

>> R. Judd: OKAY, THANK YOU.


>> C. Tiedemann: SHAWN BURGER.

>> THANK YOU FOR LETTING ME SPEAK.

FIRST OF THE ALL, I THINK IT'S VERY INTERESTING THAT NUMBER

ONE, THE ENGINEER WHO APPARENTLY IS THE SAVANT, THE

ALL-KNOWING ONE REGARDING THIS PARTICULAR ISSUE MENTIONED TO

STAFF, AND I THINK WE ALL HEARD IT, SOME OF YOU MAY HAVE

BEEN ASLEEP, WHICH WAS THE FACT THAT CERTAIN BUILDINGS,

BECAUSE OF HOW THEY'RE CONSTRUCTED, CAN HAVE BLOCKED CALLS

BECAUSE OF THE LEAD IN THE BUILDING.

WELL, THAT LEADS TO THE NEXT LOGICAL THING, WHICH IS THAT NO

MATTER HOW MANY ANTENNA YOU PUT UP, BY DEFAULT BECAUSE OF

THE CONSTRUCTION OF THE BUILDING WHERE THE EMPLOYEES ARE, OR

THE PEOPLE ARE USING THE PHONES ARE, THEY'RE GOING TO HAVE

DROPPED CALLS.

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

YOU ARE NOT GOING TO HAVE 100% PERFECT COVERAGE.

YOU HAVE TO TAKE THAT FIRST.

NUMBER TWO, THIS HONORABLE GENTLEMAN FROM, I BELIEVE,

NEXTEL, SAID THAT WE DON'T HAVE ANY COVERAGE PROBLEMS ON

ASHBY.

GUESS WHAT.

UNLESS THERE HAS BEEN A MAJOR EARTH QUICK, A MAJOR CALAMITY,

BETWEEN THIS AFTERNOON AND TONIGHT, A MAJOR EARTHQUAKE,

WHERE IS ALTA BATES?

IT'S ON ASHBY.

HE SAID, I'M SURE THE RECORD WILL SHOW, WE DON'T HAVE ANY

COVERAGE ISSUES ON ASHBY.


ALSO, THE HONORABLE GENTLEMAN, THE LAWYER FOR VERIZON,

MENTIONED THAT THE CAPACITY NOW IS FINE.

WE'RE DOING THIS FOR THE FUTURE.

WELL, ZONING YOU SHOULD RULE ON WHAT IS TODAY, NOW.

NOT TWO YEARS FROM NOW, THREE YEARS FROM NOW.

THANK YOU.

>> C. Tiedemann: THANK YOU.

NOW, THE APPLICANT WILL HAVE THREE MINUTES TO RESPOND.

YOU CAN WATCH.

>> THANK YOU FOR ALLOWING ME TO RESPOND TO SOME OF THE

COMMENTS.

COREY ALVIN, NEXTEL COMMUNICATIONS WE SPOKE AND TRIED TO

FIGURE OUT WHAT WAS THE ISSUE WITH THE MAPS THAT YOU

REQUESTED.

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

AND THE REASON WHY WE DIDN'T DRIVE THAT AREA, IS BECAUSE

THAT AREA WAS CONSIDERED A COVERAGE ISSUE AND WE GAVE THE

ENGINEER -- CAPACITY ISSUE, SORRY.

CAPACITY.

IN THOSE AREAS, THEY'RE NOT COVERAGE ISSUES.

SO THE COVERAGE ISSUES ARE WHAT WE WERE TASKED TO SORT OF

EVALUATE.

AND THAT OCCURRED ON THE EAST -- THE WEST AND THE SOUTH

SIDES OF THE BUILDING.

SO WE HAVE TWO ANTENNAS ON THE EAST SIDE.

AND THEY'RE MAINLY THERE FOR CAPACITY.

IF THAT SITE GETS FULL IT NEEDS TO HANDLE MORE CALLS.


THOSE ANTENNAS WILL HANDLE THOSE.

THAT'S NOT A COVERAGE ISSUE.

THE OTHER COMMENT I WANTED TO MAKE IS THAT THE ISSUE OF

COVERAGE AT ALTA BATES ON ASHBY, I DIDN'T SAY THAT WE DIDN'T

HAVE COVERAGE PROBLEMS ON ASHBY.

I SAID WE DIDN'T HAVE COVERAGE PROBLEMS AT ALTA BATES ON

ASHBY.

THE NORTHERN PART -- THE EAST SIDE OF TELEGRAPH HAS PRETTY

GOOD COVERAGE.

THAT'S ALL THE WAY UP TO COLLEGE.

THE SOUTHERN PART OF THE TOWN, SOUTHERN PART OF THE --

SOUTHERN PART OF -- SORRY, I LOST MY TRAIN OF THOUGHT.

SOUTH BERKELEY, BETWEEN WOOLSY AND DWIGHT, BETWEEN ABOUT

CALIFORNIA AND SHATTUCK OR TELEGRAPH, IS OUR COVERAGE

OBJECTIVE.

**This is not a legal record of the ZAB meeting.— it has not been proofed for accuracy.**

I JUST WANTED TO MAKE THAT CLEAR.

>> C. Tiedemann: THANK YOU.

>> QUICKLY TO RESPOND, REGARDING THE WEST FACING ANTENNAS,

THE ENGINEERS TELL ME IN THE EAST BAY THEY DO NOT FACE

ANTENNAS TOWARDS THE BASE BECAUSE OF REFLECTIVE PROBLEMS.

ONE OF THE REASONS WE'RE NOT USING ONE OF OUR OTHER SITES,

WE'VE SHOWN PHOTOGRAPHS IN THE MATERIALS YOU HAVE, IS

BECAUSE TO COVER THIS AREA, IT'S SO HIGH IT WOULD REACH

MARIN COUNTY.

THAT'S WHY THERE'S NOT A WEST FACING ANTENNA.

>> R. Judd: WHAT PROBLEM?


>> THE RADIO SIGNAL, IF IT FACES SAN FRANCISCO, CAN SKIP

ACROSS THE WATER AND INTERFERE WITH THE SYSTEMS IN SAN

FRANCISCO.

SAN FRANCISCO THEY TEND NOT TO HAVE EAST FACING ANTENNAS,

AND IN THE EAST BAY YOU DON'T HAVE WEST FACING ANTENNAS.

IN MARIN COUNTY THEY DON'T HAVE SOUTH FACING ANTENNAS.

AS MUCH AS WE RE EXPECT THE WORK OF THE ENGINEER, WE DON'T

LIKE THIRD PARTY ENGINEERS, THE FACT HE WAS HIRED, THIS IS

NOT SOMETHING THAT WE CREATED.

THIS IS SOMETHING THAT THE CITY OF BERKELEY HIRED.

THERE WAS A COMMENT ABOUT AESTHETICS.

AND FREQUENTLY R.F. TRANSPARENT PANELS ARE LESS ATTRACTIVE

THAN PUTTING THE PANEL UP, AND THAT'S WHAT THE DESIGN REVIEW

COMMITTEE DECIDED.

CAN YOU PUT FIBERGLASS AND PANELS ON TO MAKE IT LOOK NOT

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

LIKE AN ANTENNA BUT FREQUENTLY IT'S BETTER TO PUT THE

FOUR-FOOT ANTENNAS.

THEY ARE NOT LARGE.

THERE'S A QUESTION ABOUT TIMING AND WHY ARE WE PUTTING IN

FACILITIES THAT AREN'T NECESSARY UNTIL JANUARY OF '08.

IT'S SIX MONTHS AWAY.

WE ALSO SUBMITTED INFORMATION FROM OUR CONSTRUCTION AND

PERMITTING PERSONNEL AFTER WE GET THIS PERMIT, SHOULD WE GET

IT, WE HAVE TO GET A BUILDING PERMIT, CONSTRUCTION PLANS

THROUGH PLAN CHECK, A VARIETY OF OTHER THINGS THAT'LL MAKE IT

DIFFICULT FOR TO US GET THIS SITE ONAIR.


EVEN IF IT WAS APPROVED TODAY, BY SEPTEMBER OF '08.

THAT'S WHY WE TRY TO PLAN THESE THINGS.

THIS APPLICATION WAS DONE IN MAY OF '05.

TO QUICKLY WRAP UP, I THINK THAT MORE THAN ANYWHERE ELSE

THAT I'VE SEEN VERIZON WIRELESS HAS PROVED THE NEED FOR THIS

SITE WITH PROPRIETARY INFORMATION GIVEN TO THE THIRD PARTY

ENGINEER.

THERE ARE NO ENVIRONMENTAL IMPACTS AS DETERMINED BY THE

STAFF.

STAFF HAS RECOMMENDED APPROVAL THREE TIMES FOR THIS SITE.

I ALREADY SAID, I WANT YOU TO RECOGNIZE THIS AS VITAL

INFRASTRUCTURE.

WE UNDERSTAND THIS IS AN EMOTIONALLY CHARGED ISSUE.

AND WE UNDERSTAND THAT MOST OF THE TESTIMONY YOU'VE HEARD

TONIGHT IS REGARDING HEALTH AND PEOPLE'S FEAR ABOUT HEALTH.

THERE WAS ONE COMMENT FROM A MEDICAL PROFESSIONAL THAT SAID

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

THEY TEST PRODUCT LIKE THIS FOR FIVE TO TEN YEARS BEFORE

THEY DETERMINE THEY'RE SAFE.

I HAVE TO REMIND YOU THAT CELL PHONES HAVE BEEN AROUND FOR

OVER 20 YEARS.

IN THE RECORD WE INCLUDED A STUDY FROM 420,000 PEOPLE OVER

20 YEARS AND THAT SHOWS THAT THE CANCER RISK, THERE'S NO

SIGNIFICANT DIFFERENCE BETWEEN THOSE WHO HAVE PHONES AND

DON'T HAVE PHONES.

IF YOU LOOK AT THE STUDY IT SHOWS PEOPLE WITH PHONES HAD

SLIGHTLY LESS CANCER RISK.


WE UNDERSTAND THAT PEOPLE DON'T UNDERSTAND THIS.

BUT THE R.F. ENERGY FROM THE SUN IS 135,000 TIMES MORE THAN

YOU GET FROM WHEN YOU STAND AT THE BASE OF ONE OF THESE

ANTENNAS.

I DIDN'T SAY THAT, MARIN COUNTY SAID THAT.

I DON'T NEED TO TELL YOU ABOUT THE FEDERAL PRE-EMPTION.

THANK YOU.

>> C. Tiedemann: THANK YOU.

LET'S CLOSE THE PUBLIC HEARING.

JESSE?

>> J. Arreguin: I HAVE A QUESTION FOR STAFF.

WE HAVE TO –– THE DECISION WE'RE MAKING HAS TO BE IN

COMPLIANCE WITH THE 1996 TELECOMMUNICATIONS ACT.

AT THE CITY COUNCIL, COUNCILMEMBER ANDERSON RAISED THE ISSUE

THAT THERE IS A SIGNIFICANT PORTION, SIZABLE PORTION OF THE

NEED FOR THIS ADDITIONAL COVERAGE COULD BE DUE TO THE FACT



**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

THAT LATELY, I'M SUPPOSING IN THE FUTURE, THAT INDIVIDUALS

USE THEIR CELL PHONES NOT JUST FOR CALLS BUT ALSO DATA

TRANSFER.

WHETHER IT'S SEARCHING THE INTERNET, TEXT MESSAGING, I DO

THAT WITH MY PHONE AS WELL.

SINCE WE HAVE TO MAKE A DECISION THAT'S SUPPOSED TO BE IN

COMPLIANCE WITH THE FACTS, DID THAT ACT SPECIFICALLY ACCOUNT

FOR DATA TRANSFER?

>> ARE YOU ASKING WHETHER IT DOESN'T APPLY OR DOES IT APPLY

TO ANY USE OF THE CELL PHONE OR ONLY CERTAIN USAGES?


>> J. Arreguin: WHAT USES DID THE ACT APPLY TO?

>> D. Sanderson: I DON'T KNOW.

I THINK IT'S JUST --.

>> C. Tiedemann: OKAY.

>> J. Anthony: I CAN'T VOTE FOR THIS, OF COURSE.

YOU KNOW, DDT HAS BEEN AROUND A LONG TIME.

BUT IT TOOK US A LONG TIME TO FIGURE OUT WHAT IT HAD DONE TO

US.

AND THAT'S NOT THE ONLY THING THAT I CAN MENTION.

I'M JUST SAYING, I THINK WE'RE BEING BULLIED.

AND FRANKLY, THERE'S NO WAY I COULD VOTE FOR IT.

I CAN'T VOTE FOR SOMETHING TO WHICH THE COMMUNITY WHO LIVE

THERE ARE HAVING TROUBLE WITH IT.

PEOPLE LIVING SOMEWHERE ELSE ARE WRITING THE LETTERS SAYING

IT'S FINE.

NOW, THAT WON'T DO IT FOR ME.

THERE'S NO WAY I CAN VOTE FOR IT.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

I'M SORRY ABOUT THE FACT THAT YOU CAN -- OUR GOVERNMENT HAS

NO IDEA ABOUT PROTECTING ITS CITIZENS AND PROBABLY CARES

LESS ABOUT US.

WE BETTER START CARING ABOUT OURSELVES.

I'M SORRY, IT'S A JOB FOR SOME PEOPLE, THAT'S YOUR JOB.

BUT IT'S NOT MY JOB.

AND I STILL HAVE COMMON SENSE AND I KNOW THAT THIS COULD

HAVE BEEN PUT IN SOME OTHER PLACE.

THERE'S NO REASON WHY YOU HAVE TO HAVE IT AT THIS PLACE.



YOU HAVE BEEN WORKING ON IT FOR FIVE YEARS.

YOU DIDN'T NEED IT WHEN YOU STARTED WORKING ON IT, THAT'S

THE WAY I SEE IT.

AND NOW WE'RE SAYING WE WON'T NEED IT UNTIL 2008.

I'D BE A FOOL TO VOTE FOR THIS.

WEIGHT UNTIL PEOPLE CAN'T MAKE THEIR PHONE CALLS.

IT WON'T KILL 'EM.

THEY SHOULD PAY THEIR PHONE BILLS.

>> C. Tiedemann: THANK YOU.

BOB, THEN JILL.

>> R. Allen: ONE OF THE THINGS THAT STRUCK ME IN THE PACKET

OF INFORMATION WE GOT WAS AN E-MAIL FROM SALLY WILLIAMS TO

THE COUNCIL AND IT HAD A LOT OF BACKUP WITH IT.

SALLY WAS THE PAST CHAIR OF THE CITY OF BERKELEY

TELECOMMUNICATION TASK FORCE.

I HAVE TO ADMIT I HAD NEVER -- DIDN'T KNOW WE HAD HAD A

TELECOMMUNICATIONS TASK FORCE.



**This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.**

SO I TALKED TO SALLY.

AND THIS WAS A TASK FORCE THAT WAS APPOINTED BY CITY COUNCIL

IN ABOUT 2000.

THEY WORKED FOR 2 1/2 YEARS.

THEY HAD A BUDGET OF $27 ON,000.

-- $270,000.

THE TASK FORCE INCLUDED TWO PEOPLE FROM U.C. BERKELEY, AND

THEY HELD PUBLIC HEARINGS AND SOLICITED SCIENTIFIC OPINIONS

FROM ACROSS THE COUNTRY.


IF YOU LOOK AT THE BACKUP MATERIAL, THEIR RESEARCH INCLUDED

SCIENTIFIC INFORMATION FROM AROUND THE WORLD.

IN THEIR COLLUSIONS THEY STATED THAT THERE IS NO EVIDENCE

THAT PROPERLY INSTALLED ANTENNAS CAN CAUSE HARM.

IN THIS DISCUSSION, WITH SALLY, SHE NOTED THAT WHILE U.C.

BERKELEY IS FULLY EQUIPPED WITH CELL PHONE AND WIRELESS

ANTENNAS, IN THE AREA OF WIRELESS TECHNOLOGY THE CITY IS

WOEFULLY BEHIND NOT ONLY U.C. BUT SURROUNDING BAY AREA

COMMUNITIES.

SHE WAS PARTICULARLY CONCERNED THAT BERKELEY WAS IGNORING

THE IMPORTANCE OF THE FAMILIES NOW PLACED ON CELL PHONES

WITH ABILITY TO STAY IN CONTACT AND KEEP TRACK OF THEIR

CHILDREN AND OTHER FAMILY MEMBERS.

I CAN VOUCH FOR THAT.

THE ONLY REASON THERE ARE TWO CELL PHONES IN OUR FAMILY IS

BECAUSE AT THE LAST BIG EARTHQUAKE WHEN BOTH MY WIFE AND I

WORKED IN SAN FRANCISCO IT WAS PURE LUCK THAT WE ENDED UP

MAKING CONTACT IMMEDIATELY AFTER THE EARTHQUAKE, AND EVER

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

SINCE WE'VE BOTH CARRIED CELL PHONES FOR THAT REASON.

SALLY ALSO DESCRIBED THAT ONE OF THE SERIOUS CONCERNS OF THE

TASK TASK FORCE WERE SAFETY CONCERNS AND THESE

COMMUNICATIONS ISSUES AND FAMILIES.

REGARDING THE HEALTH RISKS, I DON'T THINK I'M OVERSTATING

HER POSITION WHEN I SAY THAT SHE WAS APPALLED THAT BERKELEY

WOULD MAKE DECISIONS BASED ON THE BAD SCIENCE THAT HAS

DOMINATED THIS CURRENT CONVERSATION.


AS A FOOTNOTE TO THIS, ALSO IN OUR -- ONE OF THE MANY

PACKETS WE RECEIVED ON THIS, AND I CAN'T REMEMBER WHICH ONE,

THERE WAS A MEMO THAT WE RECEIVED FROM THE HEAD OF THE

BERKELEY HEALTH DEPARTMENT WHERE HE MADE THE SAME CONCLUSION

AS THE TASK FORCE THAT THERE'S NO HEALTH DANGER FROM

PROPERLY DESIGNED ANTENNAS WHICH MEET FEDERAL STANDARDS.

I THINK EVEN IF WE DID NOT ACCEPT THE IDEA THAT A DECISION

BASED ON HEALTH RISKS WAS NOT WITHIN ZAB JURISDICTION, IN

THE FACE OF THE RECOMMENDATIONS OF OUR OWN CITIES SENIOR

HEALTH OFFICER AND THE CITY'S OWN TASK FORCE, I DO NOT SEE

THAT WE'VE BEEN PRESENTED WITH ANY RELIABLE EVIDENCE TO

SUPPORT DENIAL OF THE APPLICATION BASED ON HEALTH CONCERNS.

TESTIMONY BASED ON THE WEB IS NOT ENOUGH.

A SECONDARY THAT REALLY, AS I DID MY OWN INVESTIGATION LEGAL

REALLY CAUGHT MY ATTENTION, WAS THE DISCUSSIONS OF THE

DRAMATIC GROWTH IN CELL PHONE USAGE AND THE PATTERNS OF WHO

IS USING CELL PHONES.

THERE IS AN ARTICLE FROM TUESDAY, MAY 15 IN THE SAN

**This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.**

FRANCISCO "CHRONICLE" THAT WAS ONE OF TWO ARTICLES THAT

APPEARS WITHIN A WEEK IN THE "CHRONICLE" ON CELL PHONE USE.

I'M GOING TO QUOTE A COUPLE OR THREE OF THE LINES.

ACCORDING TO THE SURVEY OF 13,000 HOUSEHOLDS ACROSS THE

NATION, 29% OF PEOPLE AGES 25 TO 29 AND 25% OF THE AGES 18

TO 24 HAVE ABANDONED RESIDENTIAL PHONES AND RELY SOLELY ON

CELL PHONES.

54% OF UNRELATED ADULTS WITH NO CHILDREN ARE WITHOUT A LAND


LINE.

RENTERS, 26% WERE MORE LIKELY THAN OWNERS TO USE WIRELESS.

OVER 15.8% OF HOUSEHOLDS DO NOT OWN A LAND LINE.

THE POPULARITY OF LAND LINES PEAKED IN 2000 WITH 192 MILLION

SUBSCRIBERS.

SINCE THEN THE NUMBER OF PHONE CUSTOMERS IS STEADILY

DECREASING TO 75 MILLION IN 2005.

 — 175 MILLION IN 2005.

TO SHOW YOU THAT I REALLY NEED TO GET A LIFE AND GET OUT OF

THIS KIND OF RESEARCH, I HAPPEN TO BE LOOKING AT THE CURRENT

CITY BUDGET BOOK FOR THE CITY OF BERKELEY.

AND CAME ACROSS THE INTERESTING INFORMATION THAT THE UTILITY

USER TAX REVENUES FROM PHONE LAND LINES HAS DECREASED FROM

2.4 MILLION IN '05 TO $1.5 MILLION IN '07.

AND IN CONTRAST, THE UTILITY TAX REVENUES FROM CELLULAR

SERVICES HAS INCREASED FROM $2.7 MILLION IN '05 TO $3.1

MILLION IN '07.

I THINK IT'S CLEARLY EVIDENT THAT THE DEMANDS BY THE

PROVIDERS TO INCREASE THEIR SERVICE, TO MEET INCREASED

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

USEAGE OR CELL PHONES, IS BACKED BY A NATIONAL PHENOMENON

THAT'S GOING ON THAT I WOULD SUGGEST THAT MOST OF US IN THE

ROOM, WITH MAYBE HALF A DOZEN FACES I SEE IN EXCEPTION,

WE'RE NOT EXACTLY IN THAT AGE GROUP THAT THEY'RE DISCUSSING.

AND THAT AGE GROUP IS LIVING IN A DIFFERENT WAY WHEN THEY'RE

MOVING INTO APARTMENTS, WHEN THEY'RE STUDENTS AND MOVING

FROM YEAR TO YEAR OR EVEN SEMESTER TO SEMESTER.


THEY'RE USING CELL PHONES AND NOT USING LAND LINES.

IN ADDITION WE HEARD THE APPLICANT'S TESTIMONY THEIR USAGE

INCREASED 96% OVER THE LAST YEAR.

HOW MUCH DO WE HAVE TO HEAR TO UNDERSTAND, THIS COUNTRY AND

THIS CITY IS GOING THROUGH A MAJOR CHANGE IN THE WAY WE

COMMUNICATE.

AND WE'RE NOT KEEPING UP WITH THE DEMAND FOR IT.

WE'VE ALSO HEARD FROM AN INDEPENDENT COUNCIL.

I'D APOLOGIZE TO THAT CONSULTANT FOR THE INSULTS THAT THE

HONESTY OF YOUR INFORMATION, I THINK YOU PROVIDED US WITH

SOME INTERESTING INFORMATION, THAT ALSO CORROBORATES THIS

NEED.

THE CONCLUSION IS THE FIND THINGS WE MADE TO DENY THE

APPLICATION IN OUR LAST MEETING SIMPLY IGNORED THE PERVASIVE

EVIDENCE THAT THE USE OF CELL PHONES IS EXPANDING ON A

MASSIVE SCALE.

I THINK THAT DENIAL WAS INFLUENCED, AMONG OTHER THINGS, BY

THE PUBLIC TESTIMONY THAT WE HEARD THAT NIGHT AND THE TYPE

OF TESTIMONY THAT WE HEARD TONIGHT MUCH IT'S VERY

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

INTIMIDATING.

I RESPECT THE PASSION AND THE CONCERN OF THE RESIDENTS

TESTIFYING, BUT I SIMPLY DON'T BELIEVE THE BAD SCIENCE YOU

ARE PUTTING FORWARD.

AND FINALLY, I THINK THAT OUR LAST -- WE APPROVED THIS

APPLICATION MONTHS AND MONTHS AGO.

I THINK THAT OUR DECISION TO DENY THE APPLICATION LAST TIME


WAS SERIOUSLY FLAWED.

AND I THINK THAT THE INADEQUACY OF OUR LAST ACTION IN

DENYING THAT APPLICATION IN ADDITION TO THE INTIMIDATION OF

THE FEARS OF HEALTH ISSUES WAS ALSO IN PART A DECLARATION OF

OUR FRUSTRATION AT THE PROCESS WE'RE ALL GOING THROUGH THAT

WE MADE A DECISION ONCE AND SENT IT TO THE COUNCIL, AND THEY

SENT IT -- DIDN'T HAVE THE GUTS TO MAKE THE DECISION SO THEY

SENT IT BACK TO US.

AND WE MADE ANOTHER DECISION, WHICH WAS QUITE THE OPPOSITE,

AND IT WENT TO COUNCIL AND THEY SENT IT BACK AGAIN.

WELL, I THINK THAT AT THE LAST MEETING THERE WAS REACTION

THAT "SCREW IT," THEIR DECISION TO MAKE, DOESN'T MATTER

WHICH WAY WE VOTE.

I HOPE ON THIS THIRD HEARING THAT WE TREED IT WITH MUCH MORE

SERIOUS -- THAT WE TREAT IT WITH THE SERIOUSNESS THAT IT

DESERVES.

I THINK THAT'S AMPLE EVIDENCE TO APPROVE THESE APPLICATIONS.

EVEN IF YOU WERE TAKING INTO CONSIDERATION THE ISSUES OF

NEED AND HEALTH, WHICH WE HAVE BEEN TOLD WE'RE NOT SUPPOSED

TO TAKE INTO CONSIDERATION.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

HOWEVER, I SUGGEST THAT OUR RULE IN THIS DEBATE IS TO MAKE A
DECISION BASED ON OUR OWN VIEW, I SEE NO BASIS TO DENY THESE
APPLICATIONS.

I PROVE APPROVAL.

-- I MOVE APPROVAL.

>> SECOND.


>> J. Martinucci: I THINK BOB ELOQUENTLY STATED THE WAY I
FEEL ABOUT CELL PHONE ANTENNAS.

I'Ve DONE SOME RESEARCH FOR THE LAST FEW YEARS, 6 1/2 YEARS
I'VE BEEN ASSOCIATED WITH COUNCIL, WE'VE SEEN TWO OR THREE
OF THESE PROJECTS COME THROUGH.

WE HAVE HAD TO DO RESEARCH, LOOK AT THE EVIDENCE.

AND I AGREE THAT THE EVIDENCE INDICATES THAT THE HEALTH
CONCERNS ARE NOT THERE.

NOW, VERY DEFINITELY NEXTEL AND VERIZON ARE HERE TO MAKE
MONEY.

THAT'S FINE, WE HAVE LOTS OF BUSINESSES IN TOWN THAT ARE
HERE TO MAKE MONEY.

BUT I HESITATE TO PORTRAY THEM NECESSARILY AS THE BAD GUYS.

AS BOB POINTED OUT, THE DEMAND IS GREAT AND THE DEMAND IS
GETTING GREATER.

WE ALL HAVE PRETTY SIGNIFICANT ANECDOTAL EVIDENCE TO POINT
THAT OUT.

AND I THINK THAT UTILITY TAX BILLS IS FAIRLY SIGNIFICANT
EMPIRICAL EVIDENCE THAT THAT'S THE WAY THE TREND IS GOING.

THE PROVIDERS ARE TRYING TO PLAN FOR THE FUTURE.

**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

I DON'T THINK THAT TREND IS GOING TO DIE OUT ANY TIME SOON.

I THINK IT IS AN INTERESTING DISCUSSION TO TALK ABOUT

COVERAGE AND CAPACITY AND OTHER PARTS OF BERKELEY.

I LIVE IN NORTH BERKELEY AND MY VERIZON SIGNAL DOESN'T GO

INTO MY HOUSE AND I HAVE TO SIT ON THE FRONT PORCH IF I CALL

MY DAUGHTER UP IN WASHINGTON.


BUT I'M SURE THERE ARE PLANS TO HAVE CELL TOWER

INSTALLATIONS IN NORTH BERKELEY.

ONE WAS APPROVED A YEAR OR TWO AGO ON SHATTUCK AVENUE.

AND ULTIMATELY, AND I'M A NEWCOMER TO THIS, BUT I'VE SEEN

THIS VOLLEY GO BACK AND FORTH FOR SEVERAL MONTHS, IF NOT

YEARS.

AND I ALSO AGREE WITH BOB ON THAT POINT.

THERE'S KIND OF INEVITABILITY THAT THIS WILL GO BACK TO THE

COUNCIL.

HOPEFULLY IT WON'T COME BACK TO THE ZAB FOR A FOURTH TIME.

SO I FEEL LIKE WHATEVER DECISION IS MADE HERE TONIGHT, WILL

EVENTUALLY GO TO THE COUNCIL.

THEY WILL HAVE TO DECIDE IT.

I CAN'T MAKE THE FINDINGS TO DENY THIS APPLICATION, EITHER.

>> C. Tiedemann: JESSE ARREGUIN?

>> T. Doran: BEFORE WE GO ANY FURTHER, ISN'T IT APPROPRIATE

THAT WE HAVE -- STATE WHETHER WE HAVE HAD ANY DISCUSSIONS

WITH THE PARTICIPANTS?

>> D. Sanderson: WE'RE GETTING CLOSE, WE MAY BE AT OUR BREAK

FOR THE CAPTIONER.

>> C. Tiedemann: JESSE ANTHONY, HAVE YOU HAD ANY EX PARTE

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

COMMUNICATIONS?

>> J. Anthony: YES.

>> C. Tiedemann: WITH WHO?

>> J. Anthony: ANYBODY I TALKED TO?

IT WASN'T ANYBODY IN PARTICULAR ABOUT ANY PARTICULAR THING

ABOUT IT.

IT WAS MOSTLY AFTER THE LAST MEETING.

>> C. Tiedemann: OKAY.

>> T. Doran: I THINK IT'S IMPORTANT, I HAD A MEETING

YESTERDAY WITH THE REPRESENTATIVE OF THE BERKELEY

NEIGHBORHOOD ANTENNA FREE UNION.

WHERE THEY HAD AN OPPORTUNITY TO EXPLAIN THEIR POSITION TO

ME.

>> C. Tiedemann: BOB?

RICK?

ME, NO.

>> S. Shumer: NO.

>> M. Alvarez-Cohen: NO.

>> J. Arreguin: I HAVE HAD MULTIPLE CONVERSATIONS WITH

MICHAEL BARGLOW, WHO IS CONCERNED ABOUT THE PROJECT,

EXPRESSING THAT HE FEELS THAT THESE POW TO YOUERS ARE NOT

NECESSARY AND THE ZAB SHOULD AIF YOU RECALL ITS PREVIOUS DE

SIS.

>> C. Tiedemann: DO WE NEED A BREAK?

>> D. Sanderson: UNLESS YOU THINK YOU'RE GOING TO DO THIS IN

A FEW MINUTES.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

LET'S TAKE A BREAK.

>> C. Tiedemann: ALL RIGHT.

>> C. Tiedemann: ALL RIGHT.

THE QUEUE THAT I HAVE IS JESSE ARREGUIN, MICHAEL FOLLOWED BY


TERRY.

>> J. Arreguin: BOB AND JOE MADE COMMENTS REGARDING THE FACT

THERE IS A NEW GROUP OF CELL PHONE USERS THAT SPECIFICALLY

JUST USE THEIR CELL PHONE, THEY DON'T HAVE A LAND LINE.

I MUST ADMIT I'M ONE OF THOSE PEOPLE.

I DON'T HAVE A LAND LINE.

I USE MY CELL PHONE FOR ALL MY CALLS.

AND I AGREE THAT WE NEED TO ENSURE THAT THE SERVICES THAT WE

PROVIDE AND RESPOND TO THOSE NEW USERS.

I HAVE A CINGULAR PHONE.

AND I GET DROPPED CALLS ALL THE TIME.

WITH A CINGULAR PHONE.

I WANT TO INCREASE SERVICE BUT THE ISSUE OF WHETHER PEOPLE

WANT INCREASED SERVICE VERSUS WHETHER THERE'S A NEED FOR

INCREASED SERVICE ARE TWO SORT OF SEPARATE ISSUES.

THE THING THAT WE NEED TO CONSIDER TONIGHT IS WHETHER THERE

IS SUBSTANTIAL EVIDENCE FOR NECESSITY.

I DON'T THINK THERE IS ENOUGH EVIDENCE TO MAKE THAT FINDING

IN MY OPINION.

FIRST OF THE ALL, WE RECEIVED THESE POST CARDS FROM A NUMBER

OF BERKELEY RESIDENTS AND RESIDENTS OFF THEY ARE CITIES

INDICATING THEIR SUPPORT FOR A VERIZON APPLICATION.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

AS HAS BEEN DISCUSSED, A LARGE NUMBER OF THESE KIDS DO NOT

LIVE IN THE AREA WHERE THE SERVICE IS BEING PROPOSED.

I BELIEVE THAT THIS EVIDENCE SHOULDN'T BE CONSIDERED.

I DON'T THINK IT REALLY HAS ANY MERIT REGARDING WHETHER THIS

IS ANY INDICATION OF THE FACT THAT PEOPLE WHO LIVE IN THIS

AREA ACTUALLY NEED INCREASED SERVICE.

ONE COMMENT THAT MR. ALFREDSON RAISED, IS THE FACT THIS IS A

DEMAND BUSINESS.

I GUESS, I HAVE HAD DIFFICULTY TRYING TO UNDERSTAND HOW WE

MAKE A DETERMINATION REGARDING WHETHER A DECISION WE MAKE

WOULD LIMIT THE ABILITY TO PROVIDE SERVICE.

THERE REALLY ISN'T ANY SPECIFIC THRESHOLD.

HE STATED THAT THE -- THE DETERMINATION OF THESE KINDS OF

THINGS IS OUTSIDE THE CAPABILITY OF LOCAL GOVERNMENTS, IT

SHOULD BE DETERMINED BY THE INDUSTRY.

THAT CONCERNS ME BECAUSE IT APPEARS THAT THE BASIS FOR

INCREASED SERVICE IS TO ENSURE THAT EVERY SINGLE INDIVIDUAL

HAS ACCESS TO SERVICE.

THAT DOESN'T, I GUESS, DISTRICT THE FACT THAT THERE IS

SERVICE BEING PROVIDED.

SO ONE OF THE THINGS WE HAVE TO DETERMINE IS WHETHER THIS

WOULD PROHIBIT THE PROVISION OF SERVICE.

I DON'T THINK IT WOULD PROHIBIT THE SERVICE, IT WOULD

INCONVENIENCE SOME PEOPLE WHO NEED SERVICE.

HE ALSO RAISEDTED FACT THERE WAS A CELL PHONE PROJECT IN SAN

FRANCISCO.

**This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.**

I DON'T KNOW WHETHER THAT WAS IN A COMMERCIAL DISTRICT OR

COMMERCIAL DISTRICT ABUTTING A RESIDENTIAL DISTRICT.

BUT WE NEED TO ACKNOWLEDGE THE FACT THAT EVEN THOUGH THIS IS

ALONG SHATTUCK AVENUE, WE HAVE A ANYBODY HOOD THAT'S RIGHT


NEXT TO IT.

WE NEED TO CONSIDER WHAT ARE THE IMPACTS OF THESE TOWERS ON

THAT NEIGHBORHOOD.

YOU'LL NOT SAYING IN THIS CASE ABOUT THE HEALTH AFFECTS, I

DON'T KNOW WHY THAT WAS BROUGHT UP IN THE DISCUSSION, BUT

THIS WILL IMPACT THE NEIGHBORHOOD AS EVIDENCED BY THE

OVERWHELMING TESTIMONY AND MATERIAL THAT WE RECEIVED IN THE

RECORD.

I DO AGREE THIS IS AN EQUITY ISSUE.

THERE ARE A CONSIDERABLE AMOUNT OF ANTENNAS IN SOUTH

BERKELEY.

DOESN'T MEAN THEY WON'T BE IN ANY OTHER PARTS OF THE CITY.

WHERE DO WE DRAW THE LINE?

THAT'S THE DETERMINATION WE NEED TO MAKE TONIGHT.

I JUST DO NOT BELIEVE THAT THESE ARE NECESSARY.

THIS IS A LOT OF UNANSWERED QUESTIONS.

I DON'T FEEL I HAVE ENOUGH EVIDENCE TO MAKE THAT

DETERMINATION.

I'M GOING TO DENY THAT WE DENY THE PERMITS.

>> J. Anthony: I SECOND THAT.

>> C. Tiedemann: A SUBSTITUTE MOTION.

>> D. Sanderson: WE HAVE A MOTION.

>> J. Arreguin: A SUBSTITUTE MOTION.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

>> C. Tiedemann: MICHAEL FOLLOWED BY TERRY FOLLOWED BY SARA.

>> M. Alvarez-Cohen: I'M GOING TO EXPLAIN MY VOTE AND

ADDRESS THIS, SINCE THE PUBLIC HEARING IS OVER, TO THE BOARD


HERE.

I'M OPEN TO FEEDBACK AND CHANGING IT.

REGARDLESS OF THE EVIDENCE OR LACK THEREOF OR THE FEDERAL

LAWS AND THE THREATS ASSOCIATED WITH THAT, NO MATTER WHICH

WAY WE VOTE, AS WE DISCUSSED, IT IS GOING TO BE APPEALED TO

THE CITY COUNCIL.

THAT'S ONE THING.

SECOND, IT DOESN'T APPEAR THAT THIS BOARD IS GOING TO COME

UP WITH A DECISIVE VOTE AT 9-0 OR 8-1.

OR 7-2.

I DON'T THINK IT'S GOING THAT THAT WAY.

IT WON'T BE DIVISIVE MESSAGE TO THE CITY COUNCIL ON WHICH

WAY IT'S GOING TO GO.

BASED ON THOSE TWO ASSUMPTIONS, I THINK I'M GOING TO VOTE IN

A WAY WHICH -- WHO DO I WANT TO GIVE THE BURDEN OF THE

APPEAL TO?

DO I WANT TO GIVE IT TO THE GRASSROOTS NEIGHBORHOOD

INITIATIVE OR TO THE CORPORATION?

I THINK CORPORATIONS DESERVE THE BURDEN OF THE APPEAL

PROCESS.

SO I'M GOING TO VOTE TO DENY THIS, UNLESS SOME OF YOU CAN

CONVINCE ME OTHERWISE THE NEXT FEW MINUTES.

>> C. Tiedemann: TERRY, THEN SARA.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

>> T. Doran: THANK YOU.

.I HAVE A LOT OF NOTES SO I MIGHT REPEAT MYSELF OR JUMP

.AROUND.

BUT I'M GOING TO TRY TO GET EVERYTHING OUT THERE.

BECAUSE I WANT EVERYONE THAT'S POSSIBLE TO UNDERSTAND MY

POSITION.

AND HOPEFULLY BOARD MEMBERS WILL UNDERSTAND WHAT I'M SAYING.

FIRST, I WANT TO SAY THAT I'M VERY NEUTRAL ON THIS.

I'M A, WHAT, A CINGULAR USER.

SO I COULD CARE LESS, REALLY, I'M NOT GOING TO CHANGE

REGARDLESS OF HOW GREAT THESE TWO COMPANIES MIGHT SAY THEIR

COVERAGE WOULD BE TO GET EVERYTHING THEY HAVE.

SO I'M NOT BASING IT ON THAT.

AND I ALSO WANT TO THANK EVERYONE WHO CAME THIS EVENING.

I REALLY LISTENED VERY CAREFULLY.

I THINK IT'S IMPORTANT.

IT'S A VERY IMPORTANT ISSUE.

IT'S AN IMPORTANT ISSUE TO ME AND I KNOW IT'S AN IMPORTANT

ISSUE TO YOU.

AND I ALSO WANT TO SAY THAT I TRIED MY BEST TO READ AND ALSO

DIGEST ALL THE INFORMATION THAT WE WERE GIVEN.

EACH BOARD MEMBER HAD A HUGE STACK OF MATERIAL, INCLUDING

VERBATIM TESTIMONY, VERBATIM WHAT TRANSPIRED AT THE LAST TWO

CITY COUNCIL MEETINGS.

IF WE DIDN'T WATCH THE MEETINGS OR SEE -- REWATCH THEM ON

TELEVISION, THAT WE AT LEAST HAVE THE TRANSCRIPT OF

EVERYTHING THAT WAS SAID.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

SO I BELIEVED THAT I UNDERSTAND WHAT HAS BEEN SAID TONIGHT

AS WELL AS WHAT WAS PRESENTED TO THE TWO CITY COUNCIL


MEMBERS.

I GUESS ALSO, BEFORE I PUT DOWN WHAT I WANTED TO SAY BEFORE

THIS EVENING, JUST A LITTLE RESPONSE ABOUT MYSELF.

I DON'T HAVE TO WEAR ON IT MY SLEEP SLEEVE, BUT I WILL SAY

IT, I'M A CANCER SURVIVOR, AND I HAD A NONHODGKINS LYMPHOMA —

THROUGHOUT MY BODY, WENT THROUGH CHEMO, AND I BELIEVE THAT

I'M AT LEAST AS SENSITIVE AS ANYONE ELSE IN THIS ROOM TO

ENVIRONMENTAL HAZARDS.

I'VE STUDIED IT AS MUCH AS I COULD AFTER MY CANCER, AND AS

WELL MY WIFE IS A CANCER SURVIVOR.

THE ISSUE OF HEALTH IS SOMETHING THAT IS VERY DEAR TO ME.

AND I'VE TAKEN VERY SERIOUSLY WHAT HAS BEEN PRESENTED BY

PARTICULARLY COMMUNITY MEMBERS.

BUT I MUST EMPHASIZE THAT FOR ME, WE ALSO HAD IN OUR PACKET,

WE'RE NOT MAKING A DECISION THIS WAY, BUT WE ALSO HAD IN OUR

PACKET THAT WAS MENTIONED BY ANOTHER ZAB MEMBER, THAT THE

TELECOMMUNICATIONS TASK FORCE OF THIS CITY, WITH THE HELP OF

AS MANY EXPERTS AS THEY COULD, LOOKED AT THE MATERIALS THAT

THEY COULD, AND THEIR CONCLUSIONS — CONCLUSION WAS THAT

CELL PHONE FACILITIES ARE NOT NOW SHOWN TO BE A HEALTH

HAZARD TO OUR COMMUNITIES, IF THEY FOLLOW THE REGULATIONS

SET FORTH BY THE FEDERAL COMMUNICATIONS ACT.

AND THESE ARE STANDARDS THAT ARE FOLLOWED ALL OVER THE

WORLD.

**This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.**

SO, I — I JUST WANT TO SAY THAT I KNOW THAT THERE ARE

PEOPLE IN THIS ROOM, PEOPLE WHO I HAVE KNOWN FOR MANY YEARS,


WHO HAVE COME TO A DIFFERENT CONCLUSION.

BUT I JUST WANT TO SAY THAT FOR ME, THE JURY IS OUT AND THAT

THAT IS NOT PART OF MY CONSIDERATION.

I JUST ALSO WANT TO SAY, JUST FOR THE RECORD, I THINK I'M AS

MUCH AN ANTI-CAPITALIST AS ANYONE IN THIS ROOM.

PROBABLY MORE SO THAN ANYONE IN THIS ROOM.

AND THAT THE HISTORY OF MY POLITICAL ACTIVITY PROVES THAT.

'S BUT I DON'T BELIEVE THAT MY DECISION ON THIS BOARD IS THE

PLACE WHERE I DRAW MY LINE IN THE SAND.

TO FIGHT BIG BUSINESS IN THIS COUNTRY.

BECAUSE I DON'T SEE THE ISSUE IN THAT WAY.

I JUST WANTED TO --

>> C. Tiedemann: TERRY?

I WANT YOU TO BE ABLE TO EXPRESS YOURSELF BUT BE MINDFUL

THAT THE HOUR IS LATE AND THE MORE SUCCINCT YOU CAN BE, THE

BETTER.

>> T. Doran: I WANT TO TAKE AS MUCH TIME AS THE PUBLIC TOOK.

>> C. Tiedemann: THEY TOOK AN HOUR.

>> T. Doran: I WANT TO SAY ONE OTHER THING, IT'S VERY

IMPORTANT TO ME.

AND I THINK PEOPLE SHOULD ALSO KNOW IT.

PEOPLE ARE SAYING, DON'T PUT THIS CELL PHONE TOWER HERE.

ARE THEY SAYING DON'T PUT ANY CELL PHONE TOWERS IN BERKELEY?

OR PUT IT IN SOMEONE ELSE'S NEIGHBORHOOD?

BECAUSE EVERY COMMERCIAL CORY DONE THAT OUR ZONING CODE --

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

CORRIDOR THAT OUR ZONING CODE ENCOURAGES THESE FACILITIES TO

BE PLACED ON ARE RIGHT NEXT TO NEIGHBORHOODS.

EVERY SINGLE ONE.

UNIVERSITY AVENUE, ASHBY, AND SHATTUCK.

AND SO FOR ME, THAT IS NOT A COMPELLING ARGUMENT.

I THINK I ALSO WANT TO THANK OUR BOARD MEMBERS, HERE.

WE WERE GIVEN A VERY SPECIFIC CHARGE BY THE CITY COUNCIL.

WE WERE TO LOOK AT NEW EVIDENCE AND WE WERE SUPPOSED TO LOOK

AT NEW LEGAL EVIDENCE.

WE ALSO NEED TO LOOK AT THE ZONING CODES.

ZONING CODES VERY CLEARLY STATE FOR CELL PHONES, ALL

FINDINGS SHALL BE BASED ON SUBSTANTIAL INFORMATION IN THE

RECORD SUCH AS WHERE REQUIRED, TECHNICAL ANALYSIS BY AN

APPROVED RADIO FREQUENCY ENGINEER, LETTERS FROM

TELECOMMUNICATIONS OFFICERS WITH EXISTING FACILITIES, THE

ZONING OFFICER ABOARD MAY REQUIRE THAT ANY DETERMINATION

REQUIRED BY THIS CHAPTER BE SUPPORTED BY INDEPENDENT

ANALYSIS BY AN APPROVED ENGINEER OBTAINED BY THE CITY.

I READ THAT AS WELL, THAT THAT IS WHAT WE DETERMINED,

WHETHER THERE'S A NEED OR NOT, AND NOT ANECDOTAL EVIDENCE

THAT'S BROUGHT HERE EITHER BY THE COMPANIES OR BY OTHER

PARTICIPANTS IN THIS PROCESS.

AND I, FOR ONE, FEEL THAT THAT IS PRECISELY WHAT HAPPENED

TONIGHT.

WE, THE CITY DIRECTED AND WE HAVE AN INDEPENDENT ENGINEER

GIVE US AN ANALYSIS AND A STATEMENT THAT IN HIS BEST





This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.
OPINION, THERE IS A NEED FOR THESE TWO FACILITIES.

WE'RE NOT SUPPOSED TO CONSIDER ANYTHING ELSE.

AND THAT IS WHAT OUR CHARGE IS.

THE OTHER PART OF THE CODE IS THAT WE ARE TO PROVE A USE

PERMIT, I AM READING, NOW, ON PAGE 95, SECTION 23-C.17.100,

FINDINGS REQUIRED FOR APPROVAL.

THAT SAYS, UPON ADVICE WE HAVE TO APPROVE, UPON ADVICE OF

THE CITY ATTORNEY.

THAT THE DENIAL OF THE APPLICATION WOULD BE AGAINST STATE

AND FEDERAL LAW.

AND WE ALL RECEIVED A MEMORANDUM FROM THE CITY ATTORNEY THAT

SAID PRECISELY THAT.

SO, I JUST FEEL THAT BASED ON THE CHARGE GIVEN TO US BY THE

CITY COUNCIL, THAT THE ONLY THING WE CAN DO, AND I WOULD

LIKE TO SEE IT A 9-0 VOTE, APPROVE THIS USE PERMIT.

>> C. Tiedemann: THANK YOU.

SARA?

>> S. Shumer: TO BEGIN WITH, I THINK WE HAVE NOT GOTTEN

ANSWERS TO CERTAIN QUESTIONS, WE DO NOT HAVE GOOD

INFORMATION.

THAT WE DO NOT HAVE SUBSTANTIAL EVIDENCE TO FIND THAT THE

TOWERS IN THIS PARTICULAR LOCATION, DENYING THE TOWERS IN

THIS LOCATION, WOULD, QUOTE, PROHIBIT OR HAVE THE EFFECT OF

PROHIBITING THE PROVISION OF PERSONAL WIRELESS SERVICE.

WE HAVE SERVICE AND IT'S A MATTER OF LEVEL.

WE HAVE NOT BEEN GIVEN ANY CRITERIA BY WHICH TO JUDGE WHAT

LEVEL IS PROVIDING SERVICE OR WHAT LEVEL IS PROHIBITING THE

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

PROVIDING OF SERVICE.

IT IS CLEAR EVIDENCE THAT YOU DON'T KNOW IT IN DETAIL, IT IS

LARGELY AN ANECDOTAL, THERE ARE SOME AREAS MUCH LESS SERVED

THAN THIS AREA.

THERE ARE AREAS MUCH LESS SERVED THAN THIS AREA THAT I DON'T

THINK HAVE THIS AREA QUALIFIES FOR PROHIBITING SERVICE.

THE OTHER AREAS IS MUCH STRONGER.

THEREFORE OUR CODE DOES APPLY.

AND PARTICULARLY 23.C.17.100.D, TO APPROVE THE ANTENNA YOU

MUST FIND THAT ITS LOCATION ARE, QUOTE, NECESSARY FOR THE

PROVISION OF WIRELESS SERVICE AND THIS FINDING MUST BE BASED

ON POTENTIAL EVIDENCE THAT WITHOUT SUCH ANTENNA THE FACILITY

OPERATOR WILL BE UNABLE TO PROVIDE PERSONAL WIRELESS SERVICE

TO ITS CUSTOMERS IN THE PROPOSED COVERAGE AREA.

WE JUST DON'T HAVE THE EVIDENCE THAT THAT IS THE CASE.

>> T. Doran: THERE IS AN OR IN THERE.

>> S. Shumer: LET ME FINISH.

>> T. Doran: I'M SORRY, I DIDN'T'T MEAN TO SAY THAT.

>> S. Shumer: WE ARE ALSO GIVEN AS HE HAS SUBJECTED, ANOTHER

OPTION.

WE CAN FIND THAT, OR WE CAN FIND -- CALL ON THE OPTIONS OF

RELYING ON THE CITY ATTORNEY'S STATEMENT THAT FEDERAL LAW

PREEMPTS US.

I DON'T THINK WE HAVE THE EVIDENCE TO DO THAT.

THEREFORE, THE BASIS, THERE IS A BASIS IN THE LACK OF

REQUIRED INFORMATION FROM THE APPLICANT FOR NOT TAKING THIS



This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

OPTION.

WE DON'T TO HAVE TAKE THAT OPTION.

WE HAVE TO MAKE A FINDING EITHER THAT IT IS NECESSARY OR WE

MAY TAKE THIS.

BUT I DON'T THINK THAT'S BEFORE US.

SO, IN SUM, WHAT I'M SAYING IS I DON'T FIND THE INFORMATION

TO MAKE A DETERMINATION OF WHAT IS AN APPROPRIATE, NECESSARY

LEVEL OR STANDARD OF CRITERIA.

I THINK THE STANDARD OF DROPPED CALLS IN A DISASTER IS NEVER

GOING TO BE MET.

THAT'S GOING TO BE, YOU'LL NEVER MEET THAT.

EVERYBODY IS GOING TO BE CALLING.

THAT'S SORT OF THE 100-YEAR STORM OR WHATEVER.

WHAT HAS BEEN SUGGESTED IS THE 3% DROP, IN SOME HOURS.

I DON'T FIND THAT SUBSTANTIAL.

I FIND THAT, AS THEY SAY, A MINIMUM.

I DON'T THINK WE HAVE THE EVIDENCE TO MAKE THE JUDGMENT THAT

THIS IS A NECESSITY.

>> C. Tiedemann: RICK?

>> R. Judd: THERE IS A VERY INTERESTING QUESTION HERE

UNDERLYING THIS, WHICH IS WHAT DOES IT MEAN TO SAY SOMETHING

IS NECESSARY FOR THE PROVISION OF A PERSONAL WIRELESS

SERVICE?

IF WE WERE TO -- WHICH IS ALMOST THE SAME STANDARD AS THE

CITY LAW AS IN THE FEDERAL LAW.

WE WERE TALKING ABOUT, LET'S SAY, DOMESTIC WATER SERVICE.



This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

I THINK WE WOULD SAY THAT NOT HAVING WATER SERVICE 3% OF THE

TIME WOULD REALLY NOT BE SATISFACTORY TO US.

IN THIS CASE, IT'S A LITTLE DIFFERENT THAN THAT, BECAUSE

CELL PHONES ARE NOT PROBABLY NECESSARY TO US, AS DRINKABLE

WATER OR ELECTRIC SERVICE.

ON THE OTHER HAND WE HAVE THE ALTERNATIVE THAT, WELL, THIS

IS WHAT I THINK MR. AL BRITON CALLED IT, A DEMAND DRIVEN

BUSINESS.

>> THERE CLEARLY ARE PEOPLE USING PERSONAL WIRELESS SERVICES

OF A KIND THAT SEEM COMPLETELY UNNECESSARY TO ME FOR ANYONE

TO EVER USE.

INCLUDING WATCHING DOGS SKATEBOARD ON YOUTUBE.

BUT I DON'T HAVE ANY WAY OF EVALUATING WHICH OF THOSE TWO

RULES OF DECISIONS IS THE RIGHT RULE.

I WAS A LAWYER, I RETIRED AS A LAWYER, I I'VE NOT SUCCEEDED

IN ADHERING TO TOO MANY PRINCIPLES SINCE GETTING ON THIS

BOARD BUT ONE IS I DON'T TRY TO BE MY OWN LAWYER.

THERE IS A RULE THAT A LAWYER WHO REPRESENTS HIM OR HERSELF

HAS A FOOL FOR A CLIENT.

AND OUR CITY ATTORNEY HAS, I DON'T WANT TO GO INTO THE

CONTENTS OF A MEMORANDUM THAT I THINK WAS INTENDED TO BE

CONFIDENTIAL, AND STATED WAS CONFIDENTIAL.

BUT MADE IT PRETTY CLEAR THAT LEGALLY WE NEED TO BE LEANING

TOWARD ALLOWING PEOPLE WHO WANT TO WATCH THE DOGS SKATEBOARD

HAVE THE FACILITY TO WATCH THE SKATEBOARDING ON YOUTUBE IF

THEY WANT TO.





This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

THIS WAS REMANDED TO US WITH DRECKS TO CONSIDER TWO THINGS
-- ONE WAS LEGAL ADVICE, AND I THINK I'VE GIVEN MY ADVICE ON
WHERE THE LEGAL ADVICE TENDS TO LEAD US.

AND THE SECOND WAS NEW EVIDENCE.

THE IMPLICATION OF THAT IS THAT THE ED OLD EVIDENCE WAS NOT
ENOUGH TO UPHOLD OUR FINDINGS OF DENIAL OF THESE PERMITS.

ALL OF THE NEW EVIDENCE THAT I'VE HEARD TONIGHT CAME FROM
ENGINEERING DATA THAT BASICALLY SUPPORTS ISSUING THE
PERMITS.

LOOKING AT THE DIRECTIONS THAT WE GOT WHEN THIS WAS REMANDED
TO US, AND LOOKING AT WHICH WAY I THINK WE HAVE TO LEAN IN
INTERPRETING THESE PROVISIONS BASED ON THE LEGAL ADVICE THAT
WE HAVE GOTTEN, I'M GOING TO SUPPORT COMMISSIONER ALLEN'S
MOTION TO APPROVE THE PERMITS.

>> C. Tiedemann: SARA?

>> S. Shumer: MY READING OF THE TRANSCRIPT OF THE COUNCIL
DISCUSSION IS THAT MUCH OF THE NEW EVIDENCE THAT THEY WERE
CONCERNED ABOUT WAS THE EVIDENCE THAT DROPPED CALLS ARE MUCH
MORE FREQUENT IN NORTH BERKELEY AND IN THE HILLS AND THAT
THERE SEEMS TO BE EVIDENCE THAT BERKELEY WAS CONSIDERED TO
HAVE EXCELLENT COVERAGE.

I THINK THAT WAS PART OF THE NEW EVIDENCE THAT THEY WANTED
US TO CONSIDER.

>> C. Tiedemann: I WASN'T GOING TO MAKE A COMMENT ON MY
VOTE, I WAS GOING TO CALL THE QUESTION.

BUT I THINK WE NEED TO BE HONEST ABOUT WHAT THE COUNCIL DID.

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

AND THEY ASKED FOR NEW EVIDENCE. BUT, AND I HOPE SOME OF

THEM ARE UP THIS LATE WATCHING, THEY'RE TRYING TO DODGE A

POLITICAL HOT POTATO.

AND WE DID NOT -- WE DON'T HAVE HARRY S. TRUMAN NAME PLATES

THAT SAY "THE BUCK STOPS HERE" OF THE BUCK SHOULD STOP WITH

THEM.

THEY'VE SENT IT BACK TWICE.

I HOPE THEY DON'T SEND IT BACK AGAIN.

I AGREE WITH MICHAEL'S REASONING, THIS IS GOING UP TO THEM.

I THINK WE HAVE TO TAKE IT SERIOUSLY.

I'VE THOUGHT ABOUT IT SERIOUSLISM THE AUDIENCE KNOWS FROM MY

PREVIOUS VOTE I DON'T USE A CELL PHONE.

HAS NOTHING TO DO WITH HEALTH EFFECTS OF CELL PHONES, IT HAS

TO DO WITH WHAT I THINK IS A REAL DETERIORATION IN PUBLIC

LIFE AND HUMAN CONTACTS BY ALL HAVE THESE HAND HELD DEVICES.

PEOPLE IN AN AIRPORT, YOU DON'T HAVE CONVERSATIONS WITH

PEOPLE ANY MORE, BECAUSE THEY'RE HOLDING UP THEIR CELL

PHONES SAYING "WHAT ARE YOU DOING?"

"I'M IN THE AIRPORT."

ON THEIR CELL PHONES MUCH IT'S RIDICULOUS THE LEVEL OF

RUDENESS THAT RESULTS ON DEPENDENCE ON THESE DEVICES.

AS I READ THE FEDERAL LAW, IT SAYS WE CAN'T DO SOMETHING

THAT PROHIBITS THE PROVISION OF SERVICE, AND I DON'T THINK

WE'RE DOING THAT, BASED ON THE EVIDENCE WE HAVE IN FRONT OF

US.

BUT I DEPART FROM THE CITY ATTORNEY'S ANALYSIS THAT SAID,

This is not a legal record of the ZAB meeting -- it has not been proofed for accuracy.

ESSENTIALLY, WE HAVE TO VOTE TO APPROVE THESE.

I THINK THAT WHY DO WE HAVE THIS HEARING IF WE HAVE TO VOTE

TO APPROVE IT?

WE HAVE SOME GENERAL DISCRETION SO LONG AS WE'RE NOT

VIOLATING FEDERAL LAW IN OUR OWN ORDINANCES.

ONE OF THE CRITERIA WE HAVE APPLIED IS GENERAL DETRIMENT.

AND IN MY PERSONAL VIEW, DOING THINGS TO INCREASE PEOPLE IN

THIS COMMUNITY, CARRYING IPHONES SOON AND BEING ON THE

INTERNET AND NEVER TALKING TO PEOPLE AROUND THEM IS A

GENERAL DETRIMENT.

I WOULD ENCOURAGE THE COUNCIL TO ACTUALLY MAKE A DECISION ON

THIS.

AND NOT SEND IT BACK TO US.

BUT I THOUGHT THAT MICHAEL HAD SORT OF A NICE ANALYSIS.

ONE PARTY OR THE OTHER IS GOING TO APPEAL THIS.

SO THE PHONE COMPANIES ARE IN A BETTER POSITION TO APPEAL

THAN NEIGHBORS.

I SUPPORT THE SUBSTITUTE MOTION.

I THINK WE'VE HEARD FROM EVERYONE.

WHY DON'T WE TAKE A ROLL CALL VOTE.

>> D. Sanderson: THIS ON THE SUBSTITUTE MOTION TO DENY BASED

ON FINDINGS.

>> S. Shumer: I HAVE SOME POSSIBLE FINDINGS.

>> D. Sanderson: OKAY.

DO WE WANT TO HEAR THEM?

>> R. Judd: NO.


>> D. Sanderson: SOMEONE NEEDS TO READ THEM INTO THE RECORD

This is not a legal record of the ZAB meeting – it has not been proofed for accuracy.

OR SOMETHING TO HAVE THEM BE PART OF THIS.

>> C. Tiedemann: SARA?

>> S. Shumer: THESE ARE CLEARLY OPEN TO CHOOSING AMONG THEM.

EDITING, ET CETERA.

WE FIND THAT WE ARE UNABLE TO MAKE THE NECESSARY FINDING

BASED ON SUBSTANTIAL EVIDENCE THAT THESE TOWERS ARE

NECESSARY TO PROVIDE PERSONAL WIRELESS SERVICE IN THE

COVERAGE AREA.

PARENTHESES 2.3.C, 17, ET CETERA."

SERVICE BEING PROVIDED AND NO EVIDENCE HAS BEEN PRESENTED

THAT EXISTING SERVICE IS NOT AN INADEQUATE LEVEL WE FIND

THAT THE ASSERTED GAP OF DROPPED CALLS 1% TO 3% DO NOT

CONSTITUTE SIGNIFICANT GAPS BUT ARE RATHER DEMINI MUSS, A

QUOTE FROM SOME CASE.

WE FIND THE LOCATION IS EFFECTIVELY IN A RESIDENTIAL AREA

AND THE OBJECTIVE OF THE ORDINANCE IS TO PREVENT PUTTING

THEM IN RESIDENTIAL AREAS AS NECESSARY TO PROVIDE SERVICE.

WE FIND NO SUCH NECESSITY.

WE FIND THAT WE ARE IN COMPLIANCE WITH FEDERAL LAW IN

DENYING THE USE PERMIT FOR CELL TOWERS AT THIS LOCATION,

THIS DOES NOT PROHIBIT THE PERSONAL WIRELESS SERVICES TO

THIS AREA.

SERVICES EXIST WITH NO SIGNIFICANT GAP, SIGNIFICANT BEING

IMPORTANT.

THE ASSERTED GAPS ARE DEMINIMUS.


>> C. Tiedemann: WHETHER OR NOT PEOPLE WHO VOTED THE MOTIONS

Captioner's Report, ZAB, 06-28-07                                    Page 175 of 176

This is not a legal record of the ZAB meeting — it has not been proofed for accuracy.

OR STAFF AGREES WITH THIS, THE CITY COUNCIL CAN TAKE THIS

UP.

>> D. Sanderson: I APPRECIATE HAVING THE FINDINGS.

THANK YOU VERY MUCH.

>> C. Tiedemann: LET'S HAVE A ROLL CALL VOTE.

>> D. Sanderson: ON THE SUBSTITUTE MOTION TO DENY BOTH

PROJECTS.

CORRECT?

BOARD MEMBER ANTHONY.

>> YES.

>> DORAN.

>> NO.

>> ALLEN.

>> NO.

>> JUDD.

>> NO.

>> MARTINUCCI.

>> NO.

>> SHUMER.

>> YES.

>> ALVAREZ-COHEN.

>> YES.

>> ARREGUIN.

>> YES.

>> TIEDEMANN.

>> C. Tiedemann: YES.

>> D. Sanderson: MOTION PASSES.